# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>OUR ALCHEMY, LLC, *et al.*,<br><br>           Debtors. | Bankr. Case No. 16-11596 (JTD)<br><br>Bankr. Adv. Pro. No. 21-51420 (JTD) |
| GEORGE L. MILLER, in his capacity as Chapter 7 Trustee for the jointly administered bankruptcy estates of Our Alchemy, LLC and Anderson Digital, LLC,<br><br>           Appellant,<br><br>v.<br><br>ANDERSON MEDIA CORPORATION, ANCONNECT, LLC, and ANDERSON MANAGEMENT SERVICES, INC.<br><br>           Appellees. | Bankruptcy Appeal<br><br>DE BAP No. 24-00007<br><br>Civil Action No. 24-cv-00243-CFC |

## APPENDIX TO APPELLEES' ANSWERING BRIEF

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Evelyn J. Meltzer (DE No. 4581)
Hercules Plaza, Suite 5100
1313 N. Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302)-777-6532
Facsimile: (302)-421-8390
evelyn.meltzer@troutman.com
*Counsel for Appellees*

**HUNGELING RUBENFIELD LAW**

David J. Hungeling (*pro hac vice*)
Georgia State Bar No. 378417
Peachtree 25th, Suite 599
1718 Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 574-2466
Facsimile: (404) 574-2467
david@hungelinglaw.com
*Counsel for Appellees*

# TABLE OF CONTENTS

| Document Description | 21-51420 (JTD) D.I. | Appendix Page No. |
|---|---|---|
| *Memorandum Opinion and Order* of the Bankruptcy Court Partly Granting Motion to Dismiss the Trustee's Complaint | 20 | AS1 |
| Exhibit 15 to April 20, 2023 Deposition of George L. Miller – SunTrust Downgrade Recommendation | 45-3 | AS24 |
| Exhibit 16 to April 20, 2023 Deposition of George L. Miller – April 22, 2016 Email from Mark A. Perez with Attached Financial Information | 45-3 | AS55 |
| Exhibit 17 to April 20, 2023 Deposition of George L. Miller – CIM | 45-3 | AS59 |

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| OUR ALCHEMY, LLC, *et al.*, | ) | Case No. 16-11596 (JTD) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| GEORGE L. MILLER in his capacity as | ) | |
| Chapter 7 Trustee for the jointly administered | ) | |
| bankruptcy estates of Alchemy, LLC and | ) | |
| Anderson Digital, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 21-51420 (JTD) |
| | ) | |
| ANDERSON MEDIA CORPORATION; | ) | |
| ANCONNECT, LLC; ANDERSON | ) | |
| MANAGEMENT SERVICES, INC.; CHARLES | ) | |
| C. ANDERSON, JR.; JAY R. MAIER; BILL | ) | |
| LARDIE; AND CHUCK TAYLOR | ) | |
| | ) | |
| Defendants. | ) | **Re:  D.I. 9** |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff George L. Miller, the Chapter 7 Trustee for the jointly administered bankruptcy estates of the Debtors (the "**Trustee**"), commenced this adversary proceeding against Defendants[1] seeking to avoid and recover certain alleged fraudulent transfers made by ANConnect (the "**2021 Action**").[2]  Defendants move to dismiss arguing that: (i) the 2021 Action is barred by the applicable limitations period; (ii) the Trustee lacks standing to bring the claims;

---

[1] Defendants in the present action are Anderson Media Corporation ("**Anderson Media**"), ANConnect, LLC ("**ANConnect**"), Anderson Management Services, Inc. ("**AMS**") (Anderson Media, ANConnect, AMS, together the "**Business Defendants**"), Charles C. Anderson, Jr., Jay R. Maier, Bill Lardie, and Chuck Taylor (Charles C. Anderson, Jr., Jay R. Maier, Bill Lardie, and Chuck Taylor, together the "**Management Defendants**").

[2] Complaint, Adv. D.I. 1. A previous action was initiated by the Trustee against the same Defendants in 2018. Adv. Proc. No. 18-50633.

and (iii) the Complaint fails to state a claim upon which relief may be granted.[3]  Having

considered the parties' arguments and submissions the Motion is granted in part and denied in

part as set forth below.

**JURISDICTION AND VENUE**

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28

U.S.C. § 1334(b).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is

proper pursuant to 28 U.S.C. § 1409(a).

**BACKGROUND**

In July of 2015, Our Alchemy purchased certain assets from ANConnect (the

"**ANConnect Transaction**").[4]  On February 17, 2016, ANConnect and Anderson Merchandisers

filed a complaint against Our Alchemy in Delaware state court (the "**Delaware Action**"),

alleging that Our Alchemy owed ANConnect post-closing adjustments and certain other

payments and compensation in connection with the ANConnect Transaction.  In response,

Debtors alleged that Our Alchemy is a creditor of ANConnect for purposes of the Delaware

Uniform Fraudulent Transfer Act ("**DUFTA**") and asserted counterclaims against ANConnect

for breach of the ANConnect Transaction's asset purchase agreement and for wrongful

withholding of receivables owed to Debtors.[5]

Debtors filed their respective petitions under Chapter 7 of the Code on July 1, 2016.  On

June 29, 2018, the Trustee commenced an adversary proceeding against the Defendants and

---

[3] Defendants' Motion to Dismiss the Trustee's Complaint, Adv. D.I. 9 (the "**Motion**"); Memorandum of Law in Support of the Defendants' Motion to Dismiss the Trustee's Complaint ("**Defendants' Memorandum in Support**"), Adv. D.I. 10

[4] At the time of the transaction, Our Alchemy was known as Millennium Entertainment, LLC. Complaint, Adv. D.I. 1 at 7-9.

[5] *Id*. at 8. Because of Our Alchemy's bankruptcy filing, the Delaware Action has been stayed pursuant to 11 U.S.C. § 362.

**AS2**

several others, seeking to avoid the ANConnect Transaction as fraudulent (the "**2018 Action**"). The 2018 Action remains pending following denial of a motion for partial summary judgment. [6]

On December 29, 2021, the Trustee commenced the 2021 Action alleging that in June of 2016, while the Delaware Action was pending and while ANConnect was winding down operations, ANConnect intentionally made several transfers to insiders in order to defraud known creditors while it was insolvent or in the zone of insolvency. Specifically, the Complaint alleges that ANConnect fraudulently transferred approximately $23.8 million to affiliated entities in June and August of 2016 "with the actual intent to hinder, delay, and/or defraud its then-current and future creditors, including Our Alchemy (the "**Transfers**"). [7] The 2021 Action asserts claims for: (i) fraudulent transfers pursuant to Section 1304(a) of DUFTA and Sections 544 and 550 of the Code against the Business Defendants; (ii) breach of fiduciary duty against the Management Defendants who authorized the Transfers; and (iii) aiding and abetting breach of fiduciary duty against those same Management Defendants.

## ANALYSIS

### I.    LEGAL STANDARD

Defendants move to dismiss all three Counts of the 2021 Action on several grounds. First, Defendants move to dismiss Count I as barred by the applicable limitations period. Further, they seek dismissal of Count I for failing to state a claim upon which relief may be granted and failing to meet the applicable pleading standards for bringing fraud claims.

---

[6] The 2018 Action was filed against several subsidiaries of Anderson Media. In connection with the 2018 Action, the Trustee argues that the ANConnect Transaction is avoidable as a constructive and actual fraudulent transfer under DUFTA Sections 1304(a) and Section 1305(a) as well as under Sections 544, 548, and 550 of the Bankruptcy Code. Prior to the motion for partial summary judgment, a motion to dismiss the 2018 Action was denied in part and granted in part in *Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, Ch. 11 Case No. 16-11596 (KG), Adv. No. 18-50633 (KG), 2019 Bankr. LEXIS 2905 (Bankr. D. Del. Sep. 16, 2019).

[7] Complaint, Adv. D.I. at 11-14.

Defendants also seek dismissal of Counts II and III on statute of limitations grounds, and because the Trustee lacks standing to bring breach of fiduciary duty claims.

Defenses based on limitation periods are generally fact specific and are raised as affirmative defenses when answering a complaint. The Third Circuit, however, recognizes that a limitations defense may be raised by a motion under Rule 12(b)(6)[8] if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) (quoting *Hanna v. United States Veterans' Administration Hospital*, 514 F.2d 1092, 1094 (3d Cir. 1975)). If the validity of the "bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6). *Id.*

In addition, a Rule 12(b)(6) motion can challenge the sufficiency of the factual allegations in the complaint. *Kost v. Kovacevic*, 1 F.3d 176, 183 (3d Cir. 1993). To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The court must draw all reasonable inferences in favor of the plaintiff. *See, e.g., Alpizar-Fallas v. Favero,* 908 F.3d 910, 914 (3d Cir. 2018). On a motion to dismiss, "[t]he defendant bears the burden to show that the plaintiff's claims are not plausible." *In re LSC Wind Down, LLC*, 610 B.R. 779, 783 (Bankr. D. Del. 2020).

---

[8] Fed. R. Civ. P. 12 is made applicable to bankruptcy proceedings pursuant to Fed. R. Bankr. R. 7012.

AS4

Weighing a motion to dismiss, requires a three-part analysis. "First, the court must take note of the elements needed for a plaintiff to state a claim." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citing *Iqbal*, 556 U.S. at 675). Second, the court must separate the factual and legal elements of the claim, accepting all of the complaint's well-pled facts as true and disregarding any legal conclusions. *Id.*; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citing *Iqbal*, 556 U.S. at 679). Third, the court must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief. *Santiago*, 629 F.3d at 130.

Federal Rule of Civil Procedure 9 requires that when alleging fraud or mistake, "a party must state with particularity the circumstances constituting fraud or mistake" [9] *DiMartino v. BMW of N. Am., LLC*, No. 15-8447 (WJM), 2016 U.S. Dist. LEXIS 106138, at *20-23 (D.N.J. Aug. 11, 2016) (granting defendant's motion to dismiss where plaintiff failed to satisfy Rule 9(b)'s heightened pleading requirement).

Rule 12(b)(1) allows for dismissal of a complaint when the court lacks subject matter jurisdiction. Because standing is a jurisdictional matter, a motion to dismiss brought under Rule 12(b)(1) for lack of standing is proper. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (citing *Ballentine v. U.S.*, 486 F.3d 806, 810, 48 V.I. 1059 (3d Cir. 2007)). Generally, a decision on Rule 12(b)(1) grounds does not go to the merits. *In re Cubic Energy, Inc.*, 603 B.R. at 749. In deciding a Rule 12(b)(1) motion, courts "must first determine whether the motion is a facial or factual attack." *In re Schering-Plough Corp.*, 678 F.3d at 243 (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). While a party raising a facial attack disputes the sufficiency of the pleadings, a party

---

[9] Fed. R. Civ. P. 9 is made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7009.

raising a factual attack argues that "although the pleadings facially justify jurisdictional prerequisites, one or more of the allegations is untrue, rendering the controversy outside the court's jurisdiction. *In re AE Liquidation, Inc.*, 435 B.R. 894, 900 (Bankr. D. Del. 2010).

When reviewing a factual attack, courts may consider evidence outside the pleadings to evaluate the merit of the disputed allegations. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000); *In re AE Liquidation, Inc.*, 435 B.R. at 900. However, when reviewing a facial attack, courts "must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the Plaintiff." *Gould Electronics, Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). Since the parties have not cited to any information outside of the Complaint, Defendants' motion is a facial attack. *See Team Angry Filmworks, Inc. v. Geer*, 171 F. Supp. 3d 437, 440-41 (W.D. Pa. 2016) ("If the defendant challenges jurisdiction in its Rule 12(b)(1) motion before answering the complaint or otherwise presenting competing facts, the Rule 12(b)(1) motion is, by definition, a facial attack." (internal quotation marks and citation omitted)); *Askew v. Church of the Lord Jesus Christ*, 684 F.3d 413, 417 (3d Cir. 2012) ("As the defendants had not answered [the complaint] and the parties had not engaged in discovery, the [Rule 12(b)(1)] motion to dismiss was facial.")); *Const. Party v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (determining that where the Commonwealth filed its motion before filing any answer to the complaint the attack was facial as a factual attack requires a factual dispute established by competing facts).

## II. DISCUSSION

### A. Count I: Avoidance and Recovery of Transfers

Defendants argue that because the Transfers occurred more than five years before the Trustee initiated this Action, the Trustee's fraudulent transfer claims are time-barred.

Defendants identify the Texas Uniform Fraudulent Transfer Act ("**TUFTA**") as the relevant governing statute arguing that this case has the most significant relationship with Texas. The Trustee contends that DUFTA is the relevant statute but asserts that the same result would occur under either DUFTA or TUFTA as both Texas and Delaware adopted the Uniform Fraudulent Transfer Act. At this stage of the proceeding, I do not need to decide which statute applies because the result under either is the same. See, e.g., *In re Mervyn's Hldgs., LLC*, 426 B.R. 488, 496 n.6 (Bankr. D. Del. 2010) (declining to conduct a choice of law analysis and instead proceeding with an analysis under UFTA as each state similarly adopted the UFTA and the same result would occur). *In re Physiotherapy Hldgs., Inc.*, Ch. 11 Case No. 13-12965, Adv. No. 15-51238, 2017 Bankr. LEXIS 3830, at *9 (Bankr. D. Del. Nov. 6, 2017) ("[m]any Courts have held that a motion to dismiss is not the appropriate time to raise the choice of law question because the decision may require a full factual record."). Since the result under either law would be the same, I will proceed with the analysis limited to the four-year statute of repose and the one-year discovery rule contained in both DUFTA and TUFTA. [10]

Under both DUFTA and TUFTA there is a four-year statute of repose for fraudulent transfer claims based on either constructive or actual fraud. 6 Del. Code § 1309(1)-(2); *accord* Tex. Bus. & Com. Code § 24.010(a)(1)-(2). The Trustee merely alleges the applicability of Section 1304(a) without distinguishing between Sections 1304(a)(1) and 1304(a)(2). Section 1304(a)(1) applies to fraudulent transfer claims based on actual fraud while Section 1304(a)(2)

---

[10] The Trustee attempts to rely on Section 544 to pursue certain fraudulent transfer claims. However, the Trustee did not address this argument in Plaintiff's Memorandum in Opposition. Instead, he calls his inclusion of Section 544 "mistaken" in a footnote without affirmatively addressing or withdrawing that claim. Plaintiff's Memorandum in Opposition, Adv. D.I. 13 at 15 n.4. Because the Trustee has abandoned that claim by failing to respond to Defendants' arguments and concedes that it is untimely, the Trustee's Section 544 claim is dismissed with prejudice. *See United States ex rel. Kelly v. Select Specialty Hosp.-Wilmington, Inc.*, No. 1:16-CV-347, 2018 U.S. Dist. LEXIS 53815, at *18 (D. Del. Mar. 30, 2018).

applies to fraudulent transfer claims based on constructive fraud.[11] Section 1309(2) governs constructive fraudulent transfer claims and sets a strict four-year period for filing a cause of action. 6 Del. Code § 1309(2). Because Section 1309(2) does not provide for the use of the discovery rule, any fraudulent transfer claims based on constructive fraud brought by the Trustee under Section 1304(a)(2) are time-barred.[12]

Where a party's fraudulent transfer claim is based on actual fraud, both statutes provide for a one-year discovery rule. 6 Del. Code § 1309(1); *accord* Tex. Bus. & Com. Code § 24.010(a)(1). The discovery rule extends the time in which a claimant may file a claim by one year after the plaintiff knew or could have reasonably discovered the transfer and its fraudulent nature. *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 195 (5th Cir. 2013) ("we *Erie* guess that the Texas Supreme Court would conclude that section 24.010(a)(1) of TUFTA requires that a fraudulent-transfer claim must be filed within one year after the fraudulent nature of the transfer is discovered or reasonably could have been discovered."); *Forman v. Kelly Capital, LLC (In re Nat'l Serv. Indus.)*, Ch. 7 Case No. 12-12057, Adv. No. 14-50377, 2015 Bankr. LEXIS 2029, at *21 (Bankr. D. Del. June 18, 2015) ("If the fraud is hidden, however, the statute of limitations is extended to one year after the fraud was or could reasonably

---

[11] Section 24.005(a)(1) of TUFTA applies to actual fraudulent transfer claims and Section 24.005(a)(2) applies to constructive fraudulent transfer claims. Like Section 1309(2) of DUFTA, TUFTA's Section 24.010(a)(2) sets a strict limitations period of four year for constructive fraudulent claims brought pursuant to Section 24.005(a)(2). Section 24.010(a)(1) makes the discovery rule available for actual fraudulent transfer claims brought under Section 24.005(a)(1).

[12] The alleged Transfers took place in 2016, well outside of the four-year window provided for in Section 1309(2). Complaint, Adv. D.I. 1 at 11-12. Even if this were not the case, the Trustee failed to address any exceptions for constructive fraud despite his blanket reliance on Section 1304 in the Complaint. By not addressing constructive fraudulent transfer claims in Plaintiff's Memorandum in Opposition, the Trustee abandoned any alleged constructive fraudulent transfer claims and concedes that they are time-barred. Therefore, any fraudulent transfer claims based on constructive fraud are dismissed with prejudice.

have been discovered by the creditor."). A successful fraudulent transfer claim based on actual

fraud, however, must satisfy the requirements of Rule 9(b).

Rule 9(b) requires that a party pursuing a claim for actual fraudulent transfer plead fraud

with particularity. Fed. R. Civ. Proc. 9(b). Defendants argue that the Trustee's complaint fails to

meet that pleading requirement because the Complaint contains only conclusory statements

without specific facts to support a claim for actual fraud. The Trustee disagrees, arguing that the

Complaint alleges at least eight badges of fraud sufficient enough to establish an actual intent to

defraud. I agree.

Determining whether a transfer was made with fraudulent intent is a fact intensive

inquiry "rarely susceptible to resolution at the [pleading] stage." *In re Polichuk*, 506 B.R. 405,

418 (Bankr. E.D. Pa. 2014). Courts in both Texas and Delaware rely on badges of fraud as

circumstantial proof of actual fraudulent intent. *Jones v. Dyna Drill Techs*., LLC, No. 01-16-

01008-CV, 2018 Tex. App. LEXIS 6689, at *14 (Tex. App. Aug. 23, 2018) (quoting *ASARCO

LLC v. Americas Mining Corp.*, 396 B.R. 278, 370 (S.D. Tex. 2008)); *In re Fedders N. Am., Inc.*,

405 B.R. 527, 545 (Bankr. D. Del. 2009). The badges of fraud include a consideration of

whether:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control
> of the property transferred after the transfer; (3) the transfer or obligation was concealed;
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or
> threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the
> debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the
> consideration received by the debtor was reasonably equivalent to the value of the asset
> transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became
> insolvent shortly after the transfer was made or the obligation was incurred; (10) the
> transfer occurred shortly before or shortly after a substantial debt was incurred; and (11)
> the debtor transferred the essential assets of the business to a lienor who transferred the
> assets to an insider of the debtor.

Tex. Bus. & Com. Code § 24.005(b)(1)-(11); *accord* 6 Del. Code § 1304(b)(1)-(11) ("(3) the transfer or obligation was disclosed or concealed"). "A court need not find that all—or even a majority—of the badges of fraud are present to find that a debtor acted with actual intent to hinder, delay, or defraud." *Osherow v. Charles (In re Wolf)*, Ch. 7 Case No. 15-31477-HCM, Adv. Nos. 16-03002-HCM, 16-03005-HCM, 2016 Bankr. LEXIS 3397, at *74 (Bankr. W.D. Tex. Sep. 15, 2016) (citing *In re Think3, Inc.*, 529 B.R. 147, 198 (Bankr. W.D. Tex. 2015)).

The 2021 Action alleges facts indicative of certain badges of fraud including that the Transfers were concealed [13] and made to insiders of ANConnect for no consideration; [14] were made after Our Alchemy filed substantial counterclaims against ANConnect; [15] consisted of substantially all of ANConnect's assets, rendering ANConnect insolvent; [16] and constituted the removal of ANConnect's assets to avoid the claims of creditors. [17] Thus, the 2021 Action pleads with particularity enough facts to satisfy Rule 9(b)'s requirements.

Defendants contend that even if Count 1 meets the appropriate pleading standard, it is still time-barred because the facts giving rise to the claim were known or reasonably knowable more than a year before the 2021 Action was commenced. Defendants specifically argue that the Trustee was aware that ANConnect began winding down its business in 2010, selling several material business lines. [18] According to Defendants, these facts would have prompted a reasonably diligent creditor to investigate whether its right to payment was threatened. [19] The Trustee counters this suggestion by arguing that due to the privately held nature of the Defendants the Transfers were

---

[13] *Id*. at 13.
[14] Complaint, Adv. D.I. 1, at 3, 5, 12.
[15] *Id*. at 10-11.
[16] *Id*. at 12-13.
[17] *Id*.
[18] Complaint, Adv. D.I. at 5-7, 9.
[19] Defendants' Memorandum in Support, Adv. D.I. 10 at 14-15 (quoting facts within the Complaint for support).

concealed and only discoverable by him in March of 2021 when he received discovery in the 2018 Action.[20]

Whether facts giving rise to the Trustee's claims were known or reasonably knowable more than a year before the 2021 Action was commenced is a question of fact not appropriate for determination at this stage. *Janvey v. Willis of Colo., Inc.*, Civil Action No. 3:13-CV-3980-N, 2014 U.S. Dist. LEXIS 183344, at *20 (N.D. Tex. Dec. 5, 2014) ("[a]pplication of the TUFTA 'discovery rule' is a factual question generally inappropriate for resolution on a motion to dismiss"); *In re IT Grp. Inc.*, Adv. No. 04–1268, 2005 WL 3050611, at *16 (D. Del. Nov. 15, 2005) (declining to dismiss a fraudulent transfer claim on statute of limitations grounds because a factual issue regarding when the fraud was or could have reasonably been discovered existed). Therefore, the Defendants' motion to dismiss Count I, to the extent it alleges claims for actual fraudulent transfers, is denied.

### B. Counts II and III: Breach of Fiduciary Duties and Aiding and Abetting Breach of Fiduciary Duties

The Trustee's second and third causes of action are against the Management Defendants for breach of fiduciary duty and aiding and abetting breach of fiduciary duty.[21] The Trustee alleges that the Management Defendants breached their fiduciary duty to creditors when they distributed the assets of ANConnect to its members leaving nothing for creditors. The Trustee asserts that because ANConnect is insolvent and ceased business operations, under Texas law its assets became assets of a trust for the benefit of its creditors. Defendants move to dismiss on two grounds: 1) the claims are barred by the applicable statute of limitations; and 2) the Trustee lacks

---

[20] Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Failure to State a Claim, Adv. D.I. 13 ("**Plaintiff's Memorandum in Opposition**") at 24.

[21] If the Trustee's claims for breach of fiduciary duty against the Management Defendants fail, his claims for adding and abetting those breaches fail as well.

standing to bring claims for breach of fiduciary duty. Because I find that the Trustee lacks standing, I do not need to address the statute of limitations argument in connection with Counts II and III.

### i.        Standing

Defendants make two arguments why the Trustee lacks standing to bring claims for breach of fiduciary duty.  First, they argue that the "trust fund" doctrine upon which the Trustee relies is no longer applicable under Texas law because it has been abrogated by statute.  Second, they assert that because ANConnect is a Texas limited liability company (LLC) the Trustee lacks standing because he is not, and never was, a member of ANConnect which is a requirement for standing to assert derivative claims on behalf of a Texas LLC.  For the reason discussed below, Defendants are incorrect on both grounds.

### ii.        The Trust Fund Doctrine

The Trustee relies on the equitable corporate trust fund doctrine to argue that standing exists for creditors of a Texas corporation (and by extension an LLC) to sue officers and directors for breach of fiduciary duty when an entity is insolvent and ceases business operations.[22]  To be sure, the status of the Texas corporate trust fund doctrine is a bit muddled. As the Fifth Circuit recognized in *In re Mortgage America Corp.*, "the 'corporate trust fund doctrine' is [a] theory that has been most thoroughly studied by courts and commentators, [but] is nonetheless often poorly understood." 714 F.2d 1266, 1268-69 (5th Cir. 1983). The doctrine is an equitable remedy that "was established principally to permit a court of equity to marshal and distribute a corporation's assets upon its insolvency and dissolution in much the same way as would a modern bankruptcy court." *Id*. at 1269.

---

[22] Plaintiff's Memorandum in Opposition, Adv. D.I. 13 at 27-29.

12

AS12

Relying upon the Texas Supreme Court's decision in *Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547 (Tex. 1981), Defendants argue that the corporate trust fund doctrine has been supplanted by Texas statutory law and the Trustee is therefore barred from proceeding under the trust fund doctrine. In *Hunter*, the court was faced with the question of whether a tort action that arose eleven years after the corporation's statutory dissolution could be brought under the trust fund doctrine despite the three-year statute of limitations in Article 7.12 of the Texas Business Corporation Act. Tex. Bus. Corp. Act. Art. 7.12 (expired Jan. 1, 2010). [23] The *Hunter* court recognized that beginning in 1879, the Texas legislature began enacting remedial statutes that embodied the trust fund doctrine, including Article 7.12. The court went on to explain that:

> Under these remedial statutes, the legislature had given creditors of a dissolved corporation 'the same broad measure of relief which equity would have afforded in the absence of legislation.' . . . The effect of these statutes was to supplant the equitable trust fund theory by declaring a statutory equivalent. In Texas, recognition of the trust fund theory, as applied to dissolved corporations, did not exist apart from these statutes.

*Hunter*, 620 S.W.2d at 550.

Despite this ruling by the Texas Supreme Court, numerous Texas state and federal courts continue to recognize the existence of the trust fund doctrine under Texas law without reference to the *Hunter* decision. *See, e.g.*, *White v. Zhou Pei*, 452 S.W.3d 527, 541 n.16 (Tex. App. 2014)

---

[23] In 2010, Article 7.12 was replaced by Tex. Bus. Orgs. Code § 21.552(a) which provides that:

> Subject to Subsection (b), a shareholder may not institute or maintain a derivative proceeding unless:
>     (1) the shareholder:
>         (A) was a shareholder of the corporation at the time of the act or omission complained of; or
>         (B) became a shareholder by operation of law originating from a person that was a shareholder at the time of the act or omission complained of; and
>     (2) the shareholder fairly and adequately represents the interests of the corporation in enforcing the right of the corporation.

Tex. Bus. Orgs. Code § 21.552(a)

("when a corporation becomes insolvent and ceases doing business, its assets become a trust

fund for the benefit, primarily, of its creditors, and the officers and directors owe a fiduciary duty

to the creditors, breach of which gives rise to a cause of action for the creditors against the

officers and directors."); *Ramirez Cap. Servs., LLC v. McMahan*, No. 4:21-CV-00241-ALM,

2021 U.S. Dist. LEXIS 238776, at *14 (E.D. Tex. Dec. 14, 2021) (recognizing that the trust fund

doctrine recognizes a creditor's right to sue derivatively and exists only in the context of an

insolvent corporation that is no longer operating); *Floyd v. Hefner*, No. H-03-5693, 2006 U.S.

Dist. LEXIS 70922, at *48-49 (S.D. Tex. Sep. 29, 2006) ("only the trust fund doctrine, as

explained by Texas state courts, rather than some other 'insolvency exception,' provides a basis

for creditors of a corporation to sue the directors of that corporation.").

Surprisingly, even one of the main cases cited by Defendants for the proposition that the

trust fund doctrine is no longer relevant in Texas actually recognizes it applicability.  In *Aurelius*

*Capital Master, Ltd. v. Acosta*, No. 3:13-CV-1173-P, 2014 U.S. Dist. LEXIS 151201 (N.D. Tex.

Jan. 28, 2014), the court was faced with the question of when creditors may derivatively sue a

corporation's directors for breach of fiduciary duty.  The court recognized that "Texas law

indicates that creditors have never been given the right to sue for breach of fiduciary duty outside

the limited exception of the trust fund doctrine." *Id*. at *8.  The court went on to recognize that

mere insolvency was not sufficient to invoke the doctrine.  Instead, a creditor "can only bring

such suits when the corporation is insolvent and no longer operating." *Id*. at *6.  Since the

corporation at issue in *Aurelius* was still operating, the court concluded, creditors did not have

standing to bring a derivative suit for breach of fiduciary duty.

How then does one reconcile the Texas Supreme Court's decision in *Hunter*, with the

numerous cases that still recognize the applicability of the trust fund doctrine?  While none of the

cases cited by the parties address the dichotomy, the answer appears fairly straight forward. As the *Hunter* court stated, the statutory enactments supplanted the trust fund doctrine "as applied to <u>dissolved</u> corporations." The dissolution of a Texas corporation is governed by chapter 11 of the Business Organization Code (BOC). This chapter of the BOC provides certain benefits to a company seeking to dissolve, as well as certain obligations in order to receive those benefits. For example, a company is not terminated until it files a certificate of termination. Tex. Bus. Orgs. Code § 11.102. A Certificate of Termination must include, among other things, a certification that all taxes have been paid, provide the names and addresses of all governing persons, attest to compliance with all winding up requirements, and include a file number provided by the Texas Secretary of State. Tex. Bus. Orgs. Code § 11.101. Significantly, the company must also provide a deposit for all liabilities to both known and unknown creditors. Tex. Bus. Orgs. Code § 11.352.[24] In return, the dissolved entity receives, among other things, the benefit of a three-year statute of limitations for all claims that existed at the time of dissolution. Tex. Bus. Orgs. Code § 11.359.[25]

The logical conclusion, of course, is that the trust fund doctrine still exists in Texas unless a company has undertaken the process of dissolution under the BOC. To hold otherwise would be fundamentally unfair to the creditors of a company that ceases business operations, distributes its assets to its shareholders or members but never seeks the protection of dissolution. Outside of the receivership route, nothing in the BOC gives creditors the right to seek dissolution of a company and there do not appear to be any cases where a court allowed a creditor to do so.

---

[24] The BOC also provides that a court may revoke a dissolution for both actual and constructive fraud, and the applicable statute of limitations is tolled in accordance with the discovery rule. Tex. Bus. Orgs. Code § 11.153.

[25] Section 11.359 may actually be a statute of repose since the BOC refers to "extinguishment." *See Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P. v. Rankin*, 307 S.W.3d 283, 286-87, 287 n.15 (Tex. 2010).

15

**AS15**

Tex. Bus. Orgs. Code § 11.405.[26]  Creditors that are defrauded (whether actual or constructive)

by the officers and directors of an insolvent, non-operating company that did not seek dissolution

would be left with no recourse.

The Trustee's complaint does not allege that ANConnect filed for dissolution in

accordance with the BOC.  More significantly, Defendants do not claim in their motion to

dismiss that they undertook the process of seeking dissolution under the BOC. The Trustee does

allege that ANConnect is insolvent and that it ceased business operations.  Defendants do not

dispute this allegation in the Motion to Dismiss.

### iii. Does the Trust Fund Doctrine Apply as Against a Texas Limited Liability Company?

Having determined that the trust fund doctrine still applies in Texas under certain

circumstances, the question remains whether it matters that ANConnect is a Texas LLC, rather

than a corporation.  Not surprisingly, the parties disagree.  Defendants contend that under Texas

law, only a member of an LLC has standing to pursue derivative claims citing to Section 101.452

the Texas BOC.  Section 101.452 provides in relevant part:

> (a) Subject to Subsection (b), a member may not institute or maintain a derivative
> proceeding unless:
>     (1) the member:
>         (A) was a member of the limited liability company at the time of the
>         act or omission complained of; or
>         (B) became a member by operation of law originating from a person
>         that was a member at the time of the act or omission complained of;
>         and
>     (2) the member fairly and adequately represents the interests of the limited
>     liability company in enforcing the right of the limited liability company.

Tex. Bus. Orgs. Code § 101.452(a).

---

[26] Section 11.405(a)(4) of the BOC provides that a court may order the liquidation of the property and
business of a domestic entity and may appoint a receiver if a creditor establishes that irreparable damage
will ensue to the unsecured creditors of the domestic entity as a class unless there is an immediate
liquidation. Tex. Bus. Orgs. Code § 11.405(a)(4).

The Trustee argues that notwithstanding Section 101.452, Texas courts have recognized the ability of creditors to sue under the trust fund doctrine where an LLC is insolvent and is no longer operating. Defendants counter that the Trustee fails to distinguish between cases applying the doctrine to Texas corporations and those involving LLCs. None of the cases cited by either party directly address the applicability of the trust fund doctrine to cases involving a Texas LLC.

Defendants, for example, refer to the decision by Judge Gross in *Smith v. Weinshanker (In re Draw Another Circle)* 602 B.R. 878, 901 (Bankr. D. Del. 2019) for the proposition that while under Texas law, the court found that creditors did have fiduciary duty claims against certain Texas corporations, the only LLC defendant in the case was dismissed for lack of standing. Defendants failed to disclose in their papers, however, that the dismissed LLC was a Delaware LLC, not a Texas LLC. As discussed below, that is a distinction with a big difference.

Defendants also rely on *Elgohary v. Steakley*, No. 4:17-cv-01534, 2017 U.S. Dist. LEXIS 190621 (S.D. Tex. Oct. 10, 2017), a case the Trustee cited for the proposition that BOC Section 101.452 only applies when a <u>member</u> seeks to bring a derivative suit and does not preempt application of the trust fund doctrine to a Texas LLC. In a gross misrepresentation of the holding in that case, Defendants stated in their papers that: "The court held that a derivative action plaintiff lacked standing to sue on behalf of the LLC because Texas law requires that a derivative action plaintiff be a member of the entity he intends to represent."[27] That is decidedly <u>not</u> what the court held. Instead, the court found that while the plaintiff was still a member of the LLC (having been removed as a manager, not as a member), due to his personal litigation against the defendants, the limited size of his contribution to the LLC, his hostility toward the defendants and his inability to garner support among other members, he did not fairly represent the interests

---

[27] Defendants' Reply in Support, Adv. D.I. 14 at 10

of the LLC in order to maintain the litigation as required by Section 101.452. *Elgohary*, 2017 U.S. Dist. LEXIS 190621, at *23-24. The court further held that because he did not have standing to represent the parent LLC, he also did not have double derivative standing to bring an action on behalf of the LLC's wholly owned subsidiaries. *Id.* at *24-25.

The only case that arguably comes close to addressing the issue is *Floyd v. Option One Mortg. Corp. (In re Supplemental Spot, LLC)*, 409 B.R. 197 (Bankr. S.D. Tex. 2009). Defendants criticize the Trustee's reliance on *Floyd* because the court relies on trust fund doctrine. As I have already stated, the trust fund doctrine can apply in certain limited circumstances. *Floyd* is problematic in a number of other ways, however. First, the *Floyd* court was making findings of fact and conclusions of law following a trial in which a chapter 11 trustee was seeking to recover fraudulent transfers from a debtor— that happened to be a Texas LLC— to a third party. While the court recognized the applicability of the trust fund doctrine to insolvent corporations,[28] the court did not mention (let alone analyze) the fact that the debtor was a Texas LLC as opposed to a corporation. The case, therefore, has little precedential value to the question at hand, i.e., can a creditor sue derivatively on behalf of a Texas LLC under the trust fund doctrine?

The bottom line is that there is no relevant authority to indicate how Texas courts might decide the issue of creditor standing to sue on behalf of a Texas LLC. I must, therefore, try to determine how the Texas Supreme Court would address the question. *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996) ("[i]n adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply existing

---

[28] The *Floyd* court concluded that a fiduciary relationship existed with the debtor's creditors since the debtor was insolvent at the time of the transfers. 409 B.R. at 204. As I have noted above, the trust fund doctrine requires a showing of insolvency and that the company has ceased operations.

state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us."). Defendants, under a public policy argument, would have me look to Delaware law on creditor standing in the context of a Delaware LLC. In *CML V, LLC v. Bax*, 28 A.3d 1037 (Del. 2011), the Delaware Supreme Court found that the plain language of the Delaware Limited Liability Act unambiguously limited derivative standing exclusively to members or assignees of members of the LLC. *Id*. at 1041. The applicable provision of the LLC Act reads as follows:

> In a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action and:
> (1) At the time of the transaction of which the plaintiff complains; or
> (2) The plaintiff's status as a member or an assignee of a limited liability company interest had devolved upon the plaintiff by operation of law or pursuant to the terms of a limited liability company agreement from a person who was a member or an assignee of a limited liability company interest at the time of the transaction.

6 Del. C. § 18-1002.

In *CML*, the court held that the Delaware General Assembly's use of the mandatory and exclusive "must," rather than the permissive "may" evidenced its intent to confer derivative standing rights to LLC members and assignees only. *CML*, 28 A.3d at 1042. The *CML* court then contrasted this with the language of the statute governing derivative actions against a Delaware corporation—which the court had previously held did not bar creditors of insolvent corporations from derivative standing. *See N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("creditors of an insolvent corporation have standing to maintain derivative claims against directors on behalf of the corporation for breaches of fiduciary duties."). The Delaware General Corporation Law, 8 Del. C. § 327 provides:

> In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such

19

**AS19**

stockholder's stock thereafter devolved upon such stockholder by operation of
law.

8 Del. C. § 327.

Section 327 does not explicitly mention a creditors' ability to maintain a derivative

action. However, the Delaware Supreme Court held that the officers and directors of insolvent

corporations owe fiduciary duties to creditors because shareholders no longer have an economic

interest in an insolvent corporation. *Schoon v. Smith*, 953 A.2d 196, 208 n.46 (Del. 2008)

(interpreting the court's decision in *N. Am. Catholic Educ. Programming Found., Inc. v.

Gheewalla*, 930 A.2d 92, 101 (Del. 2007)). Thus, Creditors are given derivative standing to

pursue breach of fiduciary duty claims against the directors of an insolvent corporation as

creditors take the place of shareholders. *Gheewalla*, 930 A.2d at 101.

Unlike the Delaware LLC statute, the Texas LLC statute contains the permissive "may"

and not the mandatory and exclusive "must" with regard to derivative standing. Indeed, the

language in the LLC statute is almost identical to the Texas corporation statute, merely

substituting "member" for "shareholder". Tex. Bus. Orgs. Code § 21.552; accord Tex. Bus. Orgs.

Code § 101.452. It is reasonable to conclude, therefore, that Texas courts would recognize the

ability of creditors to sue the officers and directors of an insolvent, non-operating LLC for

breaches of fiduciary duty under the same trust fund doctrine applied to Texas corporations.

### iv.      The Trustee Must Sue Derivatively

Even though I have concluded that creditors can rely on the trust fund doctrine to bring

derivative claims against the officers and directors of a Texas LLC,[29] there is one remaining

---

[29] The Trustee's has alleged that Our Alchemy is a creditor of ANConnect for purposes of the DUFTA.
Complaint, Adv. D.I. at 11. Defendants' dispute the Our Alchemy's creditor status but acknowledge that
such status is assumed to be true for purposes of this Motion. Defendants' Memorandum in Support, Adv.
D.I. 10 4 n.4.

hurdle that the Trustee fails to clear – the Complaint only alleges direct claims, not derivative claims against the Management Defendants. As the Fifth Circuit recognized in *MortgageAmerica Corp.*, if an action is to be brought under the trust fund doctrine "it must be brought on behalf of all those similarly situated, and [] a single creditor, acting on its own behalf, does not have standing." 714 F.2d at 1271 (citing, *Sutton v. Reagan*, 405 S.W.2d 828, 834-35 (Tex. Civ. App. – San Antonio 1966)).

A derivative suit allows the party bringing it to sue on behalf of the corporation for harm done to the corporation and any recovery for that harm goes to all stakeholders. In other words, if the Trustee was successful in his claims against the Management Defendants, any amounts recovered would go ANConnect for the benefit of all ANConnect creditors, not just to the Trustee. In a derivative suit, the corporation is a necessary party "so that it is not later subject to a second suit." *Providential Invest. Corp.*, 320 S.W.2d 415, 418 (Ct. Civ. App. Of Texas, Houston 1959). "The reason it appears formally as a defendant is because it is under the control of persons charged with the wrongs complained of in the suit and refuse to act." *Id. See also, Nguyen v. Nugyen*, 2021 WL 786628 *5 (Ct. Civ. App. Texas, Houston 2021) (quoting Providential). The Trustee's Complaint does not allege that it is acting on a derivative basis and does not name the Business Defendants as nominal defendants on whose behalf he purports to act. The failure of the Trustee to bring the claims derivatively is fatal to the Trustee's standing argument.[30] For this reason, Counts II and III of the Complaint are dismissed.

---

[30] Whether the Trustee could bring derivative claims against the Management Defendants on behalf of all creditors of ANConnect in this Court would raise a serious issue of subject matter jurisdiction that I need not address here.

21

AS21

### C.  Leave to Amend

In a footnote, the Trustee alternatively seeks leave to amend his Complaint if I determine that any of his claims are insufficiently stated.[31]  Rule 15(a)(2), made applicable by Bankruptcy Rule 7015, provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  Although courts in this circuit liberally allow such amendments, courts retain their discretion to grant or deny such motions where there is undue delay, bad faith, a dilatory motive, prejudice, or futility. *See Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, Ch. 11 Case No. 16-11596 (KG), Adv. No. 18-50633 (KG), 2019 Bankr. LEXIS 2906, at *40 (Bankr. D. Del. Sep. 16, 2019); *Miller v. Welke (In re United Tax Gp., LLC)*, Ch. 7 Case No. 14-10486 (LSS), Adv. No. 16-50088 (LSS), 2018 Bankr. LEXIS 1290, at *4 (Bankr. D. Del. Apr. 26, 2018); *Stanziale v. Khan (In re Evergreen Energy, Inc.)*, 546 B.R. 549, 565 (Bankr. D. Del. 2016) (quoting *Foman v. Davis*, 83 S. Ct. 227, 230 (1962).

The Trustee's footnote request for leave to amend is procedurally improper and, therefore, insufficient to grant the requested relief. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999) ("Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly.").  Moreover, the Trustee has failed to indicate any particular grounds on which the amendment is sought. *Mackereth v. Kooma, Inc.*, No. 14-04824, 2015 U.S. Dist. LEXIS 63143, at *34 (E.D. Pa. May 14, 2015) (quoting *U.S. ex rel Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013)).  Because I am making a finding that the Trustee's request for leave to amend a complaint

---

[31] Plaintiff's Memorandum in Opposition, Adv. D.I. 13 at 30 n.12.

is improper based on procedural infirmities, I am not making a finding of undue delay, bad faith, a dilatory motive, prejudice, or futility.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

For the foregoing reasons, Defendants' Motion is **GRANTED** as to Counts II and III and **DENIED IN PART** as to Count I. The Trustee's footnote request for leave to amend is also denied as procedurally improper.

Dated: June 27, 2022

JOHN T. DORSEY, U.S.B.J.

## SUNTRUST DOWNGRADE RECOMMENDATION

**Date:** 1/21/16

**Borrower:** Our Alchemy, LLC ("Alchemy," the "Company," or the "Borrower," fka Millennium Entertainment, LLC)

**Sponsor:** Virgo Investment Group, LLC ("Virgo" or the "Sponsor")

**TBE:** $21.1MM

**Current Risk Rating:** 15H

**Proposed Risk Rating:** 16H

### BORROWER SUMMARY

**Existing Exposure**

| Facility | Global Exposure | Global Outstanding | STR Exposure | STB Outstanding | SBE Inclusion | Maturity | PRISM |
|---|---|---|---|---|---|---|---|
| Senior Secured Revolver | $ 26,000,000 | $ 17,200,000 | $ 9,533,333 | $ 6,306,667 | $ 9,533,333 | 9/4/2018 | 15H |
| Senior Secured Term Loan A | 32,743,750 | 32,743,750 | 12,006,042 | 12,006,042 | 12,006,042 | 9/4/2018 | 15H |
| Guidance Line for Swaps | Bilateral | Bilateral | 2,000,000 | - | 2,000,000 | 7/7/2016 | 15H |
| Guidance Line for Corp Card | Bilateral | Bilateral | 75,000 | - | - | 7/7/2016 | 15K |
| **Total** | **$ 58,743,750** | **$ 49,943,750** | **$ 23,614,375** | **$ 18,312,708** | **$ 23,539,375** | | |

**Proposed Exposure**

| Facility | Global Exposure | Global Outstanding | STR Exposure | STB Outstanding | SBE Inclusion | Maturity | PRISM |
|---|---|---|---|---|---|---|---|
| Senior Secured Revolver | $ 26,000,000 | $ 17,200,000 | $ 9,533,333 | $ 6,306,667 | $ 9,533,333 | 9/4/2018 | 16H |
| Senior Secured Term Loan A | 31,487,501 | 31,487,501 | 11,545,417 | 11,545,417 | 11,545,417 | 9/4/2018 | 16H |
| Guidance Line for Corp Card | Bilateral | Bilateral | 50,000 | - | - | 7/7/2016 | 15K |
| **Total** | **$ 57,487,501** | **$ 48,687,501** | **$ 21,128,750** | **$ 17,852,084** | **$ 21,078,750** | | |

**NOTE: THIS MEMO SHOULD BE READ IN CONJUNCTION WITH THE DOWNGRADE MEMO DATED 12/15/15**

SunTrust recently completed an approval for a downgrade of Alchemy to a PRISM 15, as outlined in the Downgrade Memo from 12/15/15.

Since that memo, we received November financial statements, and SunTrust Credit, Coverage, and Leveraged Finance met with the Company and Sponsor (1/12/16). In that Downgrade Memo, PM outlined a number of triggers to further downgrade in the PRISM rating, including further liquidity issues, especially in the form of another overadvance on the Borrowing Base, as well as continued weak operating performance. Although the November financials were somewhat better than the poor October operating performance, we learned at the meeting the Company continues to struggle with liquidity.

### Meeting Overview: Alchemy/Virgo 1/12/16
Below is a brief outline of the findings from the meeting with the Company and the Sponsor:
In attendance:
- Alchemy/Virgo: Scott Guthrie (Co-President), Kelly Summers (Co-President), Jeff Ivers (CFO), Jesse Watson (Sr. Partner – Virgo), Mark Perez (Sr. Partner – Virgo)
- SunTrust: Jeff Dunn (SEG Group Head), Christa Thomas (SEG Coverage), Sutton Fannon (SEG Coverage), Matt Rowand (SEG Credit), Amanda Parks (SEG GPM), Adrian Cone (STRH Lev Fin)

The following topics were covered in the meeting:

- **Borrowing Base:** Alchemy informed SunTrust that they would be in an over-advance position for the 12/31/15 Borrowing Base due 1/15/16, which is the second over-advance in 3 months (October 2015 and December 2015). The Company admitted that liquidity remains an issue due to the following:
  - Soft December operating performance: Alchemy experienced higher than normal "deductions", or higher returns than anticipated, and a lighter holiday selling season on its core titles. We were not provided with any definitive December financials.

Downgrade Memo – Page 1


EXHIBIT
15

Page 1 of 31

AS24

- o Receipts: Payments from key customers continue to be an issue. The Company made a mistake with their vendor number with Wal-Mart that resulted in the Company being paid via check rather than electronically (ACH). This further delayed payments and tightened liquidity. Additionally, Wal-Mart/Sam's Club are maintaining higher return reserves (i.e. withholding full payment) until all issues with the Red Cloud integration and poor service record are resolved.
  - o Operating Performance: Booking lower receipts and higher returns in December did not help after coming off of
  - o Supplier contracts: Have some contracts through Red Cloud that continue to negatively impact working capital and as a result liquidity. For example, Dreamworks requires payment on shipment, as opposed to when a sale is booked (receivable), which is unlike most suppliers. Most suppliers are paid upon actual sales (vs. shipment) with a netting of returns.
- **Greenlight Process:** Alchemy summarized its extensive revamp of its film selection process ("greenlight") and how it has changed from the previous regime. The primary points are as follows:
  - o Old process was not collaborative or inclusive of all constituents. It was focused almost entirely on financials that were not grounded in reality (e.g. wrong team providing sales projections, sales projections for certain outlets not fitting with genre).
  - o New process starts with subjective and collaborative process, inclusive of all constituent teams. More focus on marketing and sales and effect on the financial projection. Results in better acquisition price with realistic ROI.
  - o Focus will be on films with broader appeal and multiple media windows (theatrical, DVD, Digital, TV), as opposed to the Day-and-Date (straight to DVD) product that was predominant in 2015.
  - o Goal of showing discipline on product acquisition, i.e. turning away films that are limited in distribution channels, i.e. DVD only, versus multiple distribution channels.
- **Customer Segmentation:** The Company is working on a plan to provide different levels of service to its suppliers as opposed to the full service offering to all suppliers. This will help in terms of efficiency and not wasting overhead and resources on lower-profitability accounts.
- **Customer Service:** Alchemy reported that there have been no permanent defections of customers as a result of the poor integration with Red Cloud, but noted that the Company had been paying some content suppliers ahead of time in November/December due to poor data quality issues. This had led partially contributed to the liquidity issues in October.
- **Sony DADC:** The Company reported no improvement in the credit limit with Sony, but did say that there continue to be operational issues and concerns. Alchemy was investigating options for a potential move later in 2016.

The general takeaway from the meeting was that there was little concrete data shared in the form of financials or a formal plan, but that management was working on a plan. Most of it focused on the greenlighting process and how they plan to pick better films. That is important, but the overarching concern was how does the Company manage through their operational and liquidity issues to actually utilize the new process.

### Borrowing Base & Liquidity
Of the triggers to downgrade to a PRISM 16 from a PRISM 15, outlined in the previous memo, one was another over-advance and continued liquidity issues. As indicated in the 1/12/16 meeting and confirmed in the receipt of the official 12/31/15 Borrowing Base (Appendix A), the Company is overadvanced by $1.8MM. Note that Alchemy shows a $4.1MM cash balance at 12/31/15, but payments of $3.1MM were made to key suppliers (PBS, Dreamworks) during the first two weeks of January and cash balance at 1/15/16 stood at $1.4MM.

### SunTrust Response and Action Items
SunTrust has taken the following actions and remedies as a result of the default:
- Reservation of Rights sent to Company recognizing defaults from BB over-advance and breaching Minimum EBITDA covenant
- Restricted additional borrowing by freezing the Revolver
- Reducing limit on corporate card to $50,000 and having company cash collateralize (CD) the limit amount at 105%
- Terminated the Swap Guidance Line of $2MM (no trades or outstandings under Facility when terminated).
- Requiring Company to select a consultant (list provided by SunTrust) to assist in financial controls and understanding liquidity issues
- Reviewing and analyzing daily cash flow data from last 90 days

**AS25**

CONFIDENTIAL

- Reviewing return data to determine reset of reserves in the Borrowing Base based on updated normalized returns
- Will begin to charge default rate pricing if adequate plan has not been provided by 1/25/16
- Consulting with SAD (Frank McCormack) on next steps and remedies
- Communicating with lender group regarding the default and communicating next steps including lender meeting week of 1/25/16

**Outstanding Due Diligence Items**

As mentioned, as of the writing of this memo, SunTrust has not received a formal plan from the Company on curing the over-advance on the Borrowing Base, providing a thorough short-term cash flow outlook, nor a long-term 2016 plan. As such, we have requested the following of the Company:

- Plan of how the company is going to solve the Borrowing Base default
- An updated detailed 13-week cash flow (draft has been received, but numerous open items remain)
- A full year 2016 business plan with details on film releases and expected payments
- An updated MG schedule by title
- A revised detailed liquidity ratio
- Payables analysis by customer
- FTI Inventory report
- Update of ownership levels and equity investments to-date
- Updated Greenlight summary (performance by title report - original provided week of 1/11/16 did not include projected ultimates by title)

The following financial update provides an update from the 12/15/15 Downgrade memorandum based on the receipt of November financials.

**Red Cloud Standalone Operating Performance**

As mentioned in the Waiver Request Memo (11/25/15), the Red Cloud acquisition and integration has not gone smoothly for Alchemy, due primarily to poor transition from former owner, Anderson, who chose to implement SAP software across all of its businesses, with severely negative results, at the onset of the sale and while continuing to provide Red Cloud's services to its clients during the integration period pursuant to the Transition Services Agreement between Anderson and Alchemy, Anderson mishandled the SAP implementation, and Alchemy's seeming inability to take control or handle the process, resulted in orders not being fulfilled, which ultimately affected operating performance in the form of lost sales, higher returns, and customer complaints.

As can be seen in Red Cloud's operating performance below, the poor integration, especially in 3Q, significantly impacted operating performance, especially the top line, as net revenue declined 41.5% y-o-y. A similar decline in COGS helped offset the top line decline, ultimately resulting in a 21.5% decrease in EBITDA for the Red Cloud business.

Downgrade Memo – Page 3

CONFIDENTIAL

**AS26**

ST_AL_00005448

### Red Cloud 9/30 and 11/30 Performance Summary

| Red Cloud: Actual vs. Budget | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Actual | | | Budget | Actual | | | Budget | Actual | | |
| | | | | | 2 months | 2 months | | | | | | |
| ($ in 000's) | YTD 9/30/15 | YTD 9/30/15 | Variance ($/%) | | 11/30/15 | 11/30/15 | Variance ($/%) | | YTD 11/30/15 | YTD 11/30/15 | Budget Variance ($/%) | |
| **Net Revenues** | | | | | | | | | | | | |
| 3PL | $70,961 | $42,985 | ($27,976) | -39.4% | $45,291 | $28,524 | ($16,767) | -37.0% | $116,252 | $71,509 | ($44,743) | -38.5% |
| Wholesale | 59,419 | 56,801 | (2,618) | -4.4% | 12,440 | 14,600 | 2,160 | 17.4% | 71,859 | 71,401 | (458) | -0.6% |
| SVOD | 2,288 | 3,609 | 1,321 | 57.7% | 297 | 69 | (228) | -76.8% | 2,585 | 3,678 | 1,093 | 42.3% |
| Other Digital | 5,660 | 3,831 | (1,829) | -32.3% | 2,474 | 731 | (1,743) | -70.5% | 8,134 | 4,562 | (3,572) | -43.9% |
| Returns - 3PL | (41,752) | (35,674) | 6,078 | -14.6% | (20,981) | (7,657) | 13,324 | -63.5% | (62,733) | (43,331) | 19,402 | -30.9% |
| Returns - Wholesale | (25,988) | (30,265) | (4,277) | 16.5% | (4,881) | (4,358) | 523 | -10.7% | (30,869) | (34,623) | (3,754) | 12.2% |
| **Total Net Revenues** | 70,588 | 41,287 | (29,301) | -41.5% | 34,640 | 31,909 | (2,731) | -7.9% | 105,228 | 73,196 | (32,032) | -30.4% |
| **Cost of Sales** | | | | | | | | | | | | |
| Cost of Sales | 60,341 | 32,558 | (27,783) | -46.0% | 31,499 | 28,324 | (3,175) | -10.1% | 91,840 | 60,882 | (30,958) | -33.7% |
| **Total Cost of Sales** | $60,341 | $32,558 | ($27,783) | -46.0% | $31,499 | $28,324 | ($3,175) | -10.1% | $91,840 | $60,882 | ($30,958) | -33.7% |
| % of Revenue | 85.5% | 78.9% | | | 90.9% | 88.8% | | | 87.3% | 83.2% | | |
| **Gross Profit/(Loss)** | $10,247 | $8,729 | ($1,518) | -14.8% | $3,141 | $3,585 | $444 | 14.1% | $13,388 | $12,314 | ($1,074) | -8.0% |
| SG&A | 3,742 | 3,649 | (93) | -2.5% | 746 | 538 | (208) | -27.9% | 4,488 | 4,187 | (301) | -6.7% |
| % of Revenue | 5.3% | 8.8% | | | 2.2% | 1.7% | | | 4.3% | 5.7% | | |
| **Operating Income** | $6,505 | $5,080 | ($1,425) | -21.9% | $2,395 | $3,047 | $652 | 27.2% | $8,900 | $8,127 | ($773) | -8.7% |
| Depreciation | 135 | 135 | - | | 30 | 30 | - | | 165 | 165 | - | |
| **EBITDA (Unadjusted)** | $6,640 | $5,215 | ($1,425) | -21.5% | $2,425 | $3,077 | $652 | 26.9% | $9,065 | $8,292 | ($773) | -8.5% |
| % of Revenue | 9.4% | 12.6% | | | 7.0% | 9.6% | | | 8.6% | 11.3% | | |
| **Adjusted EBITDA** | $6,640 | $6,103 | ($537) | -8.1% | $2,425 | $3,077 | $652 | 26.9% | $9,065 | $9,180 | $115 | 1.3% |
| % of Revenue | 9.4% | 14.6% | | | 7.0% | 9.6% | | | 8.6% | 12.5% | | |

- Despite the poor performance during the 3Q15, Alchemy believes the weakness to be primarily the result of poor operations and controls at the hands of the former owner and not product demand. As such, the Company has made certain adjustments to the operating performance that it has deemed as a result of the poor handling while managed by Anderson during transition. The result is nearly $7.7MM in top line adjustment and $0.9MM in EBITDA, which is nearly the entire YTD decline in EBITDA versus the budget of $6.64MM.
- The Company's operations have generally stabilized, as shown by the operating performance for October-November 2015. Although Revenue is off 7.9% vs. Plan for the two months of 10/15 and 11/15, COGS has also declined in line, resulting in gross profit of $3.6MM, 14.1% above Plan. This shows the performance since Alchemy took over operations in September 2015, showing improved results versus 3Q15.

**AS27**

CONFIDENTIAL

ST_AL_00005449

**Red Cloud YTD 9/30/15 Actuals and 4Q15 Projection**

| | Unadjusted YTD Actual | Preliminary Adjustments | Adjusted YTD Actual | Low Range | | High Range | |
|---|---|---|---|---|---|---|---|
| | | | | Adjusted 4Q Budget | FY 2015 Outlook | Adjusted 4Q Budget | FY 2015 Outlook |
| 3PL | 42,985 | 9,826 | 52,811 | 28,475 | 81,286 | 30,839 | 83,651 |
| Wholesale | 56,801 | 3,675 | 60,476 | 23,302 | 83,778 | 24,417 | 84,894 |
| SVOD | 3,609 | | 3,609 | 334 | 3,943 | 334 | 3,943 |
| Other Digital | 3,778 | | 3,778 | 1,642 | 5,420 | 2,202 | 5,980 |
| Returns 3PL | (35,674) | (4,394) | (40,068) | (8,842) | (48,910) | (9,909) | (49,977) |
| Returns Wholesale | (30,265) | (1,444) | (31,709) | (6,390) | (38,099) | (6,657) | (38,367) |
| Home Video Revenue | 41,234 | | 48,897 | 38,520 | 87,417 | 41,226 | 90,123 |
| | | | | | | | |
| Digital Services | 53 | | 53 | 84 | 137 | 198 | 252 |
| Other Revenue | 53 | | 53 | 84 | 137 | 199 | 252 |
| | | | | | | | |
| Total Net Revenue | 41,287 | | 48,950 | 38,604 | 87,554 | 41,425 | 90,376 |
| | | | | | | | |
| Total Cost of Sales | (32,558) | (6,776) | (39,334) | (34,210) | (73,544) | (35,479) | (75,812) |
| | | | | | | | |
| Gross Profit | 8,729 | | 9,617 | 4,394 | 14,011 | 4,946 | 14,563 |
| | | | | | | | |
| SG&A | (3,649) | | (3,649) | (844) | (4,493) | (844) | (4,493) |
| Operating Income | 5,080 | | 5,968 | 3,550 | 9,518 | 4,102 | 10,070 |
| | | | | | | | |
| D&A | 135 | | 135 | 45 | 180 | 45 | 180 |
| | | | | | | | |
| EBITD | 5,215 | | 6,103 | 3,595 | 9,598 | 4,147 | 10,250 |

As shown above, with this adjustment, Red Cloud's projected range of operating profitability for FY15 is within a fairly tight range of $9.6-10.3MM. The Low Range assumes actuals for October (discussed below) and November, and a 20% discount to original Management Case for December (provided at transaction closing July 2015). If Management hits its December original projection, the Company would hit its projected operating performance at Red Cloud for 2015, which had EBITDA projected at $10.23MM. Without the adjustments, Red Cloud EBITDA is projected to be in the range of $8.8-9.4MM, which is 13.9% and 8.1% below the original projection for 2015, respectively. Note that this EBITDA is still above the closing Red Cloud TTM EBITDA of $8.6MM from the Initial Underwrite.

CONFIDENTIAL

**AS28**

ST_AL_00005450

**Legacy-Alchemy Standalone Operating Performance**

| Legacy Alchemy: Actual vs. Budget | Budget | Actual | | | Budget | Actual | | | | Actual | Budget | Actual | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in 000's) | YTD 9/30/15 | YTD 9/30/15 | Variance ($/%) | | 2 months 11/30/15 | 2 months 11/30/15 | Variance ($/%) | | | YTD 11/30/14 | YTD 11/30/15 | YTD 11/30/15 | Y-o-Y Variance ($/%) | | Budget Variance ($/%) | |
| **Net Revenues** | | | | | | | | | | | | | | | | |
| Theatrical | $463 | $300 | ($163) | -35.2% | $69 | $553 | $484 | 701.4% | | $1,411 | $532 | $853 | ($558) | -39.5% | $321 | 60.3% |
| Home Video (DVD) | 27,419 | 24,022 | (3,397) | -12.4% | 10,878 | 7,717 | (3,161) | -29.1% | | 26,262 | 38,297 | 31,739 | 5,477 | 20.9% | (6,558) | -17.1% |
| Digital (VOD) | 15,413 | 13,156 | (2,257) | -14.6% | 3,715 | 2,780 | (935) | -25.2% | | 11,317 | 19,128 | 15,936 | 4,619 | 40.8% | (3,192) | -16.7% |
| Television | 2,172 | 736 | (1,436) | -66.1% | 600 | 381 | (219) | -36.5% | | 1,400 | 2,772 | 1,117 | (283) | -20.2% | (1,655) | -59.7% |
| Other/Foreign/State Reserve | 626 | 5 | (621) | -99.2% | 250 | - | (250) | -100.0% | | 22 | 876 | 5 | (17) | -77.3% | (871) | -99.4% |
| MMS | 2,323 | 2,208 | (115) | -5.0% | 1,452 | (113) | (1,565) | -107.8% | | 3,556 | 3,775 | 2,095 | (1,461) | -41.1% | (1,680) | -44.5% |
| **Total Net Revenues** | **48,416** | **40,427** | **($7,989)** | **-16.5%** | **16,964** | **11,318** | **($5,646)** | **-33.3%** | | **43,968** | **65,380** | **51,745** | **$7,777** | **17.7%** | **($13,635)** | **-20.9%** |
| **Cost of Sales** | | | | | | | | | | | | | | | | |
| Cost of Sales | 14,112 | 13,881 | (231) | -1.6% | 3,135 | 3,522 | 387 | 12.3% | | 16,317 | 17,347 | 17,403 | 1,086 | 6.7% | 156 | 0.9% |
| Film Amort | 12,889 | 10,338 | (2,551) | -19.8% | 3,532 | 2,469 | (1,063) | -30.1% | | 9,955 | 16,421 | 12,867 | 2,852 | 28.6% | (3,554) | -22.0% |
| Participation/Residuals | 9,568 | 9,060 | (508) | -5.3% | 3,670 | 2,092 | (1,578) | -43.0% | | 5,552 | 13,238 | 11,152 | 5,600 | 100.9% | (2,086) | -15.8% |
| Ultimate Participation Amortization | (690) | (352) | 338 | -49.0% | 3,684 | 4,488 | 804 | 21.8% | | 3,986 | 2,984 | 4,136 | 150 | 3.8% | 1,142 | 38.1% |
| **Total Cost of Sales** | **$35,879** | **$32,927** | **($2,952)** | **-8.2%** | **$14,021** | **$12,571** | **($1,450)** | **-10.3%** | | **$35,810** | **$49,990** | **$45,498** | **$9,688** | **27.1%** | **($4,492)** | **-8.8%** |
| % of Revenue | 74.1% | 81.4% | | | 82.7% | 111.1% | | | | 81.4% | 76.3% | 87.9% | | | | |
| **Gross Profit/(Loss)** | **$12,537** | **$7,500** | **($5,037)** | **-40.2%** | **$2,943** | **($1,253)** | **($4,196)** | **-142.6%** | | **$8,158** | **$15,480** | **$6,247** | **($1,911)** | **-23.4%** | **($9,233)** | **-59.6%** |
| SG&A | 10,316 | 11,716 | 1,400 | 13.6% | 2,172 | 3,866 | 1,694 | 78.0% | | 11,071 | 12,488 | 15,582 | 4,511 | 40.7% | 3,094 | 24.8% |
| % of Revenue | 21.3% | 29.0% | | | 12.8% | 34.2% | | | | 25.2% | 19.1% | 30.1% | | | | |
| **Operating Income** | **$2,221** | **($4,216)** | **($6,437)** | **-289.8%** | **$771** | **($5,119)** | **($5,890)** | **-763.9%** | | **($2,913)** | **$2,992** | **($9,335)** | **($6,422)** | **-328.5%** | **($12,327)** | **-412.0%** |
| Depreciation | 1,571 | 1,628 | (57) | | 4,178 | 4,844 | 666 | | | 5,186 | 5,749 | 6,472 | 1,286 | 24.8% | 723 | |
| EBITDA (Unadjusted) | $3,792 | ($2,588) | ($6,380) | -168.2% | $4,949 | ($275) | ($5,224) | -105.6% | | $2,273 | $8,741 | ($2,863) | ($5,136) | -326.9% | ($11,604) | -132.8% |
| % of Revenue | 7.8% | -6.4% | | | 29.2% | -2.4% | | | | 5.2% | 13.4% | -5.5% | | | | |
| Other Income (Expense) | ($699) | ($3,212) | $2,313 | 257.3% | ($115) | ($2,359) | ($2,244) | 1951.3% | | (4,574) | (1,014) | (5,571) | ($897) | 21.8% | ($4,557) | 449.4% |
| Interest Expense | ($986) | ($1,861) | $875 | 88.7% | ($308) | ($528) | ($220) | 71.4% | | (735) | (1,294) | (2,388) | ($1,654) | 225.0% | ($1,095) | 84.6% |
| Amort. Of Intangibles | $0 | ($2,788) | $2,788 | NA | $0 | ($820) | ($820) | NA | | - | - | (3,408) | ($3,408) | NA | ($3,408) | NA |
| Net Income | $84 | ($11,961) | ($12,045) | -14339.3% | $348 | ($8,026) | | | | ($8,222) | $684 | ($20,783) | ($12,481) | -251.8% | | |
| % of Revenue | 0.2% | -29.6% | | | 2.1% | -76.2% | | | | -18.7% | 1.0% | -40.0% | -21.3% | | | |
| **Adjusted EBITDA** | **$3,792** | **$2,412** | **($1,380)** | **-36.4%** | **$4,949** | **($275)** | **($5,224)** | **-105.6%** | | **$2,273** | **$8,741** | **$2,137** | **($136)** | **-6.0%** | **($6,604)** | **-75.6%** |
| % of Revenue | 7.8% | 6.0% | | | 29.2% | -2.4% | | | | 5.2% | 13.4% | 4.1% | | | | |
| **TTM EBITDA (Unadjusted)** | **$15,464** | **$9,080** | **($6,384)** | **-41.3%** | **$13,919** | **$2,315** | **($11,604)** | **-83.4%** | | | **$13,919** | **$2,315** | | | **($11,604)** | **-83.4%** |
| **TTM Adj. EBITDA** | | **$14,085** | **($1,379)** | **-8.9%** | | **$7,543** | **($6,376)** | **-45.8%** | | | | **$7,543** | | | **($6,376)** | **-45.8%** |

**2015 and 3Q15 Operating Performance**

In addition to the poor integration of the Red Cloud acquisition, Alchemy has shown material weakness in its legacy business model, as shown in the chart above. Operating performance began to show weakness primarily in 3Q15, with net revenue down -16.5% from budget for the quarter. Prior to that, revenue was down somewhat for 1H15, but primarily due to higher-than-normal return levels. Although return levels stabilized and came to within normal range in 3Q15 (35%), the Company began to experience top line weakness in September, especially in Digital/VOD for its 2015 titles, which was off 39.6% from budget ($4.4MM actual vs. $7.2MM budget). TV revenue was also off -66.1% for the YTD 9/30/15 and -67.7% for 3Q15.

Downgrade Memo – Page 6

CONFIDENTIAL

ST_AL_00005451

**AS29**

The poor top line performance resulted in gross profit off -40.2% from budget for the YTD 9/30/15 period. Additionally, the poor integration efforts for Red Cloud required the hiring of additional personnel and consultants at Alchemy, resulted in the termination of the CFO, John Avagliano, who is owed severance into 2016. This resulted in an additional $1.4MM in SG&A and overhead costs, as well as $2.3MM in Other Expenses over the budget. The combination of the above resulted in -$2.6MM EBITDA for the YTD 9/30/15 period vs. budget of $3.8MM. The Company believes approximately $5MM of negative impact to YTD EBITDA was the result of non-recurring items during the period, consisting of:

- A $3.0MM adjustment related to a high level of returns in 1H15, which suggest excessive "drag" from 2014 product. Essentially, the Sponsor believes the former CFO is primarily responsible for what might have been "stuffing the channel" in early 2015 with 2014 product, resulting in excessive returns. The Sponsor has hired FTI to complete an investigation and report findings on any misconduct.
- A $2.0MM adjustment to EBITDA related to additional SG&A needed for the Red Cloud transition and integration, as well as severance for terminated employees.

Even with these adjustments, EBITDA at $2.4MM was still off -36.4% from budget of $3.8MM. Appendix A provides a chart of the 3Q operating performance with a bridge of budget to actual revenue and EBITDA.

### Legacy Alchemy 4Q15 Operating Performance

The weakening 3Q15 performance was extended even further in October 2015 with net revenue faltering at $2.3MM vs. budget of $8.2MM (-24.6%). The negative variance to budget was across all categories (DVD, Digital, and TV) in what is the start of Alchemy's typically largest quarter in terms of sales and shipments. Some of the weakness in October is due to timing of titles, which can be moved to earlier or later release, which affects revenue timing; however, general weakness in titles was evident in titles such as *Back to the Jurassic, Runner, Welcome to Me,* and *Unexpected.* The 2014 and prior catalog also showed weakness, with sales of $0.2MM off nearly $3.2MM from budget of $3.4MM. The lone outperformer in October and YTD performance was PBS, with higher than projected home video sales for PBS product, which carries lower margins than Alchemy's core titles. Weak gross revenue performance, coupled with returns near plan (which assumed higher operating performance) amplified the net revenue performance shown in the chart above, resulting in net revenue off -72.2% versus budget. The detailed revenue and EBITDA budget-to-actual bridge for the month are provided in Appendix B.

November was significantly better than October in terms of performance versus Budget, with net revenue of $9.0MM ahead of Plan by 3.3%; however, the performance for the month was still hampered by higher SG&A costs, resulting in EBITDA of $3.4MM below Budget by $1.1MM, or 24%. As shown in the chart above, the result for the first two months for 4Q is revenue below Plan by 33% and EBITDA still negative at -$245M.

For the YTD period through 11/30/15, net revenue was off -20.9% from Budget and Unadjusted EBITDA was -$2.9MM versus budget of $8.7MM. Even with addback of $5MM in previously mentioned non-recurring items, Adjusted EBITDA was still just $2.1MM for the YTD 11/30 period.

We have not seen final December financials; however, the Company informed us that performance remained pressured by higher deductions (returns). The Company provided a full year 2015 outlook to the Lenders as of the 11/25/15 Lender Call, as shown in the chart below, which showed a low and high range of Adjusted EBITDA of $3.2MM and $6.2MM, respectively. Note that the YTD period shown in the chart is through 9/30/15 as the October financials had not been finalized or received at the time of this report. The Company states that it did have indication of the weak performance of October at this point and estimates on November projected performance. Further discussion with the Sponsor following receipt of the weak October results leads SEG PM to believe that results for FY15 will likely be on the low end of the range, which points to $3.2MM in Adjusted EBITDA for FY15 for legacy Alchemy. The Company confirmed performance coming in the low end of the range at the 1/12/16 meeting.

CONFIDENTIAL

**AS30**

ST_AL_00005452

## Legacy Alchemy YTD 9/30/15 Actuals and 4Q15 Projection

| | Unadjusted YTD Actual | Preliminary Adjustments | Adjusted YTD Actual | Low Range | | High Range | |
|---|---|---|---|---|---|---|---|
| | | | | Adjusted 4Q Budget | FY 2015 Outlook | Adjusted 4Q Budget | FY 2015 Outlook |
| Sell Thru | 45,776 | | 45,776 | 14,986 | 60,762 | 17,847 | 63,623 |
| Kiosk | 2,540 | | 2,540 | 280 | 2,820 | 344 | 2,884 |
| IVOD | 3,749 | | 3,749 | 742 | 4,491 | 890 | 4,639 |
| VOD | 5,855 | | 5,855 | 446 | 6,301 | 628 | 6,483 |
| SVOD | 3,552 | | 3,552 | 1,960 | 5,512 | 3,065 | 6,617 |
| TV | 736 | | 736 | 543 | 1,279 | 663 | 1,399 |
| Returns | (20,734) | 3,000 | (17,734) | (6,330) | (24,064) | (5,975) | (23,710) |
| Rebates | (3,560) | | (3,560) | (327) | (3,887) | (377) | (3,937) |
| Home Video Revenue | 37,914 | | 40,914 | 12,300 | 53,214 | 17,133 | 58,047 |
| | | | | | | | |
| Theatrical | 300 | | 300 | 456 | 756 | 457 | 757 |
| Foreign/Other | 5 | | 5 | 200 | 205 | 250 | 255 |
| Services | 2,208 | | 2,208 | 573 | 2,782 | 789 | 2,997 |
| Other Revenue | 2,513 | | 2,513 | 1,230 | 3,743 | 1,495 | 4,009 |
| | | | | | | | |
| Total Net Revenue | 40,427 | | 43,427 | 13,530 | 56,956 | 18,628 | 62,055 |
| | | | | | | | |
| Film Amortization | (8,545) | | (8,545) | (2,091) | (10,637) | (4,023) | (12,568) |
| Ultimate Participation | 352 | | 352 | (3,882) | (3,530) | (5,016) | (4,664) |
| Library Amortization | (1,793) | | (1,793) | (159) | (1,952) | (159) | (1,952) |
| Cost of Sales | (22,941) | | (22,941) | (7,055) | (29,997) | (8,082) | (31,023) |
| Total Cost of Sales | (32,927) | | (32,927) | (13,188) | (46,115) | (17,280) | (50,207) |
| | | | | | | | |
| Gross Profit | 7,500 | | 10,500 | 342 | 10,841 | 1,349 | 11,848 |
| | | | | | | | |
| SG&A | (11,716) | 2,000 | (9,716) | (3,293) | (13,009) | (3,293) | (13,009) |
| Operating Income | (4,216) | | 784 | (2,952) | (2,168) | (1,945) | (1,161) |
| | | | | | | | |
| D&A | 1,628 | | 1,628 | 3,765 | 5,393 | 5,694 | 7,322 |
| | | | | | | | |
| EBITDA | (2,588) | | 2,412 | 813 | 3,225 | 3,749 | 6,161 |
| | | | | | | | |
| EBITDA (Unadjusted) | | | | | (2,225) | | 1,161 |

**AS31**

CONFIDENTIAL

## Consolidated Alchemy & Red Cloud Outlook

### Alchemy & Red Cloud Combined 2015 Outlook

| | Low Range | | | | High Range | | | |
|---|---|---|---|---|---|---|---|---|
| | Alchemy Standalone | Red Cloud Standalone | SG&A Eliminations | Consolidated | Alchemy Standalone | Red Cloud Standalone | SG&A Eliminations | Consolidated |
| Sell Thru | 60,762 | 165,064 | | 225,825 | 63,623 | 168,544 | | 232,167 |
| Kiosk | 2,820 | | | 2,820 | 2,884 | | | 2,884 |
| Anderson Digital | | 5,420 | | 5,420 | | 5,980 | | 5,980 |
| IVOD | 4,491 | | | 4,491 | 4,638 | | | 4,638 |
| VOD | 6,301 | | | 6,301 | 6,483 | | | 6,483 |
| SVOD | 5,512 | 3,943 | | 9,455 | 6,617 | 3,943 | | 10,560 |
| TV | 1,279 | | | 1,279 | 1,399 | | | 1,399 |
| Returns | (24,064) | (87,009) | | (111,073) | (23,710) | (88,343) | | (112,053) |
| Rebates | (3,887) | | | (3,887) | (3,887) | | | (3,887) |
| Home Video Revenue | 53,214 | 87,417 | | 140,631 | 58,047 | 90,123 | | 148,170 |
| | | | | | | | | |
| Theatrical | 756 | | | 756 | 757 | | | 757 |
| Foreign/Other | 205 | | | 205 | 255 | | | 255 |
| Services | 2,782 | 137 | | 2,919 | 2,997 | 252 | | 3,250 |
| Other Revenue | 3,743 | 137 | | 3,880 | 4,009 | 252 | | 4,261 |
| | | | | | | | | |
| Total Net Revenue | 56,958 | 87,554 | | 144,511 | 62,055 | 90,376 | | 152,431 |
| | | | | | | | | |
| Film Amortization | (10,637) | | | (10,637) | (12,568) | | | (12,568) |
| Ultimate Participation | (3,530) | | | (3,530) | (4,664) | | | (4,664) |
| Library Amortization | (1,952) | | | (1,952) | (1,952) | | | (1,952) |
| Cost of Sales | (29,997) | (73,544) | | (103,540) | (31,023) | (75,812) | | (106,836) |
| Total Cost of Sales | (46,115) | (73,544) | | (119,659) | (50,207) | (75,812) | | (126,019) |
| | | | | | | | | |
| Gross Profit | 10,841 | 14,011 | | 24,852 | 11,848 | 14,563 | | 26,412 |
| | | | | | | | | |
| SG&A | (13,009) | (4,493) | 1,398 | (16,104) | (13,009) | (4,493) | 1,398 | (16,104) |
| Operating Income | (2,168) | 9,518 | | 8,748 | (1,161) | 10,070 | | 10,907 |
| | | | | | | | | |
| D&A | 5,393 | 180 | | 5,573 | 7,322 | 180 | | 7,502 |
| | | | | | | | | |
| Adjusted EBITDA | 3,225 | 9,698 | | 14,321 | 6,161 | 10,250 | | 17,810 |
| | | | | | | | | |
| EBITDA (Unadjusted) | (1,775) | 8,810 | | 8,433 | 1,161 | 9,362 | | 11,921 |

Notes on the Projected FY15 Operating Performance:

- The SG&A elimination represents inter-company eliminations due to Red Cloud overhead and administrative costs completed by Alchemy and allocated to Red Cloud on a standalone basis.
- Based on the Company's projected add-backs, ultimately to be determined between the Agent and the Company, Consolidated EBITDA will likely be on the low end of the projected range given the actual October results, so close to $14.3MM, based on recent Company guidance.
- The Company has a $17.25MM Minimum Adjusted EBITDA requirement, which allows for the add-back of certain non-recurring items. As such, preliminary indications are that the Company will breach its Minimum EBITDA covenant for FYE15 (annual covenant test).
- A miss of the Minimum EBITDA covenant would be the second time in as many years that the Company will have breached this covenant. Lenders waived and amended the Minimum EBITDA covenant requirement for FYE2014, when the Company posted EBITDA of $7.2MM on a $9.9MM EBITDA requirement. The miss was primarily the result of over-concentration in one large investment (MG, P&A) film, *Fading Gigolo*.
- In response to the covenant miss, lenders took the following remedies:
  - Tightened P&A limit per film title to $2MM for 2015, stepping up to $4MM for 2016 and $5MM thereafter (the original limit).
  - Tightened MG limit per title to $3.5MM for 2015, $4.0MM for 2016, and $5.0MM for 2017 (original limit).
  - Raise Fixed Charge Coverage covenant from 1.3x to 1.5x

CONFIDENTIAL

**AS32**

ST_AL_00005454

## Capitalization

| Capitalization ($000s) | | Consolidated 9/30/15 | | | | Consolidated 11/30/15 | | | | Pro Forma 12/31/15 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ($ in Thousands) | Maturity | | % | Mult. of Unadj. EBITDA | Mult. of Adj. EBITDA | | % | Mult. of Unadj. EBITDA | Mult. of Adj. EBITDA | | % | Mult. of Unadj. EBITDA | Mult. of Adj. EBITDA |
| Cash & Cash Equivalents | | $ 2,161 | | | | $ 2,160 | | | | $ 4,065 | | | |
| Revolving Credit Facility | 9/4/2018 | 17,200 | 17.2% | 1.03x | 0.77x | 17,200 | 17.3% | 1.56x | 1.03x | 17,200 | 17.2% | 2.04x | 1.20x |
| Term Loan Facility | 9/4/2018 | 32,744 | 32.8% | 1.95x | 1.46x | 32,744 | 33.0% | 2.96x | 1.95x | 31,488 | 31.5% | 3.73x | 2.20x |
| Senior Secured Debt | | $ 49,944 | 50.0% | 2.98x | 2.23x | $ 49,944 | 50.3% | 4.52x | 2.98x | $ 48,688 | 48.8% | 5.77x | 3.40x |
| Seller Note - Millennium Acquistion | | 5,000 | 5.0% | 0.30x | 0.22x | 5,000 | 5.0% | 0.45x | 0.30x | 5,000 | 5.0% | 0.59x | 0.35x |
| Seller Note - Red Cloud Acquisition | | 2,925 | 2.9% | 0.17x | 0.13x | 2,925 | 2.9% | 0.26x | 0.17x | 2,925 | 2.9% | 0.35x | 0.20x |
| Virgo Mezzanine Debt | | 6,000 | 6.0% | 0.36x | 0.27x | 10,000 | 10.1% | 0.90x | 0.60x | 10,000 | 10.0% | 1.19x | 0.70x |
| Total Debt & Other | | $ 63,869 | 64.0% | 3.81x | 2.85x | $ 67,869 | 68.4% | 6.14x | 4.05x | $ 66,613 | 66.7% | 7.90x | 4.65x |
| Shareholder Equity | | 35,948 | 36.0% | | | 31,327 | 31.6% | | | 31,327 | 31.4% | | |
| Total Capitalization | | $ 99,817 | 100.0% | | | $ 99,196 | 100.0% | | | $ 97,940 | 98.1% | | |
| Unadjusted EBITDA: | | | | | | | | | | | | | |
| Alchemy EBITDA (Unadjusted) | | $ 9,085 | | | | $ 2,316 | | | | $ (377) | | | |
| Red Cloud PF EBITDA | | $ 7,685 | | | | $ 8,742 | | | | $ 8,810 | | | |
| PF TTM EBITDA | | $ 16,770 | | | | $ 11,058 | | | | $ 8,433 | | | |
| Adjusted EBITDA: | | | | | | | | | | | | | |
| Alchemy Adj. EBITDA | | $ 13,851 | | | | $ 7,316 | | | | $ 4,623 | | | |
| Red Cloud PFAdj. EBITDA | | $ 8,573 | | | | $ 9,461 | | | | $ 9,698 | | | |
| PF TTM Adj. EBITDA | | $ 22,424 | | | | $ 16,777 | | | | $ 14,321 | | | |

*Note:*
- *11/30/15 Includes Virgo $4MM capital contribution in Shareholders Equity*
- *12/31/15 Alchemy EBITDA includes a $1.9MM adjustment for Intercompany eliminations.*

As shown in the chart above, a decline in operating performance at both Alchemy and Red Cloud through 9/30/15 has raised senior secured leverage from 2.33x at Closing to 3.0x at 9/30/15 on an unadjusted basis. Due to the operating performance weakness described above, leverage climbs to a steep 5.8x, well above the leverage at Closing. As mentioned, this is due primarily to Legacy Alchemy's poor film title performance that materialized in 3Q15 and escalated in October, combined with abnormally high return rates. Assuming the Company is able to add back the requested $5MM in adjustments from abnormal returns ($3MM) and transition expense/lost sales from the Alchemy acquisition, Adjusted Leverage would be 3.4x, highlighting how the decline in operating performance has had a significant impact on leverage, even when backing out one-time items.

### Liquidity

The Company has provided an updated 13- week cash flow projection since the first one provided the week of 11/25/15; however, there were numerous open due diligence items and the projection needed further refinement. Additional update memorandums will be provided upon receipt of a final 13-week liquidity projection and Business Plan.

As shown on the 12/31/15 Borrowing Base, the Company had $4.1MM of cash on hand and an over-advanced position of $1.8MM. The Company utilized most of cash in the first three weeks of 2016 to cover critical vendor and supplier payments of $3MM, resulting in cash balance of $1.4MM as of 1/15/16, thus the inability to pay down the Revolver and fix the over-advance utilizing cash on hand.

### Company/Sponsor Response to Operating Performance Issues

- Since the previous memorandum, the Company has announced to lenders that it is taking steps to rationalize its overhead and headcount. The Company plans to reduce its workforce by 40% the week of 1/25/16, with an annual run rate savings of approximately $5MM. This would bring SG&A costs behind

CONFIDENTIAL

AS33

ST_AL_00005455

**Ratings Recommendation**

SEG PM recommends another downgrade to a PRISM 16, which is a 5 notch subjective downgrade from MRA rating of PRISM 11, which is based on pro forma TTM 11/30/15 consolidated financials of Alchemy and Red Cloud. The override is due to volatile operating and weak 3Q15 and 4Q15 operating performance, Alchemy/Red Cloud integration issues, ongoing liquidity pressures in recent periods due to numerous issues (capacity constraints at Sony DADC, weak operating performance reducing shipments and receivables, return reserves at clients, participation/residual payments), as well as a management overhaul to an unproven team, now run by a co-head structure. Additionally, Red Cloud and Alchemy's primary businesses are in physical distribution of home entertainment, which is in secular decline.

A facility rating "H" is recommended based on the 12/31/15 Borrowing Base provided by the Company, based on Eligible Book Value (net of return and participation reserves).

We are currently awaiting a Plan for 2016 that shows how the Company is going to solve its over-advance situation immediately, and invests additional capital in the business to stabilize the Company through 2016, which the Company has called a "transition" year, with new management and greenlight process implemented. We estimate that the Company will need $15-20MM in additional capital to stabilize the business during this transition period

**Triggers to Further Downgrade to PRISM 17**

SEG PM would recommend a further downgrade to a PRSIM 17 if the following were to occur:

- The Company does not solve its over-advance situation present at 12/31/15 by 2/15/16, and has not delivered a Business Plan showing adequate capital to sustain the business through the next year or a short-term cash flow showing adequate liquidity without an over-advance position.
- A 10% decline in Adjusted EBITDA versus the low projection of $14.2MM, or $12.8MM.
- Additional supply chain or working capital disruption
- Customer disruption and additional issues impacting liquidity (e.g. increase in return reserve at Wal-Mart).

**Approvals:**

Preparer: Craig Cutro, Matt Rowand
Relationship Manager: Sutton Fannon, Christa Thomas
Risk Manager: Elizabeth Colt, Tom Thornhill

Acknowledged and Agreed:

_____     _____
Elizabeth Colt, PWM Specialty Credit Risk Manager     Date

_____     _____
Tom Thornhill, PWM Executive Risk Officer     Date

CONFIDENTIAL

AS34

ST_AL_00005456

**Appendix A - Company/Sponsor Response to Operating Performance Issues**

- In regards to Red Cloud integration, the Company maintained a larger staff to complete the successful transition of the Red Cloud business. Although ultimately leading to the higher-than-planned SG&A expense mentioned above, the increased staffing has assisted in correcting product fulfillment and customer reporting. During the transition phase, while Anderson continued to manage the Red Cloud business, Alchemy sent in a task force, led by BOD advisor Pat Fitzgerald and new CTO Jerry McGlynn, to parse through SAP data sets from Anderson and create a database use to create participation statements for clients. Alchemy fully took control of the Red Cloud operations in September, and has since restored and improved operations considerably. This is evidenced in Wal-Mart score cards (rating inventory availability) that dipped into the 70's from the low-90's while Anderson implemented SAP, that have been brought back up by Alchemy into the mid-90's.

- As mentioned, Alchemy terminated its CFO, John Avagliano, once the Red Cloud acquisition closed in July 2015. The Sponsor was concerned about the CFO's handling of the Red Cloud integration as well as responsiveness to the BOD and Lenders during the financing. They are also attributing some potential mishandling of product shipments and revenue recognition for 2014 ('channel stuffing') that they believe has resulted in abnormally high returns during 2015. Jeff Ivers, formerly of Participant Media, is temporarily filling-in as interim CFO and could potentially be hired permanently to fill the role.

- The Company removed Bill Lee from the CEO position in November 2015, largely due to perceived weaknesses in Mr. Lee's ability to handle the operational challenges facing Alchemy, as well as a poorly handled integration with Red Cloud. Virgo views Lee as a strong sales and marketing executive with solid contacts in the industry, and as such Lee has agreed to stay on as an advisor/consultant during his severance period.

- The Company has elevated newly-minted COO, Scott Guthrie, and former SVP of FP&A/Strategy, Kelly Summers, to Co-President roles to fill the hole left by Bill Lee. Guthrie will be responsible for leading sales, operations and finance and Summers will oversee strategic planning, marketing and production/acquisitions. Both will report to Chairman Jesse Watson of Virgo.

- In response to the abnormally high returns and potential malfeasance regarding 2014 product, Alchemy has hired FTI to consult and provide analysis on a title-by-title basis for 2014-15, to flush out the root issue causing the underperformance and high returns experienced in 2015. The project will contribute key observations pertinent to 2016 budgeting/planning.

- The Company plans to assess the Sony DADC situation once the holiday season has ended in 1Q16. Alchemy questions Sony's ability to handle Alchemy's significantly higher volume of product, and the Company is not sure when its credit limits will be reversed or increased and normal payment terms be re-implemented. The Company will re-evaluated the relationship and is exploring other moving to other providers.

- In addition to the Co-Presidents roles, Alchemy has upgraded a number of key positions with new management in the past few months, as listed below:
    - Jerry McGlynn – Chief Technology Officer - New position focused on IT and data management / processes. Former VP of The Walt Disney Company (business operations, strategy & information technology).
    - Jack Talley–EVP, Physical Sales - Position focused on physical retail relationships and sell thru. Former EVP at Sony Pictures Home Entertainment and VP at MGM (Scan Based Trading).
    - Norbert Hudak – SVP, Business Development & Affinity Pods - Position focused on physical & digital brand development. Former SVP at Cinedigm Corp (marketing and brand management).
    - Todd Green – SVP, Digital Distribution - Position focused on digital output infrastructure (cable, satellite, EST, SVOD, VOD). Former General Manager of Tribeca Film.

- To address lower operating performance, the Company significantly reduced its budgeted film investment, or Minimum Guaranty ("MG") spending, to reduce expenses and improve liquidity. As shown below, the Company has reduced film investment by $6.5MM versus budget through October.

| Minimum Guarantee Spend ($000s) | 1Q15 | 2Q15 | 3Q15 | 4Q15 | Total |
|---|---|---|---|---|---|
| Budget | $ 4,488 | $ 8,627 | $ 8,016 | $ 2,123 | $ 23,254 |
| Actual | $ 5,147 | $ 4,253 | $ 6,467 | $ 883 | $ 16,750 |
| Difference | $ 659 | $ (4,374) | $ (1,549) | $ (1,240) | $ (6,504) |

Note: 4Q15 represents only October '15 budget and actual MG spend.

- In conjunction with the rationalized film investment, the Company is revamping the way that it selects ("greenlight") and invests in new film product. Virgo's goal is to yield more consistent results out of its greenlight process and is developing more systematic ways to select and greenlight product for more predictability and less volatility in returns. A key part of this

CONFIDENTIAL

**AS35**

is maximizing marketing spend and improving content marketing to maximize return.  Kelly Summers is heading up the initiative on greenlight process and marketing.

Other initiatives include:

- Rationalization of transition and duplicative SG&A at Red Cloud/Alchemy now that companies are integrated.
- Focus on execution of Alchemy digital strategy on the Red Cloud digital platform.

Continue to improve product and service margins through content selection/curation and improved service levels.

Downgrade Memo – Page 13

CONFIDENTIAL

**AS36**

ST_AL_00005458

### Appendix B – 9/30 Operating Performance Bridge

Legacy Alchemy (standalone) Revenue and EBITDA Bridge

## For the Quarter Ending September 30, 2015 (Reforecast to Actual Bridge)

| ($ in Thousands) | | Revenue | | EBITDA |
|---|---|---|---|---|
| 2015 Q3 Forecast | $ | 19,513 | $ | 2,458 |
| 1 | Additional PBS Shipments | $ | 3,100 | $ | 155 |
| 2 | Lower Sell-Thru | $ | (3,681) | $ | (1,104) |
| 3 | Lower Theatrical service fees | $ | (130) | $ | (130) |
| 4 | Lower SVOD | $ | (1,364) | $ | (409) |
| 5 | Timing variance in VOD and title re-scheduling | $ | (1,200) | $ | (360) |
| 6 | Timing variance in iVOD | $ | (289) | $ | (87) |
| 7 | Lower Theatrical | $ | (197) | $ | (59) |
| 8 | Lower TV | $ | (609) | $ | (183) |
| 9 | Timing of PBS Participation payments (one time reconciliation) | $ | - | $ | (3,842) |
| 10 | Marketing and P&A | $ | - | $ | 482 |
| 11 | Additional G&A costs related to Anderson | $ | - | $ | (1,023) |
| 12 | Additional Shipping and freight costs | $ | | $ | (356) |
| 13 | Other | $ | - | $ | (4) |
| 2015 Q3 Actuals | $ | 15,143 | $ | (4,462) |

1  PBS sell through shipments higher than forecasted

2  Lower net sell-through shipments in catalog (-$2.0 MM), timing variances for Survivor released in prior quarter (-$2.1 MM), balanced by better than forecast performance with rest of slate (+$0.4 MM)

3  Theatrical services fees forecast not achieved in Q3 (-$375K), offset by higher MMS shipments (+$245K)

4  Reach Me accounted for $850K of negative SVOD variance in month. Starz TV deal booked in month for $250K (TV revenue), "Back to the Jurassic" accounted for $250K negative variance. The title is being shopped to Amazon and other networks to get better offer, other variances in the slate

5  Unfavorable variance for Runner and Rolling Papers, other new releases and Moonwalker VOD release date moved to 2016

6  Month-to month timing variance and YTD variance favorable

7  Primarily related to Meet the Patels theatrical timing variance. Expect full year theatrical variance to be favorable

8  Shortfall in TV catalog and 4Q14 titles

9  One time returns reconciliation adjustment due to transition of PBS product distribution from Anderson to Alchemy in January to March 2015

10  Marketing and P&A cost savings across various titles. Favorable YTD variance $544K

11  Additional overhead and transition costs from the recently acquired Anderson business. Additional consultants hired to help manage the integration. Actuals include Anderson additions, but excludes revenues and distribution costs

Note that for the $3.8MM PBS participation payment made in July 2015, the Company had not been paying participations to PBS, although they had been accruing a liability for these payments. The reason for the non-payment stems from the inability to reconcile returns between Alchemy and PBS's prior distributor after PBS switched Wal-Mart distribution to Alchemy in late 2014. Until the Company reconciled all the returns, it was not paying participations to PBS, and thus EBITDA was being overstated during the first 6 months of 2015.

**AS37**

CONFIDENTIAL

Appendix C – 10/31 Legacy Alchemy Operating Performance Bridge

## For the Month Ending October 31, 2015 (Reforecast to Actual Bridge)

| ($ in Thousands) | | Revenue | | EBITDA |
|---|---|---|---|---|
| 2015 October Forecast | $ | 8,226 | $ | 446 |
| | | | | |
| 1  Lower net Sell-Thru and net Catalog shipments | $ | (3,409) | $ | (1,850) |
| 2  Favorable Theatrical performance for "Meet the Patels" | $ | 388 | $ | 116 |
| 3  Shortfall in MMS services & Theatrical Service Fees | $ | (988) | $ | (988) |
| 4  Shortfall in SVOD and TV Catalog | $ | (327) | $ | (98) |
| 5  Shortfall in VOD and title re-scheduling into 2016 | $ | (1,193) | $ | (358) |
| 6  Shortfall in IVOD - month to month timing variance | $ | (407) | $ | (122) |
| 7  Additional G&A costs | $ | - | $ | (846) |
| | | | | |
| 2015 October Actuals | $ | 2,290 | $ | (3,700) |
| | | | | |
| TTM October | | | $ | 5,767 |

1  Lower Sell-Thru and Catalog shipments (net -$6.6 million); offset by favorable PBS sell through shipments with lower EBITDA margins (net +$3.2 million)

3  Lower MMS shipments (-$863K) and Theatrical Services Fees forecast not achieved (-$125K)

4  Timing variance for Brother's Keeper and Unexpected and unfavorable TV Catalog revenue not achieved

5  Unfavorable performance from Welcome to Me, Runner and Survivor and timing variance from titles re-scheduled to 2016

6  Month-to month timing variance. YTD variance is unfavorable by (-$336K) primarily due to Strangerland (shortfall), Runner (shortfall) and Rolling Papers (timing)

7  Additional overhead and transition costs from the recently acquired Anderson business. Additional consultants hired to help manage the integration. Actuals include three pay-period month and Anderson additions but excludes revenues and distribution costs

CONFIDENTIAL

**AS38**

ST_AL_00005460

## Appendix D – 11/30 Legacy Alchemy Operating Performance Bridge

### For the Month Ending November 30, 2015 (Reforecast to Actual Bridge)

| ($ in Thousands) | | Revenue | | EBITD |
|---|---|---|---|---|
| 2015 November Forecast | $ | 8,738 | $ | 4,503 |
| | | | | |
| 1  Net Sell-Thru and net Catalog shipments | $ | 248 | $ | 134 |
| 2  Shortfall in MMS services & Theatrical Service Fees | $ | (827) | $ | (827) |
| 3  Favorable timing of SVOD revenue | $ | 1,377 | $ | 413 |
| 4  Shortfall in VOD and title re-scheduling into 2016 | $ | (563) | $ | (169) |
| 5  Additional G&A costs (see note below) | $ | - | $ | (848) |
| 6  Lower participation expense | $ | - | $ | 306 |
| 7  Other | $ | 55 | $ | (87) |
| | | | | |
| 2015 November Actuals | $ | 9,028 | $ | 3,425 |
| | | | | |
| TTM November (excluding add-backs and other non-recurring charges) | | | $ | 1,453 |

2  Lower MMS shipments (-$702K) and Theatrical Services Fees forecast not achieved (-$125K)

3  Primarily favorable SVOD timing variance for Runner

4  Unfavorable performance from certain titles and timing variance from titles re-scheduled to 2016

5  Additional overhead and transition costs from the recently acquired Anderson business. Additional consultants hired
   to help manage the integration. Actuals include Anderson G&A additions but exclude Anderson revenues and
   distribution costs.  Portion of reported G&A is non-recurring or one-time related to the Anderson transition.

AS39

CONFIDENTIAL

ST_AL_00005461

# ALCHEMY

EXHIBIT B

## FORM OF BORROWING BASE CERTIFICATE

Dated as of January 15, 2016

The undersigned Responsible Officer of Our Alchemy, LLC (the Borrower, hereby certifies, on behalf of the Borrower that the following information is true and correct as of the date hereof, pursuant to that certain Revolving Credit and Term Loan Agreement dated as of September 4, 2014 (as the same may be amended, supplemented or otherwise modified, renewed, restated or replaced from time to time, the Credit Agreement; capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in the Credit Agreement), among the Borrower, the Lenders referred to therein and SunTrust Bank, as Administrative Agent:

|       | BORROWING BASE CALCULATION (from detailed Schedules attached) | Amount $000's | Advance Rate | Borrowing Base |
|-------|--------------------------------------------------------------|---------------|--------------|----------------|
| (i)   | All unrestricted and uncommitted cash held in a Controlled Account (other than a Collection Account) with respect to which the applicable requirements of Section 5.13(a) of the Credit Agreement are satisfied, plus | $0 | 100% | $0 |
| (ii)  | Eligible Receivables secured by an Acceptable L/C, plus | $0 | 100% | $0 |
| (iii) | Eligible Receivables from an Acceptable Obligor that is a Primary Major Acceptable Obligor, plus | $51,644 | 95% | $26,009 |
| (iv)  | Eligible Receivables from an Acceptable Obligor that is a Major Acceptable Obligor, plus | $12,852 | 90% | $7,638 |
| (v)   | Eligible Receivables from an Acceptable Obligor that is a Non-Major Acceptable Obligor, plus | $6,625 | 80% | $1,998 |
| (vi)  | U.S. Theatrical Rentals, plus | $98 | 80% | $46 |
| (vii) | Eligible Receivables from an Acceptable Obligor that is a Minor Acceptable Obligor, plus | $3,618 | 50% | $298 |
| (viii)| the Library Credit, plus | $27,200 | 40% | $10,880 |
| (xi)  | the Netflix Release Reserve, minimum | | | |

Our Alchemy, LLC • 5900 Wilshire Boulevard • 18th Floor • Los Angeles, CA 90036
Phone: 310.893.6289 • Fax: 323.937.0750 • ouralchemy.com

Page 17 of 31

CONFIDENTIAL

AS40

# ALCHEMY

| | | | | |
|---|---|---|---|---|
| (xii) | to the extent not already deducted or excluded in computing the foregoing, and without duplication of any deductions contained within any of the foregoing components of the Borrowing Base, the aggregate Dollar amount of any payments which a Loan Party is required to pay to any third Person in respect of any receivable or other amount contained within any of the foregoing components of the Borrowing Base (e.g., royalties, residuals, participations, fees, commissions) and any other projected expenses required to be paid to a third Person, in each case, as a direct result of the receipt by the Loan Parties of the applicable receivable arising in connection with such amounts (in the case of amounts which are not due and payable within two (2) years following the date of determination, such amounts shall be discounted to present value on a quarterly basis by a rate of interest equal to the interest rate in effect on the date of computation with respect to Loans that are Eurodollar Loans); | | | ( _____ ) |
| (xiii) | RedCloud EBITDA Allowance | $0 | 135% | $0 |
| (xiv) | Netflix Presale | $0 | 95% | $0 |
| | **TOTAL BORROWING BASE:** | | | **$46,869** |

The undersigned hereby represents and warrants for the benefit of the Secured Parties that:

(a)    With respect to each item of Borrowing Base credit which has been included in the foregoing calculations, each applicable provision in Article III of the Credit Agreement, and each applicable requirement of the Borrowing Base and of any defined term appearing in the definition of such term (or in the definition of any defined term appearing in the definition of such term or in any of such other defined terms), has been and remains satisfied as of the date of this certificate; and

(b)    No credit is included in the Borrowing Base for any Incomplete Item of Product.

[Signature Page Follows]

Our Alchemy, LLC • 5900 Wilshire Boulevard • 18th Floor • Los Angeles, CA 90036
Phone: 310.893.6289 • Fax: 323.937 0750 • ouralchemy.com

Page 18 of 31

CONFIDENTIAL

**AS41**

ST_AL_00005463

Attach supporting Schedules and other detail
in a form acceptable to the Administrative Agent

Our Alchemy, LLC
Borrowing Base Date: December 31, 2015
Updated January 15, 2016

**Borrowing Base Summary**

| Category | Gross Amount | Advance Rate | Net Amount [1] |
|---|---|---|---|
| Primary Major A/R | $ 51,643,770 | 95% | $ 26,008,572 |
| Secondary Major A/R | $ 12,852,157 | 90% | $ 7,657,568 |
| Non-Major A/R | $ 6,722,357 | 80% | $ 2,044,579 |
| Minor A/R | $ 5,817,809 | 30% | $ 293,556 |
| | | | |
| Netflix Presale | $ - | 95% | $ - |
| Eligible Library Amount | $ 27,200,000 | 40% | $ 10,880,000 |
| | | | |
| **Total Borrowing Base** | | | $ 46,869,074 |

**Estimated Outstanding Debt**

| | | | |
|---|---|---|---|
| Term Loan | | | $ 31,487,500 |
| Revolver | | | $ 17,200,000 |
| **Total Outstanding Debt** | | | $ 48,687,500 |
| **Borrowing Base Availability** | | | $ (1,818,426) |

**Revolver Availability**

| | | | |
|---|---|---|---|
| Max. Revolver Availability | | | $ 26,000,000 |
| Revolver Outstanding | | | $ 17,200,000 |
| | | | |
| Total Revolver Availability | | | $ 8,800,000 |
| | | | |
| Available Cash Balance | | | $ 4,064,582 |
| | | | |
| Required Liquidity | | | $ 2,000,000 |
| | | | |
| Net Revolver Availability | | | $ 246,156 |
| **Borrowing Availability (lesser of Net Revolver Availability and Borrowing Base Availability)** | | | $ (1,818,426) |

[1] Net Amount includes reserves for returns, participations and residuals, and minimum P&A spend for Netflix pre-buys

Our Alchemy, LLC • 5900 Wilshire Boulevard • 18th Floor • Los Angeles, CA 90036
Phone: 310.893.6289 • Fax: 323.937.0750 • ouralchemy.com

CONFIDENTIAL

**AS42**

ST_AL_00005464

Our Alchemy LLC (OurAlchemy)
Detailed Balance Sheet - Actual and %
Industry Classification: NAICS Code: 512120

Prepared: 12:32, 1/27/2016
Amounts Printed in: Thousands
STIMMAS (6.1.2.1)

| | 12/31/2013 | | 12/31/2014 | | 9/30/2015 | | 11/30/2014 | | 11/30/2015 | | 11/30/2015 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Statement Date | 12/31/2013 | | 12/31/2014 | | 9/30/2015 | | 11/30/2014 | | 11/30/2015 | | 11/30/2015 | |
| Months Covered | 12 | | 12 | | 12 | | 11 | | 11 | | 12 | |
| Audit Mthd | Co.Prep'd | | Co.Prep'd | | Co.Prep'd | | Co.Prep'd | | Co.Prep'd | | Co.Prep'd | |
| Accountant | | | recast | | | | recast | | | | | |
| Analyst | ufpm63 | | ugcc252 | | ugcc252 | | ugcc252 | | ugcc252 | | ugcc252 | |
| Stmt Type | Annual | | Annual | | TTM | | FY-To-Date | | FY-To-Date | | TTM | |
| Accounting Standard | US-GAAP | | US-GAAP | | US-GAAP | | US-GAAP | | US-GAAP | | US-GAAP | |
| **CURRENT ASSETS** | | | | | | | | | | | | |
| Cash | 6,228 | 7.9 | 2,377 | 2.2 | 2,812 | 1.5 | 3,810 | 3.2 | 2,160 | 1.3 | 2,160 | 1.3 |
| Accts/Notes Rec-Trade | 19,265 | 24.3 | 28,385 | 25.7 | 57,137 | 31.4 | 32,221 | 27.2 | 61,445 | 35.8 | 61,445 | 35.8 |
| Bad Debt Reserve (-) | - | - | 188 | 0.2 | 188 | 0.1 | 188 | 0.2 | 188 | 0.1 | 188 | 0.1 |
| Reserve for Returns (-) | - | - | 8,389 | 7.6 | 7,480 | 4.1 | 7,350 | 6.2 | 7,128 | 4.2 | 7,128 | 4.2 |
| Total Accts/Rec-Net | 19,265 | 24.3 | 19,808 | 18.0 | 49,469 | 27.2 | 24,683 | 20.9 | 54,129 | 31.6 | 54,129 | 31.6 |
| Accts/Notes Rec-Other | 8,399 | 10.6 | 9,861 | 8.9 | 7,398 | 4.1 | 8,519 | 7.2 | 5,656 | 3.3 | 5,656 | 3.3 |
| Inventory, net | 2,623 | 3.3 | 2,690 | 2.4 | 2,273 | 1.3 | 2,269 | 1.9 | 2,018 | 1.2 | 2,018 | 1.2 |
| TOTAL CURRENT ASSETS | 36,515 | 46.1 | 34,736 | 31.5 | 61,952 | 34.1 | 39,281 | 33.2 | 63,963 | 37.3 | 63,963 | 37.3 |
| **NON-CURRENT ASSETS** | | | | | | | | | | | | |
| Property & Equipment, net | 408 | 0.5 | 507 | 0.5 | 1,062 | 0.6 | 523 | 0.4 | 785 | 0.5 | 785 | 0.5 |
| Non-Op Non-Cur Assets | 774 | 1.0 | 4,495 | 4.1 | 1,500 | 0.8 | 3,547 | 3.0 | 4,848 | 2.8 | 4,848 | 2.8 |
| Film Assets, net | 41,553 | 52.4 | 88,768 | 80.5 | 103,456 | 56.9 | 86,668 | 73.2 | 104,103 | 60.7 | 104,103 | 60.7 |
| Intangibles - Other | - | - | 36,739 | 33.3 | 79,177 | 43.5 | 38,075 | 32.2 | 65,520 | 38.2 | 65,520 | 38.2 |
| Gross Intangibles | 41,553 | 52.4 | 125,507 | 113.8 | 182,633 | 100.4 | 124,743 | 105.4 | 169,623 | 98.9 | 169,623 | 98.9 |
| Accum Amort & Impairment(-) | - | - | 54,976 | 49.9 | 65,314 | 35.9 | 49,721 | 42.0 | 67,781 | 39.5 | 67,781 | 39.5 |
| Total Intangibles - Net | 41,553 | 52.4 | 70,531 | 64.0 | 117,319 | 64.5 | 75,022 | 63.4 | 101,842 | 59.4 | 101,842 | 59.4 |
| TOTAL NON-CURRENT ASSETS | 42,735 | 53.9 | 75,533 | 68.5 | 119,881 | 65.9 | 79,092 | 66.8 | 107,475 | 62.7 | 107,475 | 62.7 |
| TOTAL ASSETS | 79,250 | 100.0 | 110,269 | 100.0 | 181,833 | 100.0 | 118,373 | 100.0 | 171,438 | 100.0 | 171,438 | 100.0 |
| **CURRENT LIABILITIES** | | | | | | | | | | | | |
| AP & Accrued Exp. | 7,746 | 9.8 | 12,640 | 11.5 | 24,788 | 13.6 | 14,140 | 11.9 | 12,037 | 7.0 | 12,037 | 7.0 |
| AP-Producers & Participants | 33,150 | 41.8 | 34,793 | 31.6 | 57,666 | 31.7 | 40,553 | 34.3 | 67,224 | 39.2 | 67,224 | 39.2 |
| TOTAL CURRENT LIABILITIES | 40,896 | 51.6 | 47,433 | 43.0 | 82,454 | 45.3 | 54,693 | 46.2 | 79,261 | 46.2 | 79,261 | 46.2 |
| **NON-CURRENT LIABILITIES** | | | | | | | | | | | | |
| Revolver | - | - | 18,800 | 17.0 | 17,200 | 9.5 | 17,900 | 15.1 | 17,200 | 10.0 | 17,200 | 10.0 |
| Term Loan | - | - | 19,500 | 17.7 | 32,744 | 18.0 | 20,000 | 16.9 | 32,744 | 19.1 | 32,744 | 19.1 |
| Loans Payable | 8,600 | 10.9 | - | - | - | - | - | - | - | - | - | - |
| Merchandizing Financing | - | - | - | - | 4,351 | 2.4 | - | - | 4,000 | 2.3 | 4,000 | 2.3 |
| Notes Payable - Members | 4,930 | 6.2 | - | - | - | - | - | - | - | - | - | - |
| Marketing Advance | 3,225 | 4.1 | 2,199 | 2.0 | 1,372 | 0.8 | 2,212 | 1.9 | 906 | 0.5 | 906 | 0.5 |
| Deferred Revenue | 197 | 0.2 | 199 | 0.2 | 97 | 0.1 | 175 | 0.1 | - | - | - | - |
| Deferred Rent | 202 | 0.3 | - | - | - | - | - | - | - | - | - | - |
| TOTAL NON-CURRENT LIABILITIES | 17,154 | 21.6 | 40,698 | 36.9 | 55,764 | 30.7 | 40,287 | 34.0 | 54,850 | 32.0 | 54,850 | 32.0 |
| TOTAL LIABILITIES | 58,050 | 73.2 | 88,131 | 79.9 | 138,218 | 76.0 | 94,980 | 80.2 | 134,111 | 78.2 | 134,111 | 78.2 |
| **NET WORTH** | | | | | | | | | | | | |
| Subordinated Debt-Equity | - | - | - | - | 6,000 | 3.3 | - | - | 10,000 | 5.8 | 10,000 | 5.8 |
| Paid in Capital | - | - | 23,965 | 21.7 | 47,397 | 26.1 | 23,965 | 20.2 | 47,401 | 27.6 | 47,401 | 27.6 |
| Member Equity | 21,200 | 26.8 | (1,827) | (1.7) | (9,782) | (5.4) | (572) | (0.5) | (20,074) | (11.7) | (20,074) | (11.7) |
| TOTAL NET WORTH | 21,200 | 26.8 | 22,138 | 20.1 | 43,615 | 24.0 | 23,393 | 19.8 | 37,327 | 21.8 | 37,327 | 21.8 |
| TOTAL LIABILITIES & NET WORTH | 79,250 | 100.0 | 110,269 | 100.0 | 181,833 | 100.0 | 118,373 | 100.0 | 171,438 | 100.0 | 171,438 | 100.0 |
| | | | | | | | | | | | | |
| Working Capital | (4,381) | (5.5) | (12,697) | (11.5) | (20,502) | (11.3) | (15,412) | (13.0) | (15,298) | (8.9) | (15,298) | (8.9) |
| Tang Net Worth-Actual | (20,353) | (25.7) | (48,393) | (43.9) | (73,704) | (40.5) | (51,629) | (43.6) | (64,515) | (37.6) | (64,515) | (37.6) |

Notes:

AS43

CONFIDENTIAL

ST_AL_00005465

Our Alchemy LLC (OurAlchemy)
Detailed Income Statement - Actual and %
Industry Classification: NAICS Code: 512120

Prepared: 12:32, 1/27/2016
Amounts Printed in: Thousands
STIMMAS (6.1.2.1)

| | 12/31/2013 | | 12/31/2014 | | 9/30/2015 | | 11/30/2014 | | 11/30/2015 | | 11/30/2015 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Statement Date | 12/31/2013 | | 12/31/2014 | | 9/30/2015 | | 11/30/2014 | | 11/30/2015 | | 11/30/2015 | |
| Months Covered | 12 | | 12 | | 12 | | 11 | | 11 | | 12 | |
| Audit Mthd | Co.Prep'd | | Co.Prep'd recast | | Co.Prep'd | | Co.Prep'd recast | | Co.Prep'd | | Co.Prep'd | |
| Accountant | | | | | | | | | | | | |
| Analyst | ufpm63 | | ugcc252 | | ugcc252 | | ugcc252 | | ugcc252 | | ugcc252 | |
| Stmt Type | Annual | | Annual | | TTM | | FY-To-Date | | FY-To-Date | | TTM | |
| Accounting Standard | US-GAAP | | US-GAAP | | US-GAAP | | US-GAAP | | US-GAAP | | US-GAAP | |
| Alchemy & Red Cloud Sales | - | - | - | - | 171,947 | 159.7 | - | - | 171,947 | 137.6 | 171,947 | 125.8 |
| Alchemy Sales | 57,372 | 100.0 | 84,388 | 151.6 | 25,983 | 24.1 | 66,281 | 150.8 | 15,686 | 12.6 | 33,793 | 24.7 |
| Red Cloud Sales | | | | | | | | | 31,909 | 25.5 | 31,909 | 23.4 |
| Returns & Allowances/Rebates (-) | - | - | 28,720 | 51.6 | 90,233 | 83.8 | 22,315 | 50.8 | 94,601 | 75.7 | 101,006 | 73.9 |
| NET SALES/REVENUE | 57,372 | 100.0 | 55,668 | 100.0 | 107,697 | 100.0 | 43,966 | 100.0 | 124,941 | 100.0 | 136,643 | 100.0 |
| P&A, Marketing | 34,239 | 59.7 | 47,228 | 84.8 | 58,591 | 54.4 | 35,810 | 81.4 | 89,437 | 71.6 | 100,855 | 73.8 |
| Film Amort, Part/Residuals, Ult. Part. Amort | - | - | - | - | 25,798 | 24.0 | - | - | 16,943 | 13.6 | 16,943 | 12.4 |
| TOTAL COST OF SALES/REV | 34,239 | 59.7 | 47,228 | 84.8 | 84,389 | 78.4 | 35,810 | 81.4 | 106,380 | 85.1 | 117,798 | 86.2 |
| GROSS PROFIT | 23,133 | 40.3 | 8,440 | 15.2 | 23,308 | 21.6 | 8,156 | 18.6 | 18,561 | 14.9 | 18,845 | 13.8 |
| General & Admin Expense | 12,533 | 21.8 | 12,369 | 22.2 | 18,109 | 16.8 | 11,071 | 25.2 | 19,032 | 15.2 | 20,330 | 14.9 |
| Depreciation | 6,668 | 11.6 | - | - | - | - | - | - | - | - | - | - |
| Amortization of Intangible Assets | - | - | - | - | 2,788 | 2.6 | - | - | 3,423 | 2.7 | 3,423 | 2.5 |
| Transaction Costs | - | - | - | - | 1,158 | 1.1 | - | - | - | - | - | - |
| TOTAL OPERATING EXPENSE | 19,201 | 33.5 | 12,369 | 22.2 | 22,055 | 20.5 | 11,071 | 25.2 | 22,455 | 18.0 | 23,753 | 17.4 |
| NET OPERATING PROFIT | 3,932 | 6.9 | (3,929) | (7.1) | 1,253 | 1.2 | (2,915) | (6.6) | (3,894) | (3.1) | (4,908) | (3.6) |
| Interest Expense (-) | 858 | 1.5 | 1,027 | 1.8 | 2,274 | 2.1 | 735 | 1.7 | 2,389 | 1.9 | 2,681 | 2.0 |
| Other Expense (-) | - | - | 4,657 | 8.4 | 2,659 | 2.5 | 4,574 | 10.4 | 5,573 | 4.5 | 5,656 | 4.1 |
| TOTAL OTHER INCOME(EXP) | (858) | (1.5) | (5,684) | (10.2) | (4,933) | (4.6) | (5,309) | (12.1) | (7,962) | (6.4) | (8,337) | (6.1) |
| PROFIT BEFORE TAXES | 3,074 | 5.4 | (9,613) | (17.3) | (3,680) | (3.4) | (8,224) | (18.7) | (11,856) | (9.5) | (13,245) | (9.7) |
| Current Income Tax | - | - | - | - | (1,720) | (1.6) | - | - | - | - | - | - |
| Income Tax Credit (+) | - | - | 133 | 0.2 | (1,720) | (1.6) | (1) | - | - | - | 134 | 0.1 |
| TOTAL INCOME TAX EXPENSE | - | - | (133) | (0.2) | - | - | 1 | - | - | - | (134) | (0.1) |
| PROFIT BEFORE EXTRAORDINARY ITEMS | 3,074 | 5.4 | (9,480) | (17.0) | (3,680) | (3.4) | (8,225) | (18.7) | (11,856) | (9.5) | (13,111) | (9.6) |
| Extraordinary Gain(Loss) | (2,325) | (4.1) | - | - | - | - | - | - | - | - | - | - |
| NET PROFIT | 749 | 1.3 | (9,480) | (17.0) | (3,680) | (3.4) | (8,225) | (18.7) | (11,856) | (9.5) | (13,111) | (9.6) |
| EBIT | 3,932 | 6.9 | (8,586) | (15.4) | (1,406) | (1.3) | (7,489) | (17.0) | (9,467) | (7.6) | (10,564) | (7.7) |
| EBITDA | 10,600 | 18.5 | (8,586) | (15.4) | 27,180 | 25.2 | (7,489) | (17.0) | 10,899 | 8.7 | 9,802 | 7.2 |
| EBIDA | 10,600 | 18.5 | (8,453) | (15.2) | 27,180 | 25.2 | (7,490) | (17.0) | 10,899 | 8.7 | 9,936 | 7.3 |
| Adj to Retained Earnings | 2 | | - | | (7,698) | | - | | (7,698) | | (7,698) | |

Notes:

CONFIDENTIAL AS44 ST_AL_00005466

Our Alchemy LLC (OurAlchemy)
Detailed UCA Cash Flow
Industry Classification: NAICS Code: 512120

Prepared: 12:32, 1/27/2016
Amounts Printed in: Thousands
STIMMAS (6.1.2.1)

| Statement Date | 12/31/2013 | 12/31/2014 | 9/30/2015 | 11/30/2014 | 11/30/2015 | 11/30/2015 |
|---|---|---|---|---|---|---|
| Months Covered | 12 | 12 | 12 | 11 | 11 | 12 |
| Analyst | ufpm63 | ugcc252 | ugcc252 | ugcc252 | ugcc252 | ugcc252 |
| Stmt Type | Annual | Annual | TTM | FY-To-Date | FY-To-Date | TTM |
| Accounting Standard | US-GAAP | US-GAAP | | US-GAAP | US-GAAP | US-GAAP |
| Alchemy & Red Cloud Sales | - | 171,947 | | 171,947 | 171,947 | |
| Alchemy Sales | 84,388 | 25,983 | 66,281 | 15,686 | 33,793 | |
| Red Cloud Sales | - | - | | 31,909 | 31,909 | |
| Returns & Allowances/Rebates (-) | (28,720) | (90,233) | (22,315) | (94,601) | (101,006) | |
| Chg in Accts/Notes Rec-Trade | (9,120) | (42,709) | (12,956) | (33,060) | (33,060) | |
| Chg in Bad Debt Reserve (-) | 188 | - | 188 | - | - | |
| Chg in Reserve for Returns (-) | 8,389 | 7,480 | 7,350 | (1,261) | (1,261) | |
| Chg in Deferred Revenue | 2 | (59) | (22) | (199) | (199) | |
| Cash Collected From Sales | 55,127 | 72,409 | 38,526 | 90,421 | 102,123 | |
| P&A, Marketing | (47,228) | (58,591) | (35,810) | (89,437) | (100,855) | |
| Chg in Inventory, net | (67) | 44 | 354 | 672 | 672 | |
| Chg in AP & Accrued Exp. | 4,894 | 18,828 | 6,394 | (603) | (603) | |
| Cash Paid To Suppliers | (42,401) | (39,719) | (29,062) | (89,368) | (100,786) | |
| CASH FROM TRADING ACTIVITIES | 12,726 | 32,690 | 9,464 | 1,053 | 1,337 | |
| General & Admin Expense | (12,369) | (18,109) | (11,071) | (19,032) | (20,330) | |
| Transaction Costs | - | (1,158) | | - | - | |
| Chg in AP-Producers & Participants | 1,643 | 27,553 | 7,403 | 32,431 | 32,431 | |
| Cash Paid for Operating Costs | (10,726) | 8,286 | (3,668) | 13,399 | 12,101 | |
| CASH AFTER OPERATIONS | 2,000 | 40,976 | 5,796 | 14,452 | 13,438 | |
| Other Expense (-) | (4,657) | (2,659) | (4,574) | (5,573) | (5,656) | |
| Chg in Deferred Rent | (202) | - | (202) | - | - | |
| Current Income Tax | - | 1,720 | - | - | - | |
| Income Tax Credit (+) | 133 | (1,720) | (1) | - | 134 | |
| Other Income(Exp) & Taxes Paid | (4,726) | (2,659) | (4,777) | (5,573) | (5,522) | |
| NET CASH AFTER OPERATIONS | (2,726) | 38,317 | 1,019 | 8,879 | 7,916 | |
| Interest Expense (-) | (1,027) | (2,274) | (735) | (2,389) | (2,681) | |
| Cash Paid for Dividends & Interest | (1,027) | (2,274) | (735) | (2,389) | (2,681) | |
| NET CASH INCOME | (3,753) | 36,043 | 284 | 6,490 | 5,235 | |
| Current Portion Long Term Debt | - | - | - | - | - | |
| CASH AFTER DEBT AMORT. | (3,753) | 36,043 | 284 | 6,490 | 5,235 | |
| Chg in Property & Equipment, net | (99) | (604) | (115) | (278) | (278) | |
| Film Amort, Part/Residuals, Ult. Part. Amort | - | (25,798) | - | (16,943) | (16,943) | |
| Chg in Net Fixed Assets | (99) | (26,402) | (115) | (17,221) | (17,221) | |
| Chg in Accts/Notes Rec-Other | (1,462) | 1,849 | (120) | 4,205 | 4,205 | |
| Chg in Non-Op Non-Cur Assets | (3,721) | 3,211 | (2,773) | (353) | (353) | |
| Chg in Investments | (5,183) | 5,060 | (2,893) | 3,852 | 3,852 | |
| Chg in Film Costs, net | (47,215) | (65,777) | (45,115) | (15,335) | (15,335) | |
| Chg in Intangibles - Other | (36,739) | (55,567) | (38,075) | (28,781) | (28,781) | |
| Chg in Accum Amort & Impairment(-) | 54,976 | 65,314 | 49,721 | 12,805 | 12,805 | |
| Amortization of Intangible Assets | - | (2,788) | - | (3,423) | (3,423) | |
| Chg in Net Intangibles | (28,978) | (58,818) | (33,469) | (34,734) | (34,734) | |
| Cash Paid for Plant and Investments | (34,260) | (80,160) | (36,477) | (48,103) | (48,103) | |
| FINANCING SURPLUS (REQMNTS) | (38,013) | (44,117) | (36,193) | (41,613) | (42,868) | |
| Chg in Long Term Debt | 29,700 | 20,095 | 29,300 | 15,644 | 15,644 | |
| Chg in Notes Payable - Members | (4,930) | - | (4,930) | - | - | |
| Chg in Marketing Advance | (1,026) | (1,210) | (1,013) | (1,293) | (1,293) | |
| Unexplained Adj to Retained Earnings | (13,547) | (21,452) | (13,547) | 1,307 | 2,562 | |
| Adj to Retained Earnings | - | (7,698) | | (7,698) | (7,698) | |
| Chg in Paid In Capital | 23,965 | 47,397 | 23,965 | 23,436 | 23,436 | |
| Chg in Subordinated Debt-Equity | - | 6,000 | | 10,000 | 10,000 | |
| Total External Financing | 34,162 | 43,132 | 33,775 | 41,396 | 42,651 | |
| CASH AFTER FINANCING | (3,851) | (985) | (2,418) | (217) | (217) | |
| Add: | | | | | | |
| Cash | 6,228 | 3,797 | 6,228 | 2,377 | 2,377 | |
| ENDING CASH & EQUIVALENTS | 2,377 | 2,812 | 3,810 | 2,160 | 2,160 | |

SunTrust Bank, Inc. - Confidential

CONFIDENTIAL

AS45

ST_AL_00005467

Our Alchemy LLC (OurAlchemy)
Detailed UCA Cash Flow
Industry Classification: NAICS Code: 512120

Prepared: 12:32, 1/27/2016
Amounts Printed in: Thousands
STIMMAS (6.1.2.1)

| Statement Date | 12/31/2013 | 12/31/2014 | 9/30/2015 | 11/30/2014 | 11/30/2015 | 11/30/2015 |
|---|---|---|---|---|---|---|
| Months Covered | 12 | 12 | 12 | 11 | 11 | 12 |
| ...nalyst | ufpm63 | ugcc252 | ugcc252 | ugcc252 | ugcc252 | ugcc252 |
| ...nt Type | Annual | Annual | TTM | FY-To-Date | FY-To-Date | TTM |
| Accounting Standard | US-GAAP | US-GAAP | | US-GAAP | US-GAAP | US-GAAP |

CONFIDENTIAL                    **AS46**                    ST_AL_00005468

Our Alchemy LLC (OurAlchemy)
Detailed Ratios
Industry Classification: NAICS Code: 512120

Prepared: 12:32, 1/27/2016<br>Amounts Printed in: Thousands<br>STIMMAS (6.1.2.1)

| | 12/31/2013 | 12/31/2014 | 9/30/2015 | 11/30/2014 | 11/30/2015 | 11/30/2015 |
|---|---|---|---|---|---|---|
| Statement Date | | | | | | |
| Months Covered | 12 | 12 | 12 | 11 | 11 | 12 |
| Analyst | ufpm63 | ugcc252 | ugcc252 | ugcc252 | ugcc252 | ugcc252 |
| Stmt Type | Annual | Annual | TTM | FY-To-Date | FY-To-Date | TTM |
| Accounting Standard | US-GAAP | US-GAAP | | US-GAAP | US-GAAP | US-GAAP |
| **LIQUIDITY** | | | | | | |
| Working Capital | (4,381) | (12,697) | (20,502) | (15,412) | (15,298) | (15,298) |
| Quick Ratio | 0.83 | 0.68 | 0.72 | 0.68 | 0.78 | 0.78 |
| Current Ratio | 0.89 | 0.73 | 0.75 | 0.72 | 0.81 | 0.81 |
| Net Sales/Working Capital | (13.10) | (4.38) | (5.25) | (3.11) | (8.91) | (8.93) |
| **LEVERAGE** | | | | | | |
| Net Worth-Actual | 21,200 | 22,138 | 43,615 | 23,393 | 37,327 | 37,327 |
| Tang Net Worth-Actual | (20,353) | (48,393) | (73,704) | (51,629) | (64,515) | (64,515) |
| Eff Tang Net Worth-Actual | (20,353) | (48,393) | (73,704) | (51,629) | (64,515) | (64,515) |
| Debt/Worth | 2.74 | 3.98 | 3.17 | 4.06 | 3.59 | 3.59 |
| Debt/Tang Worth | (2.85) | (1.82) | (1.88) | (1.84) | (2.08) | (2.08) |
| Debt Less Sub Debt-Liability/Eff Tg Wth | (2.85) | (1.82) | (1.88) | (1.84) | (2.08) | (2.08) |
| Borrowed Funds/Eff Tg Worth | (0.42) | (0.79) | (0.74) | (0.73) | (0.84) | (0.84) |
| LT Debt/Net Fixed Assets | 21.08 | 75.54 | 51.13 | 72.47 | 68.72 | 68.72 |
| Total Liabilities/Total Assets | 0.73 | 0.80 | 0.76 | 0.80 | 0.78 | 0.78 |
| Debt to Book Capital | 0.29 | 0.63 | 0.55 | 0.62 | 0.59 | 0.59 |
| **COVERAGE** | | | | | | |
| Interest Coverage | 4.58 | (8.36) | (0.62) | (10.19) | (3.96) | (3.94) |
| Net Income+Depr+Amort-Divs/CPLTD | N/A | N/A | N/A | N/A | N/A | N/A |
| Net Income+Depr+Amort-Divs/CPLTD pp | | N/A | N/A | N/A | N/A | N/A |
| Input Cash Flow Coverage | - | - | - | - | - | - |
| UCA Cash Flow Coverage | | (2.65) | 16.85 | 1.39 | 3.72 | 2.95 |
| UCA Cash Flow/CPLTD pp | | (2.65) | 16.85 | 1.39 | 3.72 | 2.95 |
| EBITDA/Interest Exp+CPLTD | 12.35 | (8.36) | 11.95 | (10.19) | 4.56 | 3.66 |
| EBITDA/Interest Exp+CPLTD pp | | (8.36) | 11.95 | (10.19) | 4.56 | 3.66 |
| EBITDA | 10,600 | (8,586) | 27,180 | (7,489) | 10,899 | 9,802 |
| EBIDA | 10,600 | (8,453) | 27,180 | (7,490) | 10,899 | 9,936 |
| Fixed Charge Coverage | 12.35 | (8.36) | 11.95 | (10.19) | 4.56 | 3.66 |
| (FFO + Interest) / Interest Expense | N/A | (8.23) | 11.95 | (10.19) | 4.56 | 3.71 |
| Debt Coverage Ratio | N/A | (0.10) | 0.66 | 0.01 | 0.13 | 0.10 |
| Funded Debt/EBITDA | 0.81 | (4.46) | 2.00 | (4.64) | 4.54 | 5.50 |
| **PROFITABILITY (%)** | | | | | | |
| Return on Assets | 0.95 | (8.60) | (2.02) | (7.58) | (7.54) | (7.65) |
| Return on Equity | 3.53 | (42.82) | (8.44) | (38.36) | (34.65) | (35.12) |
| Gross Margin | 40.32 | 15.16 | 21.64 | 18.55 | 14.86 | 13.79 |
| Gross Margin (plus Depr) % | 40.32 | 15.16 | 45.60 | 18.55 | 28.42 | 26.19 |
| Operating Expense % | 33.47 | 22.22 | 20.48 | 25.18 | 17.97 | 17.38 |
| Operating Expense (excl Depr) % | 21.85 | 22.22 | 17.89 | 25.18 | 15.23 | 14.88 |
| Operating Profit Margin | 6.85 | (7.06) | 1.16 | (6.63) | (3.12) | (3.59) |
| Operating Profit Margin (plus Depr) % | 18.48 | (7.06) | 27.71 | (6.63) | 13.18 | 11.31 |
| Net Margin | 1.31 | (17.03) | (3.42) | (18.71) | (9.49) | (9.60) |
| Dividend Payout Rate | - | - | - | - | - | - |
| Effective Tax Rate | - | 1.38 | - | (0.01) | - | 1.01 |
| EBITA Margin % | 6.85 | (15.42) | 1.28 | (17.03) | (4.84) | (5.23) |
| **ACTIVITY** | | | | | | |
| Gross Accounts Receivable Days | - | 186.11 | 193.65 | 245.20 | 164.55 | 164.13 |
| Net Accounts Receivable Days | 122.56 | 129.88 | 167.66 | 187.84 | 144.95 | 144.59 |
| Inventory, net Days on Hand | 27.96 | 20.79 | 9.83 | 21.20 | 6.35 | 6.25 |
| Inventory Days on Hand (excl Depr) | 27.96 | 20.79 | 14.16 | 21.20 | 7.55 | 7.30 |
| Accounts Payable Days | 82.58 | 97.69 | 107.21 | 132.11 | 37.86 | 37.30 |
| Accounts Payable Days (excl Depr) | 82.58 | 97.69 | 154.42 | 132.11 | 45.03 | 43.56 |
| Net Sales/Total Assets | 0.72 | 0.50 | 0.59 | 0.41 | 0.80 | 0.80 |
| Net Sales/Net Worth | 2.71 | 2.51 | 2.47 | 2.05 | 3.65 | 3.66 |
| Net Sales/Net Fixed Assets | 140.62 | 109.80 | 101.41 | 91.71 | 173.63 | 174.07 |
| Profit Before Taxes/Total Assets (%) | 3.88 | (8.72) | (2.02) | (7.58) | (7.54) | (7.73) |
| CAPEX / Depreciation Expense | N/A | N/A | 1.02 | N/A | 1.02 | 1.02 |
| Cash to Net Sales | 0.11 | 0.04 | 0.03 | 0.08 | 0.02 | 0.02 |
| Log 10 (Net Sales) | 7.76 | 7.75 | 8.03 | 7.68 | 8.13 | 8.14 |

CONFIDENTIAL

**AS47**

ST_AL_00005469

Our Alchemy LLC (OurAlchemy)
Detailed Ratios
Industry Classification: NAICS Code: 512120

| Statement Date | 12/31/2013 | 12/31/2014 | 9/30/2015 | 11/30/2014 | 11/30/2015 | 11/30/2015 |
|---|---|---|---|---|---|---|
| Months Covered | 12 | 12 | 12 | 11 | 11 | 12 |
| ʼalyst | ufpm63 | ugcc252 | ugcc252 | ugcc252 | ugcc252 | ugcc252 |
| nt Type | Annual | Annual | TTM | FY-To-Date | FY-To-Date | TTM |
| Accounting Standard | US-GAAP | US-GAAP | | US-GAAP | US-GAAP | US-GAAP |
| **GROWTH (%)** | | | | | | |
| Total Assets Growth | | 39.14 | 89.29 | 49.37 | 55.47 | 55.47 |
| Total Liabilities Growth | | 51.82 | 89.31 | 63.62 | 52.17 | 52.17 |
| Net Worth Growth | | 4.42 | 89.24 | 10.34 | 68.61 | 68.61 |
| Net Sales Growth | | (2.97) | 128.70 | (16.40) | 144.84 | 145.46 |
| Operating Profit Growth | | N/A | N/A | N/A | (8.12) | (24.92) |
| Net Profit Growth | | N/A | 2.31 | N/A | (36.43) | (38.30) |
| Sustainable Growth | (1.72) | 7.60 | 1.80 | 6.80 | 8.86 | 8.99 |
| **CASH FLOW** | | | | | | |
| RCF / Adjusted Debt | | (0.25) | 0.46 | (0.24) | 0.17 | 0.13 |
| RCF / Net Adjusted Debt | | (0.26) | 0.48 | (0.26) | 0.18 | 0.14 |
| (RCF - CAPEX) / Adjusted Debt | | (0.25) | (0.03) | (0.24) | (0.18) | (0.18) |
| FCF / Adjusted Debt | | (0.10) | 0.65 | 0.01 | 0.13 | 0.09 |
| FCF / Net Adjusted Debt | | (0.11) | 0.69 | 0.01 | 0.13 | 0.10 |
| FFO / Adjusted Debt | N/A | (0.25) | 0.46 | (0.24) | 0.17 | 0.13 |
| FFO / Net Adjusted Debt | N/A | (0.26) | 0.48 | (0.26) | 0.18 | 0.14 |
| CAPEX / CFO | N/A | (0.03) | 0.73 | 0.40 | 2.65 | 3.29 |
| CFO / Profit Before Extraordinary Items | N/A | 0.40 | (9.79) | (0.03) | (0.55) | (0.40) |
| **SUNTRUST RATIOS** | | | | | | |
| Senior Debt/EBITDA | 1.04 | (4.46) | 2.00 | (5.06) | 4.95 | 5.50 |
| Total Funded Debt/EBITDA | 1.04 | (4.46) | 2.22 | (5.06) | 5.87 | 6.52 |

SunTrust Bank, Inc. - Confidential

CONFIDENTIAL

**AS48**

ST_AL_00005470

# STI Risk Rating Approval Report
### Approval Document

Customer Name: Our Alchemy LLC
Risk Analyst Customer ID: 572269
LAS ID: 21413902
CLO Firm Type: N/A

Prepared By: Cutro.Craig (UGCC252)
NAICS Code: 512120
Latest Annual Financial Statement Date: 11/30/2015

## Obligor Summary - Last Modified 1/27/2016

| Final Obligor Risk Rating:16 | Actual PD: 1.2205 | Risk Rating Model: MDL: Commercial and Industrial |
|---|---|---|

| Internal / Check-Adjusted Rating: | 11 |
| Guarantor Adjusted Rating: | 11 |
| Override Rating: | 16 |

** Additional or higher level approval for overrride may be required per Policy **

Comments: SEG PM recommends a 5-notch judgmental downgrade to PRISM 15 from MRA rating of PRISM 10, which is based on pro forma TTM 10/31/15 consolidated financials of Alchemy and Red Cloud. The 5-notch override is due to volatile operating and weakening 3Q15 and 10/15 operating performance, Alchemy / Red Cloud integration issues, liquidity pressures in recent periods due to numerous issues (capacity constraints at Sony DADC, weak operating performance reducing shipments and receivables, return reserves at clients) and accounting / operation improprieties are suspected to have been committed by the recently fired CFO. Additionally, Red Cloud and Alchemy's primary businesses are in physical distribution of home entertainment, which is in secular decline.

We gain some comfort in the rating due to the Company's vast distribution network which includes Target, Wal-Mart, Best Buy and Netflix. Additionally, the support of the equity investors in supporting short-term working capital needs through an unsecured Mezzanine Facility provides additional comfort.

A facility rating "H" is recommended in recognition of the projected 11/30/15 Borrowing Base provided by the Company.

Alerts: At least 1 guarantor may have a stale rating where the guarantor customer has not been reviewed/saved within the last 12 months. Please review the guarantor's ratings and save as appropriate.

| LAS: COMPASS | LAS ID: 21413902 | Current LAS Risk Rating: 15 |
|---|---|---|

### Related Parties

| Type | Name | Risk Rating | Weight % | RA ID | LAS | LAS ID |
|---|---|---|---|---|---|---|
| Guarantor | Calrissian LP | 15 | 100.00% | 584491 | COMPASS | 21413928 |
| Parent | Calrissian LP | 15 | | 584491 | COMPASS | 21413928 |

## Obligor Detail

*Section Name: Obligor*

| Factor | Value |
|---|---|
| **Obligor Information** | |
| Purpose for Rating | Out-of-Cycle Review |
| Public/Private | Private |
| Obligor Type | General C&I |
| Obligor Number | 21413902 |
| Customer Number | 572269 |
| Model Version | 6.3.2.1 |
| Model Documentation | [open clarify text to the right for scorecard documentation] |
| Last Modified Date | 1/27/2016 12:33 PM |

**Obligor Notes**

SunTrust Bank, Inc. - Confidential

**AS49**

CONFIDENTIAL

STI Risk Rating Approval Report

Prepared: 12:33, 1/27/2016

### Section Name: Parent

| Factor | Value |
|---|---|
| **Parent Information** | |
| Parent Customer Number | 584491 |
| Parent Obligor Number | 21413928 |
| Parent Name | Calrissian LP |
| Parent Final PD Rating | 15 |
| Use (Substitute) Parent Rating? | No |

**Parent Notes**

### Section Name: Internal Rating

| Factor | Value |
|---|---|
| **Select the appropriate responses** | |
| Has Financials? | Yes |
| **Financial Statement Information** | |
| Analysis Setup Statement Selection Mode | ANNUAL |
| Statement Date | 11/30/2015 |
| Type | TTM |
| Periods | 12 |
| Audit Method | Co.Prep'd |
| **Firm Size** | |
| Total Assets (in 1000s) | 171438 |
| Firm Size | Large Firm |
| **RiskCalc for Private Firm (Large Firm)Version 3.1** | |
| Moody's EDF % | 2.465313 |
| User-Supplied EDF % (optional) | |
| Reason | |
| Internal PD % | 1.22045198019802 |
| **CreditEdge for Public Firm (manual)** | |

Section Total          0.00    11.00    20.00

**Internal Rating Notes**

### Section Name: Guarantors

| Factor | Value |
|---|---|
| **Check-Adjusted Rating** | |
| Internal Rating | 11 |
| **Blended Guarantor Rating** | |
| Blended Guarantor Rating | 15 |
| Blended Guarantor Weight (%) | 0.00% |
| **Select the conditions that apply (pertains to all guarantors)** | |
| Written Support? | Yes |
| Legally Enforceable Support? | Yes |
| Strategically Important? | No |
| Promise to Maintain? | No |
| Full Guarantee? | Yes |
| Sufficient Size? | Yes |

Section Total          0.00    11.00    20.00

**Guarantor Notes**

### Section Name: Override

| Factor | Value |
|---|---|
| **Guarantor-Adjusted Rating** | |
| Guarantors | 11 |

SunTrust Bank, Inc. - Confidential

CONFIDENTIAL

**AS50**

ST_AL_00005472

STI Risk Rating Approval Report

| Factor | Value |
|---|---|
| **Select reason(s) for override** | |
| Override Reason | Other Information |
| **Final Grade Override** | |
| Override Action | Worsen by 5 |
| **Model Rating After Overrides** | |
| Override | 16 |

*Section Total*

0.00     16.00     20.00

**Final Notes**

SEG PM recommends a 5-notch judgmental downgrade to PRISM 15 from MRA rating of PRISM 10, which is based on pro forma TTM 10/31/15 consolidated financials of Alchemy and Red Cloud. The 5-notch override is due to volatile operating and weakening 3Q15 and 10/15 operating performance, Alchemy / Red Cloud integration issues, liquidity pressures in recent periods due to numerous issues (capacity constraints at Sony DADC, weak operating performance reducing shipments and receivables, return reserves at clients) and accounting / operation improprieties are suspected to have been committed by the recently fired CFO. Additionally, Red Cloud and Alchemy's primary businesses are in physical distribution of home entertainment, which is in secular decline.

We gain some comfort in the rating due to the Company's vast distribution network which includes Target, Wal-Mart, Best Buy and Netflix. Additionally, the support of the equity investors in supporting short-term working capital needs through an unsecured Mezzanine Facility provides additional comfort.

A facility rating "H" is recommended in recognition of the projected 11/30/15 Borrowing Base provided by the Company.

| Name: | Title: | Date: |
|---|---|---|
| Name: | Title: | Date: |
| Name: | Title: | Date: |

## Facility Summary

| RA Fac ID | LAS | LAS ID | Group | Commitment | Type | Model | LGD | Proposed Rating | Current Rating | Last Modified Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 230830 | COMPASS | 174 | Group 2 | $11,545 | 0123 - Non Revolver for Loans - Binding | General | 37.31% | H | H | 1/27/2016 |
| 283068 | COMPASS | 208 | Group 2 | $9,533 | 0620 - Revolver - Binding | General | 37.31% | H | H | 1/27/2016 |
| 258354 | COMPASS | 133 | Group 3 | $75 | 1730 - Corporate Card - Rev - Guidance | General | 50.00% | K | K | 1/27/2016 |
| 236316 | COMPASS | 67 | | $2,000 | 1330 - Int Rate Derivatives - Guidance | General | 50.00% | H | H | 1/27/2016 |

Alerts:     Facility '236316': The facility risk rating has been overridden (improved) by 3 grades, approval may be required from the appropriate Credit Risk Manager, Senior Credit Officer, CIB Head of Portfolio Management or DCB Goeg Portfolio Management Leader. Per Credit Policy, overrides of a swap guidance facility to match that of a loan to which it's cross-collateralized does not require override approval. Refer to GEN1201 for additional information on Override Authorities.

## Grouped Facility Detail

### Group 2

| RA FAC ID: 230830 | Model: General | LAS: COMPASS | LAS#: 174 | LGD: 37.3148% | Proposed Rating: H | Current Rating: H |
|---|---|---|---|---|---|---|
| Rating Date: | 1/27/2016 | | | | | |

| | | | |
|---|---|---|---|
| Facility Type: | 0123 - Non Revolver for Loans - Binding | Notes: | |
| Facility Class: | Term Loan | | |
| Business Group: | WIM | | |
| Guarantee Type: | None | Original Model Rating: H | |
| Commitment: | $11,545 | | |
| Outstanding: | $11,545 | | |

CONFIDENTIAL

**AS51**

ST_AL_00005473

STI Risk Rating Approval Report                                                    Prepared: 12:33, 1/27/2016

| RA FAC ID: 230830 Model: General | LAS: COMPASS | LAS#: 174 | LGD: 37.3148% | Proposed Rating: H | Current Rating: H |
|---|---|---|---|---|---|

| | |
|---|---|
| Pari Passu Commitment: | $19,942 |
| Pari Passu Outstanding: | $19,942 |
| Avg. Drawn $: | $11,545 |
| EAD Amount: | $11,545 |

| RA FAC ID: 283068 Model: General | LAS: COMPASS | LAS#: 208 | LGD: 37.3148% | Proposed Rating: H | Current Rating: H |
|---|---|---|---|---|---|

| | | | |
|---|---|---|---|
| Rating Date: | 1/27/2016 | | |
| Facility Type: | 0620 - Revolver - Binding | Notes: | |
| Facility Class: | Revolver/Line of Credit | | |
| Business Group: | None | | |
| Guarantee Type: | | Original Model Rating: H | |
| Commitment: | $9,533 | | |
| Outstanding: | $6,307 | | |
| Pari Passu Commitment: | $16,467 | | |
| Pari Passu Outstanding: | $10,893 | | |
| Avg. Drawn $: | $6,307 | | |
| EAD Amount: | $7,275 | | |

| Collateral ID: 230831 | Collateral Name: Non-Major A/R | CMS#: |
|---|---|---|

| | |
|---|---|
| Collateral Type: | 310 - ACCT/REC-MONITORED |
| Collateral Class: | 04 - Accounts Receivable |
| Value: | 2555 |
| Under Construction: | No |
| Valuation Source: | Internal Other |
| Valuation Method: | Eligible Net Book Value |
| Sr. Claim: | 0 |
| Control: | Perfected Security Interest |
| Advance Rate: | 80 |

| Collateral ID: 230832 | Collateral Name: Library | CMS#: |
|---|---|---|

| | |
|---|---|
| Collateral Type: | 430 - COPYRIGHTS |
| Collateral Class: | 18 - Intellectual Property |
| Value: | 27200 |
| Under Construction: | No |
| Valuation Source: | External Appraiser |
| Valuation Method: | Fair Market Value |
| Sr. Claim: | 0 |
| Control: | Perfected Security Interest |
| Advance Rate: | 40 |

| Collateral ID: 246816 | Collateral Name: Primary Major A/R | CMS#: |
|---|---|---|

| | |
|---|---|
| Collateral Type: | 310 - ACCT/REC-MONITORED |
| Collateral Class: | 04 - Accounts Receivable |
| Value: | 27378 |
| Under Construction: | No |
| Valuation Source: | Internal Expert |
| Valuation Method: | Eligible Net Book Value |
| Sr. Claim: | 0 |
| Control: | Perfected Security Interest |
| Advance Rate: | 95 |
| Additional Comments: | Net A/R after returns/participations reserve |

| Collateral ID: 246820 | Collateral Name: Major Acceptable A/R | CMS#: |
|---|---|---|

| | |
|---|---|
| Collateral Type: | 310 - ACCT/REC-MONITORED |
| Collateral Class: | 04 - Accounts Receivable |
| Value: | 8486 |
| Under Construction: | No |
| Valuation Source: | Internal Expert |

SunTrust Bank, Inc. - Confidential

CONFIDENTIAL                    **AS52**                    ST_AL_00005474

STI Risk Rating Approval Report

Prepared: 12:33, 1/27/2016

| Collateral Type: | 310 - ACCT/REC-MONITORED |
| Valuation Method: | Eligible Net Book Value |
| Sr. Claim: | 0 |
| Control: | Perfected Security Interest |
| Advance Rate: | 90 |

| Collateral ID:251487 | Collateral Name: Minor A/R | CMS#: |
|---|---|---|
| Collateral Type: | 310 - ACCT/REC-MONITORED | |
| Collateral Class: | 04 - Accounts Receivable | |
| Value: | 597 | |
| Under Construction: | No | |
| Valuation Source: | Internal Other | |
| Valuation Method: | Eligible Net Book Value | |
| Sr. Claim: | 0 | |
| Control: | Perfected Security Interest | |
| Advance Rate: | 50 | |

| Collateral ID:251488 | Collateral Name: US Theatrical Rentals | CMS#: |
|---|---|---|
| Collateral Type: | 310 - ACCT/REC-MONITORED | |
| Collateral Class: | 04 - Accounts Receivable | |
| Value: | 0 | |
| Under Construction: | | |
| Valuation Source: | Internal Other | |
| Valuation Method: | Eligible Net Book Value | |
| Sr. Claim: | 0 | |
| Control: | Perfected Security Interest | |
| Advance Rate: | 80 | |

### Group 3

| RA FAC ID: 258354 | Model: General | LAS: COMPASS | LAS#: 133 | LGD: 50% | Proposed Rating: K | Current Rating:K |
|---|---|---|---|---|---|---|
| Rating Date: | 1/27/2016 | | | | | |

| Facility Type: | 1730 - Corporate Card - Rev - Guidance | Notes: |
| Facility Class: | Guidance Facility | |
| Business Group: | WIM | |
| Guarantee Type: | None | Original Model Rating: K |
| Commitment: | $75 | |
| Outstanding: | $0 | |
| Avg. Drawn $: | $0 | |
| EAD Amount: | $22 | |

| Collateral ID: 258358 | Collateral Name: Unsecured | CMS#: |
|---|---|---|
| Collateral Type: | 000 - UNSECURED | |
| Collateral Class: | 23 - Unsecured | |
| Value: | 0 | |
| Under Construction: | | |
| Valuation Source: | Internal Other | |
| Valuation Method: | Net Book Value | |
| Sr. Claim: | 0 | |
| Control: | No Control Selected (Unsecured) | |
| Advance Rate: | 0 | |

### Ungrouped Facility Detail

| RA FAC ID: 236316 | Model: General | LAS: COMPASS | LAS#: 67 | LGD: 50% | Proposed Rating: H | Current Rating:H |
|---|---|---|---|---|---|---|
| Rating Date: | 1/27/2016 | | | | | |

| | | Override Reason | Cross Collateralized Swap |
| Facility Type: | 1330 - Int Rate Derivatives - Guidance | Notes: | |
| Facility Class: | Guidance Facility | | |
| Business Group: | WIM | | |
| Guarantee Type: | None | Original Model Rating: K | |

CONFIDENTIAL

**AS53**

ST_AL_00005475

STI Risk Rating Approval Report

| RA FAC ID: 236316 | Model: General | LAS: COMPASS | LAS#: 67 | LGD: 50% | Proposed Rating: H | Current Rating:H |
| --- | --- | --- | --- | --- | --- | --- |

| | |
| --- | --- |
| Commitment: | $2,000 |
| Outstanding: | $0 |
| Avg. Drawn $: | $0 |
| AD Amount: | $600 |

Override Note      Guidance line for Swaps which will be treated as pari-passu with Senior Debt facilities.

CONFIDENTIAL

AS54

ST_AL_00005476

| From: | Mark A. Perez |
| To: | Kelly Summers; Lawrence Kelly; Jeff Ivers; Scott Guthrie; Rex Bowring |
| Cc: | Peter Hoffman; Demetrios Tsipras; Chris MacDonald; Brian Wade |
| Subject: | CIM Source Data |
| Date: | Friday, April 22, 2016 1:18:14 PM |
| Attachments: | OUTPUT Alchemy Liability Management Summary 04 22 16.xlsx |
| | Alchemy Library Valuation Draft.msg |
| | Alchemy March Borrowing Base DRAFT.msg |
| | Alchemy Liabilties Schedules.msg |
| | Whs_Inventory_Title_Supplier as of April 20.xlsm.msg |
| | Re detail on disputed buysell accounts.msg |
| | Overview of Red Cloud settlement amounts 12-15-15 v 10 DAN (01 20 16) COMPLAINT SUMMARY (Adjusted).xlsx |
| | Cash Forecast Variance Report 4 21 2016 FINAL.pdf |
| | OUTPUT Alchemy Financials Summary.xlsx |
| | BDO audit-2013.pdf |
| | 2014 Income Statement Sub-schedule versions.msg |
| | Alchemy Dec 2015 Financial Statements.msg |
| | Acquisitions 2017 Inputs at April 2016 v1.xlsm |

Team – attached for everyone's reference are the source files for all financial information in the CIM (excluding the financial model output which is a separate work product). All data has been sourced from the company or based on files previous reviewed by the company.

MP

**Mark A. Perez**
Virgo Investment Group LLC
555 Twin Dolphin Dr | Suite 615 | Redwood Shores, CA 94065
Office: 650-453-3625 | Mobile: 650-483-9001 | Fax: 650-461-9117
e-mail: mark@virgo-llc.com | www.virgo-llc.com

*This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.*


EXHIBIT
16

| | Alchemy Standalone | | Alchemy Standalone | | Alchemy Standalone | | ANconnect |
|---|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014B | 2014A | 2015B | 2015A | 2015B |
| Net Revenue | 47,554 | 56,411 | 64,955 | 55,668 | 72,980 | 54,531 | 116,352 |
| Cost of Sales | 26,793 | 34,443 | 41,635 | 35,850 | 48,463 | 41,817 | 101,271 |
| **Gross Profit** | **20,761** | **21,968** | **23,321** | **19,818** | **24,517** | **12,714** | **15,081** |
| *Gross Margin* | *43.7%* | *38.9%* | *35.9%* | *35.6%* | *33.6%* | *23.3%* | *13.0%* |
| SG&A | 10,669 | 12,576 | 11,259 | 12,369 | 13,610 | 17,412 | 4,886 |
| **EBITD** | **10,092** | **9,392** | **12,061** | **7,449** | **10,908** | **(4,698)** | **10,195** |

Depreciaton in SG&A                    (246)

**AS56**

| Standalone | Eliminations | Consolidated | |
|---|---|---|---|
| 2015A | 2015A | 2015B | 2015A |
| 76,783 | | 189,332 | 131,314 |
| 63,840 | | 149,734 | 105,657 |
| **12,943** | | **39,599** | **25,657** |
| *16.9%* | | *20.9%* | *19.5%* |
| 4,456 | (2,228) | 18,496 | 19,640 |
| **8,487** | | **21,103** | **6,017** |

| ($000s) | Alchemy Standalone | | |
|---|---|---|---|
| | 2012 | 2013 | 2014 |
| Net Revenue | $47,554 | $56,411 | $55,668 |
| Cost of Sales | 26,793 | 34,443 | 35,850 |
| **Gross Profit** | **$20,761** | **$21,968** | **$19,818** |
| *Gross Margin* | *43.7%* | *38.9%* | *35.6%* |
| SG&A | 10,669 | 12,576 | 12,369 |
| **EBITD** | **$10,092** | **$9,392** | **$7,449** |
| | (audited) | (audited) | (unaudited) |

**AS57**

|  | 2015 | Alchemy + ANconnect 2015 |
|---|---|---|
|  | $54,531 | $131,314 |
|  | 41,817 | 105,657 |
|  | **$12,714** | **$25,657** |
|  | *23.3%* | *19.5%* |
|  | 15,184 | 19,640 |
|  | **($2,470)** | **$6,017** |

(unaudited)

Confidential Information Memorandum

# ALCHEMY  Debt Recapitalization
## $70,000,000 Senior Secured Term Loan

### Our Alchemy, LLC as Borrower

**April 2016**

### Disclosures

This confidential information summary (the "Presentation") is being furnished by Our Alchemy, LLC and/or its affiliates ("Alchemy") solely for the purpose of enabling prospective lenders to consider a term loan for a contemplated debt recapitalization of Alchemy.

This Presentation is provided for informational purposes and does not constitute investment advice. The recipient should seek advice tailored to its own particular circumstances from independent tax, financial, legal and advisors.

Securities offered through Growth Capital Services, member FINRA, SIPC 582 Market Street, Suite 300, San Francisco, CA 94104 www.growthcapitalservices.com

This Presentation contains information which has been provided by a number of sources. The information contained herein has not been independently verified, and no representation or warranty, express or implied, is made by Alchemy, or any of its advisers (including without limitation, EMP Media Partners LLC or its respective representatives), representatives or counsel as to the accuracy or completeness of such information or any other information to be made available to any prospective investor. In addition, contained within this Presentation are certain projections prepared solely by Alchemy. Alchemy makes no representation as to their attainability or the accuracy of the assumptions used in this preparation, nor can any such representation be implied. The actual results of Alchemy and its affiliates may differ materially from the projections set forth herein.





Confidential Information Memorandum

# Notice Concerning Forward-Looking Statements

This Presentation contains forward-looking statements and information that are based on the beliefs of Alchemy's management, as well as assumptions made by and information currently available to Alchemy. All statements other than statements of historical fact included in this Presentation are forward-looking statements, including but not limited to statements identified by the words "anticipates", "believes", "estimates", "expects", "intends", "projects" and similar expressions. These statements reflect Alchemy's current views with respect to future events; however, the statements are subject to a number of risks, uncertainties and assumptions. Should risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those in the forward-looking statements. Alchemy does not intend to update these forward-looking statements and information after the date of this Presentation.  This Presentation or the confidential financial model to be circulated by Alchemy contains a projection of future financial performance.  Such projection is based on numerous estimates and other assumptions about future events and circumstances, many of which will not be within the control of Alchemy and its management.  Alchemy believes that such estimates and other assumptions are reasonable under the circumstances, but no representation, warranty or other assurance is given that such projection will be realized.  There will be variances between such projection and actual events and results, and such variations will likely be material.

i

AS60

Confidential Information Memorandum

# Important Notices to Prospective Lenders

This Presentation has been prepared by Alchemy (collectively, with any officer, director, employee, advisor or agent of any of them, the "Preparers") for the purpose of setting out certain confidential information in respect of Alchemy's business. References to this "Presentation" include any information which has been or may be supplied in writing or orally in connection with this Presentation or in connection with any further inquiries in respect of this Presentation.

This Presentation, the information contained herein, and the information that has been or may be supplied in writing or orally in connections with this Presentation are confidential. In addition to the terms of any confidentiality undertaking that a recipient may have entered into with Alchemy, by its acceptance of the Presentation, each recipient agrees that it will not, and it will procure that each of its agents, representatives, advisors, affiliates, directors or employees (collectively, "Representatives"), will not, and will not permit any third party to, copy, reproduce or distribute to others this Presentation, in whole or in part, at any time without the prior written consent of Alchemy, and that it will keep confidential all information contained herein or otherwise supplied by Alchemy not already in the public domain without violation by the Representatives of any applicable confidentiality restriction. If a recipient has signed a confidentiality undertaking with Alchemy, this Presentation also constitutes Confidential Information (as such term is defined in each applicable non-disclosure agreement with each recipient) for the purposes of such undertaking. Each recipient, by accepting a copy of this Presentation, agrees that is shall be responsible for any breach of any applicable confidentiality restrictions (including the confidentiality restrictions set forth in this paragraph) by its Representatives.

While the information contained in this Presentation is believed to be accurate, the Preparers have not conducted any investigation with respect to such information. The Preparers expressly disclaim any and all liability for representations or warranties, expressed or implied, contained in, or for omissions from, this Presentation or any other written or oral communication transmitted to any interested party in connection with this Presentation so far as is permitted by law. In particular, but without limitation, no representation or warranty is given as to the achievement or reasonableness of, and no reliance should be placed on, any projections, estimates, forecasts, analyses or forward-looking statements contained in this Presentation which involve by their nature a number of risks, uncertainties or assumptions that could cause actual results or events to differ materially from those expressed or implied in this Presentation. By its acceptance hereof, each recipient agrees that none of the Preparers nor any of their respective Representatives shall be liable for any direct, indirect or consequential loss or damages suffered by any person as a result of relying on any statement in or omission from this Presentation, along with other information furnished in connection therewith, and any such liability is expressly disclaimed.

Except to the extent otherwise indicated, this Presentation presents information as of the date hereof. The delivery of this Presentation shall not, under any circumstances, create any implication that there will be no change in the affairs of Alchemy after the date hereof. In furnishing this Presentation, the Preparers reserve the right to amend or replace this Presentation at any time and undertake no obligation to update any of the information contained in the Presentation or to correct any inaccuracies that may become apparent. Notwithstanding the foregoing, the Preparers undertake no obligation to update any information set forth herein or otherwise provided to prospective lenders or their Representatives, whether as a result of new information, future events or otherwise.

This Presentation and all information contained herein shall remain the property of Alchemy and, without limiting the generality of the foregoing, no license whatsoever shall be deemed to be granted to any prospective lender or any of their respective Representatives. Alchemy may, at any time, request that any recipient or its Representatives promptly deliver to Alchemy or, if directed in writing by Alchemy, destroy all confidential information relating to this Presentation (including copies of this Presentation) received in written, electronic or other tangible form whatsoever, including without limitation all copies, reproductions, computer diskettes or written materials which contain such confidential information. At such time, all other notes, analyses or compilations constituting or containing confidential information in the recipient's, or their Representatives', possession shall be destroyed. Such destruction shall be certified to Alchemy by the recipient in writing.

Neither the dissemination of this Presentation nor any part of its contents is to be taken as any form of commitment on the part of the Preparers or any of their respective affiliates to enter into any contract or otherwise create any legally binding obligation or commitment. The Preparers expressly reserve the right, in their absolute discretion, without prior notice and without any liability to any recipient to terminate discussions with any recipient or any other parties at any time for any reason or no reason.

This Presentation does not constitute or form part of any offer or invitation to sell, or any solicitation of any offer to purchase any securities of Alchemy or its affiliates, nor shall it or any part of it or the fact of its distribution form the basis of, or be relied on in connection with, any contract or commitment or investment decisions relating thereto, nor does it constitute a recommendation regarding securities of Alchemy or any of its affiliates.

AS61

Confidential Information Memorandum

# Transaction Contacts

| Primary Contacts | | | |
|---|---|---|---|
| **Our Alchemy, LLC** | | | |
| Scott Guthrie | Co-President | (424) 343-1562 | Scott.Guthrie@ouralchemy.com |
| Kelly Summers | Co-President | (424) 281-3829 | Kelly.Summers@ouralchemy.com |
| Jeff Ivers | Advisor | (310) 710-1280 | Jeff.Ivers@ouralchemy.com |
| Lawrence Kelly | SVP, Strategy & Planning | (424) 281-3818 | Lawrence.Kelly@ouralchemy.com |
| | | | |
| **Virgo Investment Group, LLC** | | | |
| Jesse Watson | Partner | (650) 453-3624 | jwatson@virgo-llc.com |
| Mark Perez | Partner | (650) 453-3625 | mark@virgo-llc.com |
| Chris MacDonald | Partner | (914) 977-3315 | chris@virgo-llc.com |
| | | | |
| **Stroock & Stroock & Lavan LLP (Borrower Counsel)** | | | |
| Sky Moore | Partner | (310) 556-5959 | smoore@stroock.com |
| | | | |
| **EMP Media Partners LLC (Financial Advisor)** | | | |
| Peter Hoffman | Partner | (212) 488-0771 | hoffman@empmediapartners.com |
| Demetrios Tsipras | Principal | (212) 488-0772 | dtsipras@empmediapartners.com |
| Alicia Cooper | Senior Associate | (212) 488-0773 | cooper@empmediapartners.com |

AS62

Confidential Information Memorandum

# Execution Timetable & Key Dates

| | | April 2016 | | | | | | | May 2016 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S | M | T | W | T | F | S | S | M | T | W | T | F | S |
| 27 | 28 | 29 | 30 | 31 | 1 | 2 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 | 29 | 30 | 31 | | | | |

Key Transaction Dates

Holiday

| Date | |
|---|---|
| April 14 & 15 | ■ Teaser & NDA circulated to prospective lenders |
| April 25 | ■ CIM circulated to interested parties; data room open |
| Week of May 2 | ■ One-on-one meetings in New York & Los Angeles |
| May 5 | ■ Written indications of interest due |
| Week of May 9 | ■ On-site and confirmatory due diligence |
| May 16 | ■ Distribution of documentation |
| May 26 | ■ Closing / funding |

**AS63**

Confidential Information Memorandum

# Table of Contents

1. **Executive Summary**

2. **Business Overview**

3. **Operating Plan**

4. **Transaction Overview**

5. **Financial Information**

6. **Appendix**
   - Management Biographies
   - Data Room Access

v

**AS64**



Confidential Information Memorandum

# 1.   Executive Summary

Confidential Information Memorandum

# Executive Summary
## Introduction

- Our Alchemy, LLC ("Alchemy" or the "Company") is the largest home video distributor of independent film content and is a prominent digital distributor of content with direct relationships with all major digital outlets
  - #1 home video distribution market share for non-studio content, providing aggregation directly into all major retailers
  - Alchemy is the only independent film distributor with direct vendor access to all major physical and digital retailers
  - Alchemy is the only distribution company managing substantial market share for third-party content that also maintains a substantial project acquisition and sales infrastructure. No other company currently operates as both a top video and digital distributor and prolific acquirer of niche film product
  - By virtue of its direct vendor numbers with all major physical and digital retailers, Alchemy enjoys a unique market position with high barriers to entry against potential competitors and strong market consolidation potential
- Alchemy operates with 77 employees, is headquartered in Los Angeles, and offers fulfillment for its customers as a leading supplier of physical video content to large retailers such as Walmart and Target and digital distribution through all major outlets including iTunes, Netflix and Amazon
  - The Company is an important aggregator of independent film content from over 80 third-party suppliers to key physical and digital retailers (**services business**)
  - Alchemy manages the sales and fulfillment of a broad array of product that makes it an invaluable distributor of diverse product to the most active buyers of independent product domestically. Product diversification also helps the Company maximize its "name" capacity in the marketplace and maintain market share
  - Content is primarily concentrated in genres such as Action, Family/Kids, Faith, Horror, and Documentaries – and is not intended to compete with the larger, broad appeal theatrical product produced by the major Hollywood studios.
- To complement its services business, the Company owns and manages a large content library containing nearly 700 titles which generates stable cash flow of approximately $4 million to $5 million per year
  - To replenish its library, Alchemy sources third-party product under long-term licenses or acquires content, which generates dual-source income from distribution service fees and profit participations (**acquisitions business**)

**AS66**

# Executive Summary
## Business Platform

- Alchemy's integrated business platform generates fees or profit participations across each aspect of the content distribution and delivery chain
- Alchemy offers producers of non-studio filmed entertainment access to all major media channels to maximize exploitation of content across all consumer touch points



Confidential Information Memorandum

# Executive Summary
## Recent Events – ANconnect Transaction

■ In July 2015, to further bolster its services business, Alchemy acquired the physical home video and digital distribution capabilities of Anderson Media ("ANconnect")

  — The transaction gave Alchemy direct access to the largest retailers for which it previously did not have direct relationships/vendor numbers – Walmart, Sam's Club and Best Buy

  — Over 30 new third-party content suppliers were brought onto the Alchemy services business platform

  — The ANconnect transaction further solidified Alchemy's market position by making it the largest independent content physical distributor and further expanding its digital distribution capabilities

■ However, the ANconnect transaction presented a number of integration and operational challenges for Alchemy post-closing

  — Alchemy entered into a one-year Transition Services Agreement ("TSA") with Anderson intended to minimize any operational and service level disruptions to retailers and content suppliers during the integration of ANconnect into Alchemy

  — Under the TSA, Anderson effectively operated the ANconnect business on behalf of Alchemy – physical logistics services, warehousing, order fulfillment, freight management, and returns processing

  — Anderson implemented a company-wide transition to SAP at the start of this transition period (although concurrent, unrelated to the timing of the transaction).  The SAP transition was a failure, causing major disruptions to the ANconnect business

  — Alchemy terminated the TSA after 90 days and moved all related services in-house

■ The disruption caused by Anderson's SAP implementation during the transition period had material adverse consequences to the operating and financial condition of ANconnect/Alchemy in 2H15

**AS68**

Confidential Information Memorandum

# Executive Summary
## Recent Events – ANconnect Transaction (continued)

- Anderson's SAP implementation during the ANconnect transition period materially adversely impacted the liquidity and financial performance of the consolidated Alchemy business

- Alchemy is determining its best recourse against Anderson for effective value destruction during the ANconnect transition

| | Issue | Impact |
|---|---|---|
| **1** | **Lost Sales** | ■ Anderson did not fulfill orders or shipped to the wrong location resulting in lost sales, high returns and retailer complaints<br>■ Actual 3Q2015 sales (during the transition period) were 50% below forecast with significantly higher retailer returns<br>■ Lost working capital (liquidity) and net revenue |
| **2** | **Higher Transition Costs** | ■ Anderson could not provide accurate sales / operating data post-closing resulting in inaccurate reporting to suppliers<br>■ Alchemy was forced to retain transition personnel longer than expected to address the resulting reporting issues<br>■ Higher SG&A costs |
| **3** | **Company-wide Distraction** | ■ Anderson did not provide the expected service levels during the transition— resulting in constant "fire drills"<br>■ The Company was focused on reacting to issues (retailer complaints, content supplier issues) versus running the business<br>■ Lower performance within the core Alchemy business |

AS69

Confidential Information Memorandum

# Executive Summary
## Recent Events – Other Challenges

■ In addition to issues related to the ANconnect transition, the core Alchemy business experienced downward financial pressure in 2014 and 2015 related to lower than expected performance on acquired and owned film content

— Calendar 2014: underperformance of a high investment single title *Fading Gigolo* (April 2014 theatrical release with approximately $6 million in minimum guarantee payments ("MGs") and prints and advertising ("P&A") spend) plus certain other released titles pushed down EBITD for the year

— Calendar 2015: retailer returns "overhang" in 1H15 from underperforming 2014 releases, lower catalog sales (function of sales team distraction during the ANconnect transition), and higher SG&A related to higher ANconnect transition costs resulted in negative EBITD for the year

| ($000s) | Alchemy Standalone | | | | Alchemy + ANconnect |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2015 |
| Net Revenue | $47,554 | $56,411 | $55,668 | $54,531 | $131,314 |
| Cost of Sales | 26,793 | 34,442 | 35,850 | 41,817 | 105,657 |
| Gross Profit | $20,761 | $21,968 | $19,818 | $12,714 | $25,657 |
| Gross Margin | 43.7% | 38.9% | 35.6% | 23.3% | 19.5% |
| SG&A | 10,669 | 12,576 | 12,369 | 15,184 | 19,640 |
| EBITD | $10,092 | $9,392 | $7,449 | ($2,470) | $6,017 |

Select Historical Financial Performance (Calendar Year)

*Note: 2012-2013 based on audited financials. 2014-2015 based on unaudited financials.*

# Executive Summary
## Restructuring Plan

- The ANconnect transition is complete (large one-time drag on the business) – however, the recent negative events have left the company in a vulnerable position, under-collateralized on its senior bank facility and facing short-term liquidity issues
- The Company believes its current strategic positioning is critical to meeting the needs of independent and non-studio content owners, and that there is more value to be realized in the Alchemy platform
- Alchemy has launched a restructuring plan to stabilize the business and position Alchemy to execute on planned growth initiatives

| Initiative | Key Commentary |
|---|---|
| New management team | ■ Operations and business development expertise aligned with restructuring plan<br>■ Significant industry experience – The Walt Disney Company, Paramount Pictures<br>■ Improved fiscal discipline around cost controls and capital outlay / investments |
| Streamlined cost structure | ■ Redundant headcount reduction plan launched in February 2016 and ongoing<br>■ Pursuit of supply chain cost improvements both internally and via potential external partnerships in process |
| Services business margin improvement | ■ Use of Alchemy's unique market positioning to improve distribution fees vis-à-vis independent content suppliers |
| Improved film acquisition "greenlight" | ■ New investment model focused on leveraging Alchemy's unique distribution footprint versus chasing "prestige"<br>■ New commercial planning process based on input from all internal stakeholder groups (checks and balances)<br>■ Near-term focus on specific consumer group demand-driven titles / longer term upside with potential broader release titles |

Confidential Information Memorandum

# Executive Summary
## Summary Request

---

**Summary Request**

- In connection with its restructuring plan, Alchemy is seeking commitments for a new $70 million 3-year senior secured term loan from institutional lenders as soon as practicable. The Company is currently operating under a forbearance agreement with its senior lender group and is executing a restructuring of the business

- Alchemy is carefully managing its liquidity position with pressure from vendors and content suppliers as the Company works through a recapitalization plan, operational restructuring and strategic review

- The recapitalization financing will allow Alchemy to resolve various legacy liabilities, stabilize its liquidity position, and allow for the execution of growth initiatives aimed at leveraging its unique market position

---

☑ **Alchemy has initiated a comprehensive plan of restructuring the business**
- New management team is implementing operational improvements, enhanced supply chain management and financial discipline
- Streamlined operations with 52% cut in overhead compared to the 12-month period prior to restructuring
- Focus on improving supply chain management and optimizing relationships with key content suppliers
- Actively managing sales dilution (returns) and monetizing surplus inventory
- Restoring library replenishment initiatives with a disciplined film acquisition program

☑ **Restructured business emerges with an improved credit profile and more stable earnings**
- Proceeds from the recapitalization shall be used to extinguish legacy liabilities and 'unburden' the company to pursue growth initiatives
- Bottoms up strategy starting with a rationalized cost structure, a stabilized services business, and the re-launch of the acquisitions business
- Acquisition of new content via the new greenlight process provides earnings upside based on future capital allocation plan

☑ **Strong financial sponsorship**
- Lead sponsor, Virgo Investment Group ("Virgo"), is actively working with new management to implement the restructuring plan and recapitalization
- Virgo is contemplating the arrangement of a new content acquisitions fund (with exclusive distribution through Alchemy) designed to generate attractive investment returns from new acquired content but also offer Alchemy increased purchasing power in the market for new film acquisitions
- Existing Virgo-led subordinate debt is to be deeply subordinated without a cash pay coupon as part of the recapitalization financing

---

**AS72**

Confidential Information Memorandum

# Executive Summary
## Current Situation

| | |
|---|---|
| **Market Leadership** | ■ The only independent film distributor with direct vendor access to all major physical and digital retailers<br>■ Best in class sales operation with low-risk, recurring earnings model with the services business<br>■ Market position helps maximize sales prices for library and in-house productions |
| **New Management Team** | ■ Organizational focus on project execution and financial management<br>■ Identified initiatives to improve cash flow visibility and margin<br>■ Resetting primary focus to investment and growth within digital platforms |
| **Sponsor Support** | ■ Virgo has invested $14 million in the business since August 2015<br>■ Virgo helps develop, implement and execute Alchemy's restructuring and growth strategy<br>■ Potential arrangement of new content acquisitions fund with exclusive distribution through Alchemy |
| **Broad Distribution Output** | ■ Direct output relationships with leading buyers in the primary theatrical, home video and digital markets<br>■ Flexible domestic theatrical output arrangement to maximize risk-adjusted return<br>■ Go-to distributor for non-studio, independent content suppliers |
| **Efficient Content Acquisition Strategy** | ■ Risk and cost of development largely shifted to producer partnerships and strategic alliances while ensuring high quality supply of new content<br>■ Revamped greenlight process with broad departmental representation |

AS73

Confidential Information Memorandum

# Executive Summary
## Transaction Overview

- Alchemy is seeking a 3-year, $70 million Senior Secured Term Loan (the "Term Loan") to recapitalize the Company via the US institutional credit market, and build credit relationships that can provide financial support through a credit restructuring and support its medium-term growth initiatives (see Section 3 – "Operating Plan" – page 27)

- The Term Loan is to be used to (i) fully retire Alchemy's existing bank debt, (ii) fund near term working capital requirements, (iii) pay certain past due payments to important content suppliers or fund the negotiated settlement of certain trade obligations, (iv) finance the acquisition of new independent film content for distribution, and (v) pay transaction closing costs

- Estimated sources and uses of the financing and Alchemy's capitalization pro forma for the transaction is set forth below:

| Estimated Sources & Uses ($ millions) | |
| --- | --- |
| **Sources:** | |
| New Term Loan | $70.0 |
| Cash | 2.5 |
| Near-Term Liquidity Measures [2] | 3.0 |
| Total Sources | $75.5 |
| | |
| **Uses:** | |
| Retire existing bank debt | $47.3 |
| Working capital / content acquisitions | 2.6 |
| Trade payments | 21.6 |
| Transaction costs and expenses | 4.0 |
| Total Uses | $75.5 |

| Pro Forma Debt Capitalization[1] ($ millions) | | | |
| --- | --- | --- | --- |
| | Pre-Closing | Closing Adjustments | Pro-Forma Mar-31-2016 |
| Cash [3] | $2.5 | $0.1 | $2.6 |
| | | | |
| Existing bank facilities | $47.3 | $(47.3) | $ 0.0 |
| New Term Loan | | 70.0 | 70.0 |
| Subordinate Debt [4] | 14.0 | | 14.0 |
| Total Debt | $61.3 | $22.7 | $84.0 |
| Net Debt | $58.8 | $22.6 | $81.4 |

[1] Assumes closing as of March 31, 2016 for purposes of presentation
[2] Includes sale of non-productive inventory and certain content supplier contract termination payments currently in negotiation
[3] Approximately $2.6 million earmarked for current and future film releases (existing commitment)
[4] 100% of the Subordinate Debt is held by two of Alchemy's existing equity holders

AS74

Confidential Information Memorandum

# Executive Summary
## Pro Forma Corporate Structure & Funding Sources

■ Alchemy's legal structure and capitalization pro forma for the recapitalization is set forth below

— Approximately $48 million of paid-in capital through an investment holding company, Calrissian LP, and additional capital invested as subordinate debt by lead investors of approximately $14 million, which is to be deeply subordinated as part of the recapitalization

— A new $70 million Term Loan at the operating company supported by guarantees from each subsidiary of the borrower

■ A new film acquisition fund ("Media Fund I" or the "Fund") is contemplated to be established and initially capitalized with $5 million arranged by Virgo

— Media Fund I would establish a distribution agreement with Alchemy to source and distribute film content acquired by the Fund



Executive Summary 11

AS75

Confidential Information Memorandum

# Executive Summary
## Pro Forma Capitalization ($000s)

■ Alchemy's anticipated pro forma capitalization upon closing the recapitalization is set forth below:

| Account | Before Recap | Cash Adjustments | Non-Cash Adjustments | Pro Forma at Closing | Notes |
|---|---|---|---|---|---|
| Cash | $ 2,490 | $ 113 | $ 0 | $ 2,603 | |
| | | | | | |
| Existing Bank Facilities | | | | | |
| Revolver | 17,050 | (17,050) | -- | -- | |
| Term Loan | 30,232 | (30,232) | -- | -- | |
| Total Existing Bank Debt | 47,282 | (47,282) | -- | -- | |
| | | | | | |
| New Recap Financing | | | | | |
| Term Loan | -- | 70,000 | -- | 70,000 | |
| | | | | | |
| Existing Mezzanine Debt | 14,000 | -- | -- | 14,000 | [1] |
| Contributed Equity | 47,600 | -- | -- | 47,600 | |
| | | | | | |
| Trade Claims & Other Obligations | | | | | |
| Accounts Payable | 8,836 | (2,541) | -- | 6,296 | [2] |
| Film Minimum Guarantees | 9,037 | (4,773) | (1,625) | 2,638 | [3] |
| Participations & Residuals | 23,180 | (16,877) | (1,471) | 4,833 | [4] |
| Litigation Reserve | 4,742 | -- | (1,412) | 3,330 | [5] |
| Total Trade Claims & Other | 45,796 | (24,191) | (4,508) | 17,097 | |

[1] Deeply subordinated; zero coupon
[2] Pay 31+ Days Past Due amounts; partially offset by the ongoing ANconnect transaction reconciliation
[3] Assumes settlement of legacy amounts at 80%.
[4] Assumes settlement of legacy amounts at 85%.
[5] Assumes settlement at 70%.

**AS76**

Confidential Information Memorandum

## 2. Business Overview

AS77

# Business Overview
### Business Description

- Alchemy is the largest independent distributor of film and television content across all platforms and windows in North America
- Leading full-service distributor of non-studio film and television product, creating a one-stop destination for top sales, marketing and distribution services across all platforms
  - Partners with producers, production companies and independent suppliers to distribute content through all major distribution channels for video content
  - Alchemy acquires content for its own library for self-distribution, leveraging extensive experience and knowledge of distribution channels, business models, consumer preferences and sales trends
- Company-owned film library of nearly 700 titles
- Alchemy commands a 50% market share given its unique distribution footprint across physical and digital channels
  - Only independent distributor that provides direct access to all major physical retailers (Walmart, Target, Best Buy, Amazon, Sam's Club)
  - Leading independent supplier to digital platforms (iTunes, Netflix, cable VOD, Amazon, Hulu)
- Content comes from relationships with 80+ suppliers

AS78

Confidential Information Memorandum

# Business Overview
## Key Functional Areas and Value Proposition Across Product Lifecycle

**Acquisitions**
- Responsible for all producer, filmmaker, festival, and agency relationships
- Pursues content at the script, development, production and finished stage, and leads introduction of film projects to greenlight process
- Negotiates all content acquisition agreements, and transitions new projects into the Alchemy organization with a focus on leveraging content within key distribution channels and platforms

**Product Management**
- Primary point of client service and product strategy within the organization
- Works with filmmakers, producers, talent and suppliers on integrated marketing, product lifecycle, and distribution strategy for acquired and third-party content
- Collaborates with Sales on business plans, product management lifecycle and manages title P&L theatrical P&A budgets, media planning, and publicity

**Sales**
- Integrated team sells acquired and third-party content direct to all key retailers and digital platforms
- Collaborates with Product Management to develop and execute product management lifecycle including pricing, partner advertising and co-op support
- Oversees client relationships with all classes of trade within physical and digital channels including mass, specialty, and online retail, cable, telecom, and internet and television

**Creative Services**
- Supports production of creative and marketing materials for Alchemy acquisitions and third-party product from 80+ suppliers
- Works closely with filmmakers and vendors on creative vision and positioning for trailers, theatrical one-sheets, bonus features, TV spots, package art, in-store design, and all print and digital assets

**Supply Chain & Operations**
- Responsible for new release and promotional planning, procurement, demand planning, inventory control, customer service, VMI, QC, encoding/transcoding, data control and production of clips and promotional content
- Negotiates rate card and terms with vendors
- Drives production milestones and builds operational efficiencies across organization.

**AS79**

Confidential Information Memorandum

# Business Overview
## Operating Segments

| | 1. Content Acquisitions | 2. Full-Service Content Distribution | 3. Library Management |
|---|---|---|---|
| Summary: | ■ Acquire rights to distribute and exploit films across multiple channels and permitted geographies<br>■ First-dollar distribution fees as percentage of gross receipts<br>■ Worldwide distribution profits derived from ownership over duration of the copyright | ■ Service-based fee revenue associated with full-service physical and digital distribution<br>■ Services include marketing, sales, manufacturing and fulfillment<br>■ Product distributed across theatrical, home entertainment, TV and digital channels | ■ Distribution fees and profits from licensing product for distribution in specified channels<br>— Acquired product is owned life of copyright<br>— Licensed product is generally subject to long-term license agreements (15+ years) |
| **NTM Profit Contribution %:** | 21% | 63% | 16% |
| Strategy: | ■ Risk-averse internal guidelines and capital preservation model minimizes investment exposure<br>■ Revised greenlight process to increase profitability<br>■ Steady build-up of content ownership and film library generates long-tail revenues | ■ Grow market leadership<br>■ Optimize supplier relationships and inventory management to improve contribution margin<br>■ Leverage agency model to increase fees with high touch, high margin, premium service level | ■ Creation of innovative multi-features and multi-pack sets to reach new, wider audiences across retail and digital<br>■ Leverage access to genre trends, sales data and comparative analytics to optimize repositioning and placement<br>■ Replenishment initiatives to boost packaged value of catalog titles |
| Competitive Advantages: | ■ Real-time direct access to all content sales channels as valuation inputs<br>■ Risk mitigation and minimizing capital-at-risk<br>■ Investments priced on reverse inquiry | ■ Market leadership by volume and market share<br>■ Direct access to all channels<br>■ Trusted content curators with brand management expertise | ■ Diverse product mix helps extend appeal across a broad base of licensees and extend marketability to various genre channels<br>■ Dedicated catalog marketing and creative resources |
| **Required Capital:** | Fixed | Minimal | Low |
| Funding Sources: | ■ Self-funded (cash from operations)<br>■ Term Loan proceeds<br>■ Strategic investment | ■ Self-funded (cash from operations) | ■ Self-funded (cash from operations) |

**AS80**

Confidential Information Memorandum

# Business Overview
## Content Acquisitions – Origination & Greenlight Strategy

- New management recently overhauled the acquisition greenlight process and returned focus to Alchemy's traditional core competency in highly commercial fare (action, horror, etc.)
  - Acquisition strategy under previous management heavily focused on festival-oriented, prestige fare with emphasis on Hollywood community acceptance vs. consumer demand and marketability; expensive MG and P&A commitments led to increased risk
- New investment model:
  - Source deals that leverage Alchemy's unique distribution footprint:
    - > Acquire diverse slate of films that appeal to audiences across multiple distribution channels
    - > Build relationships with commercial filmmakers who can consistently deliver a marketable and profitable slate
    - > Real-time sales data, trends, and analytics to augment traditional comparables approach as well as measure macro industry and consumer dynamics
  - Forecasting methods updated to reflect secular shifts in marketplace and channels through which consumers obtain content
  - Attention to qualitative factors including crossover potential, commercial red flags and marketing strategy
  - Assessment of fit within film investment portfolio return objectives and capital allocation trade-offs
  - Films must achieve target ROI of 30%, inclusive of distribution fees
- Installation of a new commercial planning process to optimize content investments:
  - "Neutral" financial planning team to own investment analytics and go-to-market planning
  - Portfolio perspective with established annual investment and marketing budgets, enable management flexibility
  - Transparent forecast, actuals, quarterly business review/post-mortem

AS81

Confidential Information Memorandum

# Business Overview
## Content Acquisitions – Greenlight Process

- Acquisition strategy based on selecting projects in the key consumer genres with reliable audiences and clear target segments that meet the supply needs of Alchemy's partners across all channels of distribution (theatrical, retail, digital, cable/sat, TV)
  - Key genres include action, horror, faith, and family
- Real-time access to market intelligence, sales analytics, and consumer buying trends reduces investment risk through inclusion in greenlight discussions and valuation model
- Tiered approach that balances higher value / higher touch content with risk / return profiles to fill market needs:
  - Tier 1: Multi-platform releases, Walmart Tier 1, Redbox placement, PVOD opportunity, meaningful SVOD license
  - Tier 2: Multi-platform releases, Walmart Tier 2, Redbox potential, SVOD opportunity
- Focused on highly commercial projects under $500k in acquisition advance or MG advance
- Leverage internal theatrical releasing capabilities to achieve higher SVOD and TV licensing fees
- Carefully manage windowing to optimize ultimate P&L performance



**Collaborative Process**

**Roles & Approvals**

- **Acquisitions** delivers comprehensive "pitch" so that stakeholders have a strong sense of film product and come equipped to contribute an informed perspective on commercial opportunity for selected projects
- **Marketing** to evaluate positioning, audience appeal, target market segments, release strategy, optimal art and talent requirements, and campaign ideas
- **Sales** to participate in comps analysis, provide distribution perspective, discuss go-to-market strategies and expected performance
- **Finance** to prepare greenlight models for team review, present overall Alchemy financial goals, expected performance metrics and perspective on capital allocation
- Executive leads from all groups sign approved greenlight projects
- Projects with total investment greater than $1 million to be submitted for Board approval

**AS82**

Confidential Information Memorandum

# Business Overview
## Content Acquisitions – Commercial Planning

- Alchemy's unique position as a full-service, full-channel distributor allows it to reduce content acquisitions risk through diversified sourcing, full-cycle commercial planning and multiple business models:
  - Acquire film copyright, generate distribution fees (25-40% of gross sales), participate in backend profits and build enterprise library value
  - Distribute films from third-party suppliers through agency model, generating distribution fees (10-15% of net sales)
- Greenlight process allows Alchemy to evaluate both options and achieve maximum risk-adjusted return
- Real-time access to full cycle distribution and product management planning across all formats are leveraged to improve greenlight forecasting capabilities and assessment of title marketability



**Full Cycle Planning**

**Steps**

| | |
|---|---|
| Greenlight / Pre-Acquisition | • Project receiving greenlight are negotiated and when acquisition in complete, handed off to commercial planning team<br>• Commercial planning prepares the go-to-market strategy including sales forecasting across all channels, development of marketing plan, trade spend forecasting and creation of title-specific P&L |
| Post-Acquisition | • Content is solicited and analytics teams begin to track key metrics including screen counts, initial shipments, mid-sell reports, and digital platform sell-in<br>• Forecasts and business plans are used by supply chain and operations to author, manufacture, and ship assets |
| Post-Release | • Sales reporting team prepares box office, title and channel-specific POS, shipments, returns, and sell-through data, and title is replenished and reforecast<br>• Quarterly business reviews and post-mortem analysis to evaluate performance<br>• Observations and trends and immediately leveraged into greenlight investment model and process |

AS83

Confidential Information Memorandum

# Business Overview
## Content Acquisitions – Film Acquisition Fund

- To facilitate new content throughput at Alchemy, Virgo is contemplating the establishment of a discrete film content acquisition vehicle, Media Fund I (the "<u>Fund</u>")
  - The Fund shall be capitalized through new equity investments – initial starting equity capital amount of $5 million with the ability to grow investment capacity over time with (i) additional equity commitments and/or (ii) third-party senior financing based on a growing track record
  - Use of capital is to acquire new film content owned 100% by the Fund
- Alchemy shall serve as "<u>Master Distributor</u>" to the Fund in exchange for distribution fees generated from Fund content
  - Alchemy shall provide film content origination and qualification (greenlighting), production, exploitation of acquired rights (via license, sale or distribution), and certain administrative functions on behalf of the Fund
  - Alchemy can use the track record developed through the Fund to enhance its own funded content acquisition strategy



Business Overview

AS84

# Business Overview
**Full-Service Content Distribution**

| | |
|---|---|
| **Supplier / Content Owner Market Needs** | ■ Independent filmmakers, producers and distributors make fewer films and lack size and scale, making it difficult or impossible to gain meaningful attention for their product at big box retail, cable/sat, digital distribution and TV licensors<br><br>■ Limited visibility into retail activity and macro sales data means suppliers have fewer tools and insights, negatively impacting ability to optimize production, creative, and business planning<br><br>■ Lack of access to cost-effective manufacturing, delivery, and inventory management leads to high supply chain expense<br><br>■ Challenging to manage complex multi-channel content distribution requirements (product, legal, accounting) |
| **Retailer and Digital Platform Market Needs** | ■ Not enough resources to build and manage relationships with a large number of content suppliers, and limited desire to create additional vendor numbers in the category<br><br>■ Not enough resources to review and filter the large volume of independent content available in the marketplace<br><br>■ Time consuming and difficult to optimize available shelf space without strong category partnerships and thought leadership from experienced suppliers |
| **Alchemy Value Proposition** | ■ Allows smaller players similar access to distribution and the economics of scale major studios enjoy<br><br>■ Single source for access to specialized resources to optimize performance of titles across all content distribution channels<br><br>■ Curate industry's independent and present marketable titles and programs designed to secure optimal cross-channel placement and performance |
| **Alchemy Market Opportunity** | ■ Grow market share in current services by attracting new clients and suppliers to Alchemy<br><br>■ Increase revenues and profit by optimizing service offerings and fee structure<br><br>■ Expand portfolio of serviceable content and increase value of franchises and brands by attracting newer digital consumer-driven formats (e-books, apps, web, etc.)<br><br>■ Position Alchemy as a "major studio" solution and alternative to in-house management of category, and take advantage of continued consolidation in the market |

AS85

# Business Overview
## Full-Service Content Distribution: Top Suppliers



















AS86

Confidential Information Memorandum

# Business Overview
## Full-Service Content Distribution: Overview

- Alchemy has relationships with over 80+ content producers and suppliers who utilize Alchemy's physical and digital distribution channels to bring their films to market

- In addition to market access, Alchemy provides marketing, sales, manufacturing and fulfillment services across the theatrical, home entertainment, TV and digital channels

- The services business allows Alchemy to generate meaningful contribution with low capital risk
  - Agency model generates fee based on customer revenue generation with costs flowing through back to customer
  - Wholesale model creates contribution through sale to retailers at pre-defined rate card
  - Alchemy acts as custodian for customer receipts from retailer, ensuring first-dollar repayment of costs and earned fees

- Relationships with content suppliers and producers create a continuous supply of commercially viable content for exploitation

- Alchemy is able to leverage market intelligence, sales analytics, and consumer buying trends to influence content provided by suppliers and fill stated content needs from retailers

- Significant opportunity exists to increase fee percentages with high touch, high margin service levels and realization of operational efficiencies
  - New management has been unable to pursue these initiates due to disruption from the ANconnect transaction

- Even with operational disruptions caused by the ANconnect transaction, customers have remained loyal to Alchemy due to the importance of an independent distribution option

| Alchemy's Client Service Development Roadmap | | |
|---|---|---|
| **Short-Term: Stabilize Client Service**<br>**1-3 months** | **Mid-Term: Grow Profits & Revenues**<br>**3-6 months** | **Long-Term: Consolidation Opportunity**<br>**6+ months** |
| ■ Resolve outstanding integration issues<br>■ Establish new product flow from existing suppliers<br>■ Regain top client-service performance levels<br>■ Shed unprofitable or low-margin suppliers | ■ Develop new optimized fee structure bringing service levels in alignment with price<br>■ Attract profitable new clients from competing independent distributors (with less robust market position)<br>■ Expand portfolio of serviceable content to include more digital formats | ■ Establish strong track record and realize operational efficiencies<br>■ Position Alchemy as alternative to in-house category management<br>■ Offer solutions to studio majors preparing to offload or consolidate mature market distribution |

AS87

Confidential Information Memorandum

# Business Overview
## Library Management

- Alchemy library composed of nearly 700 films that have been acquired or licenses over time from a variety of sources since its founding in 2010
- Titles are available for exploitation in specified channels and generate distribution fees and profits from licensing product
  - Acquired product is owned life of copyright
  - Licensed product is generally subject to long-term license agreements (15+ years)
- Generates revenue along a predicable long tail with minimal costs, creating annuity like cash flows
- Library benefits from diverse product mix, which extends appeal across a broad base of licensees and marketability to various genre channels
- Dedicated resources can improve earning potential through library management initiatives
  - Innovative multi-features and multi-pack sets to reach new, wider audiences across retail and digital
  - Ability to optimize repositioning and placement given Alchemy's access to genre trends, sales data and comparative analytics
  - Replenishment initiatives to boost packaged value of catalog titles

---

**Example Library Promotion**

### 12-PICTURE MULTI-PACKS

- **Alchemy's "Action" Set is #1 Walmart Multi-Pack seller for 10 months straight and still running**
- 4-genre sets designed to target popular themes that perform well at retail (Action, Horror, Sci-Fi, Urban)
- All new package design and multi-feature line look
- Research-driven selection of re-purposed key art featuring talent and images that sell
- Leverage existing and repurposed physical inventory keeps costs low
- Value-added product maintains higher price points and avoiding bargain bin placement




---

Business Overview                                    24

**AS88**

Confidential Information Memorandum

# Business Overview
## Library Management: Fall 2016 Programs

| 2016 Retail Initiatives | |
|---|---|
| **MAKE IT A MOVIE NIGHT**<br><br>■ New 'Make It A Movie Night' gift sets feature four different themes each with 12 best-selling, star studded films<br>■ Themes include: 1. "Family Night! 2. Girls Night! 3. Adrenaline Night! 4. Date Night!<br>■ Premium gift sets include: 12 of Alchemy's best titles, spinner to help select your movie, 25 popcorn bags and a special gift for each occasion |  |
| **8-PICTURE MULTI-PACK**<br><br>■ New Alchemy Line Look featuring eight of Alchemy's best-selling current titles<br>■ Titles include: Survivor, Hangman, The Runner, Frankenstein, Rampart, Howl, Kidnapping Mr. Heineken and more<br>■ SRP: $14.99 |  |
| **6-PICTURE MULTI-PACK**<br><br>■ New Alchemy Line Look featuring six of our best-selling current titles on one disc<br>■ Films feature some of todays biggest stars, including: Nicole Kidman, Jake Gyllenhaal, Kristen Wiig, Zac Efron, Nicolas Cage, Cynthia Nixon, Jack Black, Sofia Vergara, Matthew McConaughey, Kate Hudson and more<br>■ SRP: $9.99 |  |

AS89

Confidential Information Memorandum

# Business Overview
**Library Management: Top Titles**



**AS90**

## 3.    Operating Plan

Confidential Information Memorandum

# Operating Plan
## Priority Initiatives

■ Alchemy is pursuing initiatives designed to improve contribution margin on the services business (items 1-3 below) and increase the value of its library assets over time (item 4)

| Plan | Description |
|---|---|
| **1** Margin Initiatives | ■ Negotiate higher fees with existing and new content suppliers<br>■ Expand rights portfolio to include multiple channels<br>■ Shift sales mix to higher margin digital channels |
| **2** Supply Chain Improvement | ■ Outsource back end physical supply chain operations to third-party partner<br>■ Currently in negotiations with Sony Home Entertainment |
| **3** Inventory Management | ■ Moving returns processing to Technicolor to improve turnaround time<br>■ Returns Mitigation Initiative (see next page)<br>■ Improved visibility into Walmart historical sales – improved manufacturing / shipment decisions |
| **4** Library Replenishment | ■ Re-launch of new content acquisition program based on revised greenlight process<br>■ Use of free cash flow to make modestly-sized content investments in the near-term<br>■ Option to make larger (higher upside) content investments as operating cash flow grows<br>■ Further support with proposed film acquisitions fund – access to additional new content |
| **5** Holistic Distribution | ■ Adapting distribution models and content supplier base to align with changing consumer behavior<br>■ Developing direct marketing capabilities to reach distributed niche audiences<br>■ Workforce optimization to repurpose resources to emerging formats and channels |

Operating Plan                                              28

**AS92**

Confidential Information Memorandum

# Operating Plan
## Priority Initiatives (continued)

■ Alchemy has taken or is in the process of implementing numerous upgrades and operational changes to address the key priority initiatives

| | |
|---|---|
| **Margin Initiatives** | ■ Bring Alchemy value proposition into alignment with fee structures by implementing defined tiered service levels with improved profitable terms – higher fee margins for higher involvement (product planning/marketing)<br>■ Focus on business development with new content suppliers and shift existing clients into higher margin tiers of service by expanding rights portfolio<br>■ Renegotiate existing suboptimal contracts and release unprofitable business lines |
| **Supply Chain Improvement** | ■ Negotiations with Sony Home Entertainment to outsource certain supply chain operations including demand planning, VMI, order procurement, manufacturing inventory, and logistics services<br>■ Partnership will create operational efficiencies and reduce costs with a third-party market leader while ensuring stability by leveraging better rates with sister manufacturing division Sony DADC |
| **Inventory Management** | ■ Returns Mitigation Initiative underway<br>  – Return rate objectives of 40% at Walmart, and less than 35% at other retail outlets<br>  – Reduce shipments from accounts with exceptionally high returns that came over with ANconnect<br>  – Reduce initial shipments from 4 to 3 or 2 units per store and reduce replenishment orders<br>  – Management of content release dates to allow Alchemy to ship new releases and catalog titles together, thereby reducing shipping costs<br>  – Reduce on-hand stock from 3 weeks to 2 weeks expected volume<br>  – Eliminate bottom 25% of supplier product<br>■ As Alchemy builds historical sales data with Walmart, shipments will be more in line with anticipated actual sales and returns will approach normalized levels |
| **Library Replenishment** | ■ Overhaul of greenlight process and updated forecasting model<br>■ Acquisition strategy designed to add 35+ moderately priced, highly commercial titles per year to Alchemy library (steady state)<br>■ Building robust cross-channel sales analytics platform to inform the ongoing investment model (learning mechanism) |

AS93

Confidential Information Memorandum

# Operating Plan
## Strategy: Holistic, All-Channel Approach to Distribution

- New management is evaluating potential adaptations of the current distribution model and content supplier base to best align with changing consumer behavior – ultimate transition from physical to digital over time utilizing the Company's existing direct relationships with all major digital retailers

- Leveraging access to all sales channels, developing direct marketing capabilities, and expanding to include additional emerging consumption formats is key to exploiting our unique, direct-access competitive advantage in fast-changing environment





North America Filmed Entertainment Expenditures[1] ($ in billions)

|  | 2014P | 2015E | 2016E | 2017E | 2018E | 2019E | CAGR |
|---|---|---|---|---|---|---|---|
| Box Office | $ 11.2 | $ 12.3 | $ 12.7 | $ 13.1 | $ 13.6 | $ 14.0 | +3.9% |
| Physical Media | 9.9 | 9.0 | 8.2 | 7.4 | 6.8 | 6.2 | -8.9% |
| OTT/Streaming | 5.8 | 6.8 | 7.8 | 9.0 | 10.8 | 13.3 | +17.7% |

[1] Source: PWC Global Media & Entertainment Outlook 2015-2019

AS94

# Operating Plan
## Strategy: Format and Channel Agnostic

- Alchemy enjoys a unique competitive advantage as the only independent distributor with direct access to big box retail, key digital platforms, television and theatrical releasing

- New management brings the expertise to monetize creative IP across multiple formats, channels and geographies, and believes real strength and long-term competitive advantage lies in the Company's ability to quickly shift, pivot, and maneuver in response to real-time market conditions, technology trends, and shifts in consumer consumption patterns

- Alchemy's focus remains on leveraging its current strength as a direct vendor to key partners, while maintaining a strong focus on the core strategic levers it can influence to optimize ultimate profit across the entire lifecycle of creative content

- Alchemy will continue to be active in all channels, maximizing the value in its portfolio of content sources (acquired, supplied) with new and emerging distribution opportunities, using the core strategic levers to optimize ultimate performance as the entertainment distribution landscape continues to shift and strategies evolve



| | Strategic Levers | |
|---|---|---|
| New Release | **Price** | Catalog |
| Full Channel (Theatrical, Physical, Digital) | **Format** | Select Distribution Channels |
| Longer | **Window** | Shorter |
| Mass | **Placement** | Niche |
| Point of Purchase, Impulse | **Marketing** | Targeted, Consumer |



**Evolving Strategies**

**Content**
- Acquired films
- Independent supplier
  - Franchise/brands
  - Short-form and TV
  - Feature films

**Distribution**

**Levers**
- Price
- Format
- Window
- Placement
- Marketing

**Channels**
- Theatrical Exhibitors
- Brick & Mortar Retailers
- E-Commerce Retail
- Cable / Telecom
- Digital Distribution
- Streaming
- Rental & Kiosk
- Television

**Platforms**
- Physical
- Digital
- Mobile
- Web

**Business Models**
- Sell-through / EST
- Rental / VOD
- Manufacturing On-Demand
- Subscription / Streaming
- Ad-supported

Operating Plan
31

Confidential Information Memorandum

# Operating Plan
## Business Development Initiatives

- Alchemy is pursuing several business development initiatives to improve profitability and generate additional sources of revenue
- Initiatives are incremental, leveraging existing in-house talent and expertise to drive growth
- All projects are currently in the development phase with project economics in process

| Initiative | Opportunity | Resources | Potential Contribution (run rate) |
|---|---|---|---|
| **Digital Aggregation** | Leverage in-house digital operations and direct digital relationships to expand direct-to-digital opportunities | Digital sales team<br>Digital operations expertise | $500k - $1 million |
| **Marketing Services** | Execute billing for marketing services (creative, PR) to enable self-funding profit centers | Creative services team / designers | $100k - 200k |
| **eCommerce** | Simplify access to and become key aggregator for key e-commerce platforms like Walmart.com, Target.com, Bestbuy.com | Sales team | $1 million - $1.6 million |
| **Disc on Demand** | Work with Amazon Createspace and Allied Vaughn to monetize titles that do not justify traditional manufacturing | Internal resources | $150k - $350k |
| **Scan-based Trading** | Expand retail footprint to non-traditional customers (grocery, business supply, home stores, etc.) with turnkey merchandising solution | Sales team– biz dev resource<br>Merchandising fixtures<br>Studio partner (Sony)<br>Operations procurement head | TBD |

Operating Plan    32

**AS96**

Confidential Information Memorandum

# 4. Transaction Overview

AS97

Confidential Information Memorandum

# Transaction Overview
## Credit Highlights

■ Proposed financing structure presents the lender with the following credit protections:

| | |
|---|---|
| **Priority Position** | ■ Senior secured position against all assets of Alchemy<br>■ Guarantees from subsidiaries<br>■ Sponsors' position fully subordinated<br>■ Cash management via lockbox/control agreements |
| **Clean Balance Sheet** | ■ Upon closing the Term Loan, Alchemy will have no senior debt obligations other than the Term Loan [1]<br>■ Existing legacy liabilities to be retired, settled at discounts or placed on defined short-term payment plans, leaving the Company with room to operate and removing distractions from strategy execution |
| **Collateral Protection** | ■ Library, accounts receivable and physical inventory provide protection against loan position<br>■ Net exposure to operations is 2.14x NTM EBITD (see "Financial Information" – page 43) |
| **Performance Protections** | ■ Structure to benefit from maintenance tests, including Fixed Charge Coverage Ratio and Asset Coverage financial covenants<br>■ Excess cash flow sweep is designed to provide steady paydown over term |
| **Seasoned Management Team** | ■ Alchemy's new management team brings meaningful, complementary industry experience suited to addressing existing operational opportunities and pursuing the go-forward strategic plan |
| **Pledge of Existing Library** | ■ Nearly 700 film library continues to provide steady stream of cash flows<br>■ New acquisitions add to the library value and create "lift" for the back catalog titles upon re-marketing and re-licensing |
| **Minimal Forward Capital Requirements** | ■ New content acquisitions to be funded by cash flow from operations subject to the terms of the credit agreement<br>■ Low capex business and no significant medium term liabilities aside from amounts identified as use of proceeds |

[1] *Existing Virgo-led subordinate debt shall be deeply subordinated without a cash pay coupon*

AS98

Confidential Information Memorandum

# Transaction Overview
## Indicative Term Sheet

| | |
|---|---|
| Borrower: | Our Alchemy, LLC |
| Lenders: | Institutional lenders/credit investors |
| Arranger: | EMP Media Partners or its broker-dealer affiliate, Growth Capital Services, Inc. |
| Facility: | Up to $70 million multi-draw term loan or revolver |
| Closing Date: | Expected to be May [ ], 2016, or as soon as practicable |
| Tenor: | 3 years |
| Pricing: | ■ Cash coupon: 10%<br>■ Non-cash coupon TBD |
| Yield Maintenance: | Prepayable at any time subject to premium of 103-102-101 |
| Upfront Fee/Exit Fee: | 3% at closing; 3% on exit |
| Warrants: | TBD granted to Lenders at closing as detachable penny warrants in the equity of the Borrower |
| Collateral / Security: | Perfected first priority lien in all assets of the Borrower, subject to customary permitted liens |
| Use of Proceeds: | ■ Retire senior bank debt<br>■ Working capital requirements of the Borrower<br>■ Restructuring costs<br>■ Amounts reserved for payments or settlements with trade creditors<br>■ Acquisition of new film content for distribution<br>■ Transaction closing costs & expenses |
| Mandatory Prepayments: | ■ 75% ECF sweep<br>■ Asset Coverage test compliance<br>■ 100% of proceeds of Asset Sales or Equity Sales |
| Principal / Amortization: | ■ No scheduled amortization; bullet maturity |
| Key Covenants: | ■ Asset coverage and fixed charge coverage tests<br>■ No dividends; no additional debt<br>■ No change of control<br>■ Reporting requirements |
| Other: | ■ Customary affirmative and negative covenants, representations and warranties of the Borrower<br>■ Film acquisitions capacity |

AS99

Confidential Information Memorandum

# 5.   Financial Information

**AS100**

# Financial Information
## Important Notice Regarding Financial Information

There can be no assurance that the projected financial performance presented in this section will be realized. Actual results will be different from, and may be materially different from, those set forth below. The results should not be considered to be predictive of future events. Neither Alchemy's accountants nor advisors compiled or reviewed the information set forth in this section and accordingly do not express any conclusion or any other form of assurance with respect thereto. Alchemy's management made certain assumptions in preparing its results for its historic film portfolio including estimated performance of motion pictures to be distributed by Alchemy. The results set forth below are based upon the illustrative results of Alchemy's historic financial performance for the purpose of structuring Alchemy's financial model. The estimated results for Alchemy's films that were used as the basis for the projections represent sales proceeds, estimated collections and overages due, resulting in both cash receipts and amounts receivable from third party obligors and accordingly does not conform to United States Generally Accepted Accounting Principles.

Alchemy management made significant assumptions in preparing its estimated final results for all films to be produced or acquired, financed or exploited by Alchemy. The projected results set forth in the financial model are based upon significant assumptions and were prepared to generate the illustrative results of Alchemy's financial model. Alchemy's financial model has not been audited by Alchemy or any third party auditing firm. Investors are urged to complete their own due diligence with respect to Alchemy's financial model and are encouraged to ask questions of Alchemy's management and advisors with respect thereto.

The projected results presented in the financial model are based on significant assumptions and are presented for illustrative purposes only. The accuracy of the projections is limited by, among other factors, (1) the accuracy of the estimated final results for films that have yet to be acquired or distributed, (2) the hypothetical nature of certain assumptions, including assumptions regarding the timing of cash flows and the forecasted rate of film releasing, and (3) the assumptions regarding future general film and financial market conditions and events that are impossible to predict. Actual results may vary significantly and materially from the projected results presented below, and Alchemy's ability to perform as projected depends on a number of variables that cannot be predicted with certainty. Alchemy's performance could be adversely affected by a number of factors. See also "Note Concerning Forward-Looking Statements" contained herein.

**Important notice regarding historical and projected financial information:**

1. **Certain historical financial information set forth herein is unaudited.**

2. **Alchemy plans to change its fiscal year end from December 31 to March 31.**

3. **For purposes of presenting forecasts herein, "Year 1" is April 1, 2016 to March 31, 2017, "Year 2" is April 1, 2017 to March 31, 2018 and "Year 3" is April 1, 2018 to March 31, 2019. The dates are meant to conform to each consecutive annual period during the term to maturity of the Term Loan. Reference to a previous year (e.g. "2015") indicates a calendar year (January 1 – December 31).**

AS101

# Financial Information
## Outlook – Key Assumptions | Services Business

*This page is accompanied by a separate "Important Notice Regarding Information" and "Notice Concerning Forward-Looking Statements" – please read this notice prior to review of this information*

■ **Gross Revenue**

- 10% annual market decline on physical product consistent with research estimates (Source: PriceWaterhouseCoopers, "Global Entertainment and Media Outlook 2015-2019")

- Additional gross revenue decline in year 1 (relative to 2015) based on the expected termination of certain low margin ANconnect content suppliers – approximate 40% year-over-year gross revenue decline between 2015 and year 1

- New management has not yet had the opportunity to pursue business development opportunities within the services business given the historical challenges with the ANconnect transaction transition

- With a stabilized business in year 2, the outlook assumes a modest level of new business (content suppliers) plus new digital revenues to partially offset the macro physical decline – approximate 5% year-over-year gross revenue decline in years 2 and 3

■ **Contribution Margin**

- Expected improvement based on the Margin Initiatives, Supply Chain Improvement and Inventory Management efforts as described in Section 3 ("Operating Plan," see pages 28-29)

- Assumed additional margin pick up in year 1 from the expected termination of certain low margin ANconnect content suppliers

- Total contribution margin increases by 6% from 7% to 13% during the period despite a decline in revenues over the period from 2015 through year 3

| ($000s) | 2015 | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Gross Revenue | $221,521 | $128,243 | $121,831 | $115,739 |
| % Decline | | -42% | -5% | -5% |
| Contribution Margin | $16,461 | $12,142 | $14,826 | $15,539 |
| % Margin | 7% | 9% | 12% | 13% |

Financial Information

Confidential Information Memorandum

# Financial Information
## Outlook – Key Assumptions | Acquisition Business

*This page is accompanied by a separate "Important Notice Regarding Information" and "Notice Concerning Forward-Looking Statements" – please read this notice prior to review of this information*

■ Given the current liquidity constraints, Alchemy has not been actively acquiring new film content to add to its library

■ The recapitalization will relieve the downward pressure on cash flow and enable the Company to begin investing in new film content with future generated operating cash flow

■ 15 previously committed titles are slated to be released in year 1 of the projections – MGs either paid from recapitalization proceeds or operating cash flow (working capital) representing a total MG spend of $4.5 million incurred previously

■ The outlook assumes a forward-looking film acquisition strategy focused on lower MG titles within Alchemy's key genres – Action, Horror, Faith and Family – vetted through the new greenlight process

   — Illustrative titles with average MG spend of $350k per title (low of $100k and high of $1.3 million)

   — Forecasted performance based on historical observation for titles of similar genre profile and size

   — Smaller titles generate lower absolute contribution but trend to the higher ROI range relative to initial investment – average 60-70% ROI

   — Low P&A spend attributed to new released titles due to limited theatrical releases

| ($000s) | Action High | Action Low | Horror High | Horror Low | Faith | Family Live Action | Family Animated |
|---|---|---|---|---|---|---|---|
| MG | $1,250 | $225 | $238 | $100 | $150 | $200 | $350 |
| P&A Spend | 150 | - | - | - | - | - | - |
| **Total Investment** | **$1,400** | **$225** | **$238** | **$100** | **$150** | **$200** | **$350** |
| Net Revenue | $3,129 | $569 | $646 | $428 | $515 | $525 | $954 |
| Costs and Participations | (851) | (208) | (280) | (208) | (228) | (194) | (331) |
| **Gross Contribution** | **$2,278** | **$361** | **$366** | **$220** | **$287** | **$331** | **$623** |
| ROI | 63% | 60% | 54% | 120% | 91% | 66% | 78% |

Financial Information        39

Confidential Information Memorandum

# Financial Information
## Outlook – Key Assumptions | Overhead ($000s)

*This page is accompanied by a separate "Important Notice Regarding Information" and "Notice Concerning Forward-Looking Statements" – please read this notice prior to review of this information*

- New management has taken steps to right-size overhead and headcount within the Alchemy business
  - Since 2009, there has been limited proactive management of Alchemy's headcount and as a result, overhead grew more than the business warranted over the last six years
  - In addition, the ANconnect transaction added incremental headcount redundancy that needed to be rationalized post-transition
  - SG&A reductions have been made to better reflect both the forecasted revenue base and with a focus on operational efficiencies
  - Since January 2016, Alchemy has eliminated 52% of the post-ANconnect transaction workforce to 77 heads
  - Two LA offices have been closed and the business now operates with offices in Los Angeles and Bentonville
  - Curtailed excessive T&E (selling expenses) and increased monitoring of employee expenses
- Additional strategic planning is underway to further streamline the organization in order to align overhead with the services and acquisitions businesses

| ($000s) | 2015 | Year 1 | Year 2 | Year 3 |
|---|---|---|---|---|
| Personnel & Consulting | $15,508 | $8,287 | $8,240 | $8,487 |
| Office & Selling Expenses | 1,366 | 589 | 589 | 589 |
| Legal & Accounting[1] | 557 | 168 | 168 | 168 |
| Occupancy Costs | 1,212 | 670 | 360 | 360 |
| IT Expenses | 997 | 300 | 300 | 300 |
| Total | $19,640 | $10,014 | $9,657 | $9,904 |

[1] 2015 legal & accounting includes non-recurring expenses related to the ANconnect transaction.

Financial Information                    40

AS104

Confidential Information Memorandum

# Financial Information
## Outlook – Forecasted Performance

*This page is accompanied by a separate 'Important Notice Regarding Information' and 'Notice Concerning Forward-Looking Statements' – please read this notice prior to review of this information*

| ($ in 000s) | Year 1 - FY 2017 | | | | Year 2 - FY 2018 | | | | Year 3 - FY 2019 | | | | Year 1 FY 2017 | Year 2 FY 2018 | Year 3 FY 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q2-2016 | Q3-2016 | Q1-2017 | | Q2-2017 | Q3-2017 | Q4-2017 | Q1-2018 | Q2-2018 | Q3-2018 | Q4-2018 | Q1-2018 | | | |
| Alchemy Acquired Films Released | 0 | 4 | 2 | – | – | 1 | 10 | 12 | 6 | 13 | 11 | 12 | 15 | 23 | 44 |
| Media Fund I Films Released[1] | – | – | – | 11 | 6 | 12 | – | – | – | – | – | – | 11 | 20 | – |
| Total Films Released | 0 | 4 | 2 | 11 | 8 | 13 | 10 | 12 | 6 | 13 | 11 | 12 | 26 | 43 | 44 |
| **Gross Revenues** | | | | | | | | | | | | | | | |
| Alchemy Slate | 2,756 | 3,670 | 1,701 | 408 | 290 | 726 | 9,485 | 8,411 | 14,128 | 17,176 | 13,761 | 11,158 | 8,535 | 19,911 | 56,225 |
| Catalog | 2,064 | 2,746 | 2,461 | 3,519 | 1,817 | 2,417 | 2,166 | 3,097 | 1,589 | 2,127 | 1,906 | 2,726 | 10,791 | 9,406 | 8,357 |
| Alchemy Acquired Films | 4,920 | 6,416 | 4,163 | 3,927 | 2,186 | 3,143 | 11,649 | 12,986 | 15,727 | 19,302 | 15,667 | 13,884 | 19,326 | 29,407 | 64,580 |
| Third Party Suppliers[2] | 25,776 | 29,570 | 37,146 | 41,873 | 37,794 | 43,747 | 38,762 | 39,682 | 23,844 | 27,456 | 34,241 | 33,422 | 133,972 | 155,985 | 118,964 |
| Total Gross Revenues | 530,088 | 536,992 | 541,309 | 548,799 | 538,900 | 548,890 | 560,411 | 548,190 | 538,871 | 546,789 | 548,908 | 547,306 | $153,198 | $185,282 | $183,544 |
| Alchemy Acquired Films | 3,336 | 4,454 | 3,133 | 2,683 | 1,491 | 2,190 | 7,786 | 8,536 | 19,087 | 13,323 | 10,826 | 9,480 | 13,606 | 29,006 | 44,236 |
| Third Party Suppliers[2] | 12,029 | 16,931 | 22,879 | 26,334 | 24,432 | 26,234 | 24,964 | 22,391 | 19,131 | 17,654 | 21,665 | 20,962 | 78,174 | 100,041 | 74,812 |
| Total Net Revenues | $16,366 | $21,386 | $26,013 | $29,018 | $25,924 | $28,424 | $32,750 | $30,930 | $26,737 | $30,377 | $32,490 | $30,443 | $91,780 | $130,047 | $119,047 |
| Alchemy Theatrical P&A | (400) | (250) | – | – | – | – | (300) | – | (500) | (300) | (300) | – | (650) | (300) | (1,200) |
| Alchemy MG Expense | – | – | – | – | – | (236) | (4,034) | (2,660) | (8,690) | (4,551) | (4,231) | (2,560) | – | (6,933) | (17,972) |
| Other COGS & Distribution Costs | (4,675) | (6,031) | (6,047) | (7,427) | (7,864) | (8,365) | (9,043) | (7,843) | (6,870) | (6,349) | (7,651) | (7,542) | (24,180) | (31,540) | (30,712) |
| Participations | (6,561) | (10,353) | (14,409) | (16,105) | (13,525) | (15,475) | (15,754) | (14,372) | (9,514) | (10,577) | (13,345) | (12,988) | (47,638) | (59,129) | (46,424) |
| Total Expenses | (11,636) | (16,644) | (20,456) | (23,632) | (30,689) | (34,304) | (29,132) | (34,877) | (27,634) | (23,786) | (25,727) | (23,291) | (72,468) | (97,902) | (96,408) |
| **Contribution** | | | | | | | | | | | | | | | |
| Alchemy Slate | 965 | 1,060 | 1,126 | 303 | 199 | 122 | (649) | 950 | (810) | 2,115 | 1,692 | 2,007 | 3,459 | 632 | 5,005 |
| Catalog | 398 | 849 | 857 | 1,086 | 632 | 841 | 754 | 930 | 556 | 740 | 663 | 825 | 3,169 | 3,165 | 2,785 |
| Alchemy Acquired Films | 1,362 | 1,914 | 1,963 | 1,360 | 831 | 964 | 114 | 1,868 | (253) | 2,856 | 2,353 | 2,633 | 6,625 | 3,797 | 7,788 |
| Media Fund I | – | – | – | 543 | 1,381 | 1,639 | 399 | 122 | 100 | 79 | 69 | 70 | 543 | 3,022 | 311 |
| MMS | 563 | 779 | 777 | 884 | 802 | 867 | 855 | 917 | 847 | 1,021 | 935 | 968 | 2,923 | 3,572 | 3,770 |
| PB3 | 132 | 199 | 743 | 781 | 293 | 266 | 994 | 866 | 222 | 292 | 1,090 | 949 | 1,795 | 2,929 | 2,550 |
| Red Cloud | 1,353 | 1,949 | 2,954 | 2,065 | 2,116 | 2,304 | 2,344 | 2,299 | 2,187 | 2,379 | 2,318 | 2,322 | 7,424 | 8,925 | 9,217 |
| Third Party Suppliers[2] | 2,067 | 2,926 | 3,574 | 4,116 | 4,904 | 5,197 | 4,523 | 4,164 | 3,306 | 3,765 | 4,410 | 4,319 | 12,660 | 18,345 | 15,854 |
| Total Contribution from Content | $3,429 | $4,841 | $6,607 | $6,485 | $6,336 | $6,121 | $4,637 | $6,062 | $3,103 | $6,621 | $6,763 | $7,182 | $19,313 | $23,145 | $23,639 |
| % of Net Revenues | 22% | 23% | 21% | 19% | 21% | 20% | 14% | 20% | 12% | 22% | 21% | 23% | 21% | 18% | 20% |
| SG&A | (2,952) | (2,354) | (2,354) | (2,354) | (2,414) | (2,414) | (2,414) | (2,414) | (2,476) | (2,476) | (2,476) | (2,476) | (10,014) | (9,657) | (9,904) |
| EBITD | 478 | 2,487 | 3,202 | 3,131 | 2,921 | 2,706 | 2,223 | 3,638 | 627 | 4,145 | 4,287 | 4,676 | 9,298 | 12,488 | 13,735 |
| % of Net Revenues | 3.1% | 11.6% | 12.3% | 10.8% | 11.3% | 12.2% | 6.8% | 11.8% | 2.4% | 13.6% | 13.2% | 15.4% | 10.1% | 10.4% | 11.5% |
| Interest Expense | (1,700) | (1,700) | (1,700) | (1,741) | (1,722) | (1,704) | (1,665) | (1,651) | (1,615) | (1,606) | (1,557) | (1,474) | (6,901) | (6,746) | (6,250) |
| Capital Expenditures | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (50) | (200) | (200) | (200) |
| Change in Working Capital | (1,401) | (175) | 755 | 565 | (2,246) | 1,650 | (1,453) | 663 | (1,465) | 1,399 | 1,591 | 1,805 | (275) | (1,066) | 2,652 |
| Free Cash Flow | (2,734) | 912 | 3,190 | 1,906 | (1,097) | 3,603 | (949) | 2,899 | (2,904) | 3,697 | 3,782 | 4,968 | 1,884 | 4,456 | 9,931 |
| Excess Cash Flow Sweep | | – | – | (1,153)[2] | – | (2,158) | – | (2,003)[2] | – | (1,305) | (3,185) | (3,085) | (1,115) | (4,160) | (8,165) |
| Ending Cash Balance | PF 3/31/2016 $2,603 | (121) | 391 | 2,581 | 3,372 | 2,274 | 3,719 | 2,771 | 2,668 | 1,163 | 3,465 | 4,062 | 5,434 | 33,372 | 33,656 | 35,434 |
| Senior Debt | 70,000 | 70,000 | 70,000 | 70,000 | 68,865 | 66,727 | 66,727 | 64,724 | 64,724 | 63,330 | 60,145 | 56,908 | 68,865 | 64,724 | 56,908 |

[1] Assumes Media Fund I invests up to $5mm in new film content (similar profile as new Alchemy films) at any given time with no acquisitions post Q3 2017. Assumes Alchemy earns a distribution fee equal to 15% of net revenues
[2] Third Party Suppliers include services business and Media Fund I

Financial Information     41

**AS105**

Confidential Information Memorandum

# Financial Information
## Outlook – Summary of Forecasted Results

*This page is accompanied by a separate "Important Notice Regarding Information" and "Notice Concerning Forward-Looking Statements" – please read this notice prior to review of this information*

■ **Financial Performance**

- Year 1 EBITD of $9.3 million (back to 2012-2013 levels) growing to $13.7 million by year 3

- Alchemy acquires 67 new films within the forecast period to replenish its library – $24 million in total new MG spend

- Debt paydown of $14.7 million (20% of original balance) during the forecast period with net leverage of 3.6x by the end of year 3 upon maturity of the term loan

■ **Opportunities for Upside**

- Execution of identified business development initiatives (see page 32)

- Successful business development efforts to secure additional content suppliers for the services business (modest assumption in the outlook)

- Acquisition of larger film films with broader release (theatrical) potential and greater performance upside

- Higher throughput from Media Fund I – ongoing recycling of capital within the Fund (outlook assumes no acquisitions beyond year 2) and/or additional capital investment in the Fund

**AS106**

Confidential Information Memorandum

# Financial Information
## Preliminary Asset Coverage ($000s)

*This page is accompanied by a separate "Important Notice Regarding Information" and "Notice Concerning Forward-Looking Statements" – please read this notice prior to review of this information*

- Consistent de-levering during the 3-year term
- Asset coverage improves during forecast period through debt paydown coupled with steady build of content assets
- At or near scheduled maturity, credit metrics as measured by asset coverage and EBITD leverage improve to support refinancing capacity

| | Pro Forma at Closing March 31, 2016 | Year 1 ended March 31, 2017 | Year 2 ended March 31, 2018 | Year 3 ended March 31, 2019 | Notes |
|---|---|---|---|---|---|
| **Defined Assets ("A")** | | | | | |
| Accounts Receivable, net | $20,647 | $18,309 | $19,774 | $19,911 | |
| Inventory, net | 11,737 | 8,094 | 7,671 | 10,475 | 1 |
| Back Catalog | 29,285 | 22,184 | 21,513 | 18,284 | 2 |
| New Content Ultimates | 0 | 2,957 | 4,583 | 5,919 | 3 |
| Total Defined Assets | $61,668 | $51,545 | $53,541 | $54,589 | |
| | | | | | |
| **Defined Liabilities ("B")** | | | | | |
| Term Loan Ending Balance | $70,000 | $68,885 | $64,724 | $56,560 | |
| Less: Cash | (2,603) | (3,372) | (3,668) | (5,434) | |
| Net Debt | $67,397 | $65,513 | $61,057 | $51,125 | |
| | | | | | |
| Asset Coverage Ratio (A/B) | 91.5% | 78.7% | 87.7% | 106.8% | |
| Net Debt less Assets (B-A) | $5,729 | $13,968 | $7,516 | ($3,463) | |
| Next 12 mo. EBITD (ex-Catalog and New Content) | 2,671 | 8,691 | 5,947 | 5,947 | 4 |
| Net Debt to Forward EBITD multiple | 2.14x | 1.61x | 1.26x | (0.58x) | |

[1] Assumes liquidation values per unit of $0.50, $1.53 and $3.50 for non-productive, catalog and new release titles, respectively.
[2] Assumes 5.0x multiple on next twelve-month cash flow.
[3] NPV of ultimates of acquired titles at 12% discount rate.
[4] Assumes Year 4 is same as Year 3.

Financial Information

43

AS107

Confidential Information Memorandum

# Financial Information
## Liability Management Strategy ($000s)

*This page is accompanied by a separate 'Important Notice Regarding Information' and 'Notice Concerning Forward-Looking Statements' – please read this notice prior to review of this information*

- Alchemy is currently burdened with an estimated $22.4 million of legacy liabilities related to the ANconnect transaction and transition plus payables 'overhang' from the historical acquistions business

  - Legacy liabilities are offset by approximately $9 million in unrecouped amounts related to the services business (asset to Alchemy)

- For illustrative purposes, Alchemy estimates settling such legacy liabilities at approximately 80% of outstanding value or a $4 million reduction

  - Settled legacy liabilities shall be repaid at closing or placed under a defined 12 month payment plan post-closing

- Alchemy currently has $22.4 million in current (Go Forward Business) liabilities – including MG committments for current and future releases

  - 100% of current obligations to active content suppliers for the services business shall be paid at closing – creates the best 'starting point' post-closing to maximize go forward potential of the services business

| | Legacy Liabilities | Current Liabilities | Total Liabilities | Estimated Legacy Settlement | Revised Total Liabilities | Paid @ Closing | Go Forward Business Liabilities | Key Commentary |
|---|---|---|---|---|---|---|---|---|
| **Accounts Payable** | | | | | | | | |
| Sony DADC | - | 5,606 | 5,606 | - | 5,606 | - | 5,606 | Payment post-closing in normal course |
| Trade Vendors | 2,541 | 690 | 3,230 | 2,541 | 3,230 | 2,541 | 690 | Payment of past due balances at closing |
| Subtotal | 2,541 | 6,296 | 8,836 | 2,541 | 8,836 | 2,541 | 6,296 | |
| | | | | | | | | |
| **Payable to Content Partners** | | | | | | | | |
| Services Business | 5,713 | 13,568 | 19,280 | 4,833 | 18,400 | 13,568 | 4,833 | Legacy settlement at 85% plus payment plan |
| Historical Acquisition Business | 3,900 | - | 3,900 | 3,310 | 3,310 | 3,310 | - | Legacy settlement at 85% and paid at closing |
| Subtotal | 9,613 | 13,568 | 23,180 | 8,142 | 21,710 | 16,877 | 4,833 | |
| | | | | | | | | |
| **Film Acquisitions** | | | | | | | | |
| Previously Released | 5,501 | - | 5,501 | 3,876 | 3,876 | 2,188 | 1,688 | Settlement of legacy amounts at 70% plus payment plan |
| Current & Future Releases | - | 3,536 | 3,536 | - | 3,536 | 2,586 | 951 | Payment post-closing in normal course |
| Subtotal | 5,501 | 3,536 | 9,037 | 3,876 | 7,412 | 4,773 | 2,638 | |
| | | | | | | | | |
| Other | | | | | | | | |
| ANconnect Transaction[1] | 4,742 | - | 4,742 | 3,330 | 3,330 | - | 3,330 | Legacy settlement at 70% plus payment plan |
| Subtotal | 4,742 | - | 4,742 | 3,330 | 3,330 | - | 3,330 | |
| | | | | | | | | |
| **Total Liabilities** | 22,397 | 23,399 | 45,796 | 17,889 | 41,288 | 24,191 | 17,097 | |

[1] *Estimated post-closing reconciliation payment due to Anderson, process ongoing to finalize obligations*

Financial Information      44

AS108

# Financial Information
## Accounts Receivable and Key Distribution Channels ($000s)

*This page is accompanied by a separate "Important Notice Regarding Information" and "Notice Concerning Forward-Looking Statements" – please read this notice prior to review of this information*

| | Accounts Receivable as of March 31, 2016 | | | | Distribution Channel Sales Gross Revenues July 2015 – March 2016 | | |
|---|---|---|---|---|---|---|---|
| | Account | Amount | % of Total | | Retailer | Amount | % of Total |
| 1 | Best Buy Corporate | $ 8,059.4 | 24.6% | 1 | Walmart | $ 79,796.0 | 51.8% |
| 2 | Walmart | 7,901.0 | 24.1% | 2 | Target Corporation | 25,884.5 | 16.8% |
| 3 | Target Corporation | 7,065.1 | 21.6% | 3 | Best Buy Corporate | 11,673.9 | 7.6% |
| 4 | Netflix | 2,913.6 | 8.9% | 4 | Ingram Entertainment Inc. | 8,787.2 | 5.7% |
| 5 | Ingram Entertainment | 1,932.4 | 5.9% | 5 | Costco Wholesale | 7,118.0 | 4.6% |
| 6 | Showtime | 1,105.0 | 3.4% | 6 | Sam's Wholesale | 6,135.0 | 4.0% |
| 7 | Phase 4 Walmart | 1,043.8 | 3.2% | 7 | Redbox Automated DVD Rental | 2,101.6 | 1.4% |
| 8 | Costco Wholesale | 967.4 | 3.0% | 8 | Amazon VOD | 1,652.6 | 1.1% |
| 9 | Starz/Encore (US) | 349.7 | 1.1% | 9 | Apple (iTunes) | 1,496.0 | 1.0% |
| 10 | BJ's Wholesale | 229.6 | 0.7% | 10 | Aec One Stop Group | 1,376.9 | 0.9% |
| 11 | Redbox Automated DVD Rental | 205.0 | 0.6% | 11 | K-Mart Sbt | 1,234.3 | 0.8% |
| 12 | Amazon.com | 193.3 | 0.6% | 12 | Baker & Taylor | 886.2 | 0.6% |
| 13 | Viacom Media Networks | 150.0 | 0.5% | 13 | Wax Works Video | 851.2 | 0.6% |
| 14 | Baker & Taylor | 132.5 | 0.4% | 14 | Ingram Family Video | 770.1 | 0.5% |
| 15 | Midwest Tape | 83.7 | 0.3% | 15 | Vudu, Inc. | 692.9 | 0.4% |
| 16 | In Demand | 73.3 | 0.2% | 16 | Midwest Tape | 683.6 | 0.4% |
| 17 | K-Mart Sbt | 66.8 | 0.2% | 17 | Netflix | 601.6 | 0.4% |
| 18 | International Family (US) | 50.0 | 0.2% | 18 | BJ's Wholesale | 511.6 | 0.3% |
| 19 | Freestyle Releasing | 49.6 | 0.2% | 19 | Hastings | 276.0 | 0.2% |
| 20 | Transworld Entertainment | 42.7 | 0.1% | 20 | Transworld Entertainment | 235.7 | 0.2% |
| 21 | Emi Cmg Distribution | 24.5 | 0.1% | 21 | Eurpac Warehouse Sales | 219.1 | 0.1% |
| 22 | Pacific Northwest Pictures | 24.0 | 0.1% | 22 | Microsoft | 213.4 | 0.1% |
| 23 | Verizon | 21.1 | 0.1% | 23 | Youtube (Google, Inc.) | 194.0 | 0.1% |
| 24 | Tiger Direct | 13.3 | 0.0% | 24 | Hoopla (By Midwest Tape) | 185.1 | 0.1% |
| 25 | Sam's Wholesale | 11.6 | 0.0% | 25 | Dollar General | 163.0 | 0.1% |
| | Total Top 25 | $ 32,708.4 | 99.8% | 26 | Deuce Entertainment | 157.7 | 0.1% |
| | Total - All A/R | 32,779.3 | 100.0% | 27 | Amazon.com | 154.5 | 0.1% |
| | | | | | Total | $154,051.9 | 100.0% |

Confidential Information Memorandum

# 6.    Appendix

AS110

Confidential Information Memorandum

# Appendix
## Executive Biographies

**Scott Guthrie, Co-President**
Scott Guthrie is the Co-President of Alchemy where he oversees Physical and Digital Sales, Operations and Supply Chain, Finance and the Arc and BFF partnerships. Guthrie brings over 25 years of management experience crossing sales, marketing and operations and is recognized for his ability to lead transformative business initiatives in consumer-driven categories and scale them across global markets. He has held key executive roles in business from start-ups to Fortune 500 companies including entertainment giants Paramount, MTV, THQ and The Walt Disney Company. Harnessing an extensive network of partnerships, Guthrie has built out both physical and digital distribution channels and led the creation of global footprints for leading entertainment brands such as Disney, Pixar, Nickelodeon, Marvel, Dreamworks, Rock Band and UFC.

**Kelly Summers, Co-President**
Kelly Summers is the Co-President of Alchemy where she oversees Marketing, Acquisitions, Product Management, Legal Affairs, FP&A and Business Analytics. Summers held executive roles at The Walt Disney Studios, where she led strategy, new product development, and digital distribution for the company's portfolio of film and television brands. During her tenure, she brokered the studio's first iTunes movie deal with Apple, launching the digital movie category and growing the studio's digital business into a multi-million dollar global operation. Throughout her career, she has collaborated with some of the industry's most recognizable and acclaimed filmmakers from Jerry Bruckheimer Productions, Miramax, Touchstone, Pixar Animation Studios, and Walt Disney Pictures. Summers also led strategy and integrated marketing with major global brands including Apple, Marvel, Netflix, Facebook, Amazon, Microsoft and Google.

**Jeff Ivers, Advisor**
Jeff Ivers joined Alchemy as an Advisor in January, 2016. He is a thirty-year industry veteran of studio and independent production and distribution (MGM, Orion Pictures. Triton Pictures, Motion Picture Corporation of America, Participant Media, most recently as founding CFO, then Head of Business Affairs and COO). Before becoming directly involved in the production/acquisition/distribution of hundreds of films, and Executive Producing twenty, he was a practicing CPA with Arthur Andersen & Co. He is a member of the Executive Branch of the Motion Picture Academy.

**AS111**

Confidential Information Memorandum

# Appendix
## Executive Biographies

**Norbert Hudak, SVP Acquisitions & Product Management**

Norbert Hudak is Senior Vice President of Acquisitions and Product Management at Alchemy where he develops, acquires and maximizes Alchemy's action, horror, faith, family, urban and documentary slates, and manages supplier relationships. Hudak was previously SVP of Marketing and Brand Management at Cinedigm Corp. Throughout his career he has overseen relationships with and developed strategies for major entertainment brands such as The Weinstein Co, Shout! Factory, NFL, WWE, National Geographic, Discovery, Scholastic, Jim Henson Company, Classic Media, Sesame Workshop, Codeblack Entertainment, PureFlix, and Televisa. Prior to Cinedigm, Hudak held similar positions at Gaiam Vivendi, Vivendi Entertainment, and Genius Products. Hudak started his entertainment career at Warner Bros Home Entertainment.

**Jack Talley, Executive Vice President, Sales**

Jack Talley is Alchemy's Executive Vice President of Sales overseeing sales and overall strategy of the company's physical and digital distribution channels. Talley previously worked with Sony Pictures Home Entertainment for ten years most recently as the company's Executive Vice President. In his role, Talley led the North American Commercial Team that achieved annual revenues in the billions. Prior to joining SPHE, Talley oversaw MGM's Grocery and Drug sales division and played an integral role in the strategic development and implementation of the Scan Based Trading business model. Talley's work experiences also have included Best Video, ETD, Sound Video, Media Home Entertainment and Celebrity Home Entertainment.

**Julie Rolf, Senior Vice President, Operations**

Julie Rolf serves as Alchemy's Vice President of Operations overseeing Demand Planning, Distribution, Vendor-Managed Inventory, Customer Service, Sales Planning & Reporting, and Post Production. Rolf is a seasoned Operations & Change Management Leader with more than 20 years of managing complex, multifunctional projects that establish operational excellence and improve profitability for global home entertainment organizations. Her background includes supply chain operations, project and change management leader roles with organizations including The Walt Disney Company to ensure business continuity and growth through global process optimization, systems consolidations, and best application/process recommendations.

AS112

# Appendix
## Executive Biographies

**Lawrence Kelly, Senior Vice President, Strategy & Planning**

Lawrence Kelly joined Alchemy as VP of Financial Planning & Analysis in November 2015 and oversees Budgets and Planning, Film Ultimates and Acquisitions Analysis. Lawrence has many years of Theatrical, TV and Home Entertainment experience at the major studios. Previously, he was SVP of Finance, Creative Services for Deluxe Entertainment. Before Deluxe, he was at Warner Bros. for 12 years as VP of Finance & Strategy, The Americas for Warner's Home Entertainment Group, and previously as VP of Finance & Strategy for Asia Pacific & Latin America. From working at Warner Bros., Universal Studios, and Paramount Pictures collectively, Lawrence was a key participant in the studios' financial and strategic planning, international operations, production finance, theatrical acquisitions, and complex deal structuring with a variety of studio and feature production companies as well as international partners.

**Richard Zerbal, Senior Vice President, Accounting & Finance**

Prior to joining Alchemy, Richard spent eight years at Paramount Pictures as the Vice President of Finance for the Home Media division, where he was responsible for Financial Reporting. Richard's background includes controllership roles at Vivendi Games, Primedia, and eight years in accounting and finance for The Walt Disney Company. Richard began his accounting career with PriceWaterhouseCoopers, and holds a BS and MS in Accounting from Brigham Young.

**Jennifer Dunlap, Senior Vice President, Creative Services**

Jennifer Dunlap is Senior Vice President of Creative Services for Alchemy where she oversees the creative advertising campaigns for the company's slate of films across all distribution channels including Theatrical, DVD/BD, VOD, Digital and Cable/Satellite. One of the original members that launched the US division of Summit Home Entertainment, Dunlap served as Senior Vice President of Home Entertainment Marketing Creative Services. Prior to Summit, Dunlap spent nine years at Warner and started her career in entertainment at Buena Vista Home Entertainment, a Division of Disney.

**Jerry McGlynn, Chief Technology Officer**

Jerry McGlynn serves as Alchemy's Chief Technology Officer where he spearheads the centralization of Alchemy's IT and operations, and oversees the company's existing digital platform. Prior to Alchemy McGlynn was the Vice President of Global Technology & Architecture at Quiksilver, and served in various executive IT roles at The Walt Disney Company for more than 15 years.

AS113

Confidential Information Memorandum

# Appendix
### Timeline



AS114

# Appendix
## Content Acquisitions Sample: Horror Genre – "Hangman" February 2016

| | |
|---|---|
| **Key Acquisition Metrics** | ■ Minimum guarantee: $175K<br>■ 25% distribution fee, 30% backend net participation<br>■ 77.3% ROI, 1.6x cash-on-cash coverage ratio |
| **Qualitative & Marketing Elements** | ■ Written, directed, produced by Adam Mason (The Devil's Chair, Broken, Blood River)<br>■ Commercial acting talent: Jemery Sisto (Clueless, Law & Order, Wicked City), Amy Smart (Road Trip, Felicity, The Single Mom's Club), Kate Ashfield (Shaun of the Dead, United, The Best Man)<br>■ Rated 6.9 of 10 on IMDB, 100% "want to see" on Rotten Tomatoes<br>■ Selected by SXSW (South by Southwest Film Festival) 2015, launched at Toronto Film Festival<br>■ Cast will support film through social media with 150K followers<br>■ "Found footage" films have large following (e.g., Paranormal Activity franchise grossed $350M DBO)<br>■ Strong reviews from industry (Variety, THR), and genre trades (The Horror Show, Jimmy O) |
| **Target Audience & Channels** | ■ M/F 18+<br>■ Physical, digital, cable/sat, ancillaries |
| **Home Entertainment Commercial Plan** | ■ Research shows calendar Q1 is a strong quarter for horror titles; title held for 2/2 release date<br>■ Collaborative effort to steer artwork into more proven "stalker" territory over the overexposed "found footage" genre; led to securing Tier 1 placement in retail and digital platforms<br>■ Social media marketing plan supported by cast, concentrated around film's launch<br>■ February release allows for full lifecyle planning, with re-promotion and price program put in place for Sep/Oct Halloween season, and included in all Horror promotions<br>■ In year two, title can be placed in value locations, and combined with other strong Horror genre titles to form multi-packs and features |
| **Key Performance Metrics** | ■ Physical net ship dollars total $687K, with impressive 20% sold through by end of second week at Walmart, no week-two decay, and continued replenishment<br>■ Digital has reached 55% of expected ultimate contribution in first 8 weeks<br>■ Cable/sate has reached 30% of expected ultimate contribution in first 8 weeks |

Confidential Information Memorandum

# Appendix
## Data Room Access

- Borrower to circulate data room access instructions upon request
- Data room to include:
  - Summary Term Sheet for the Facility for purposes of LOI or commitment letters
  - Descriptive materials regarding Alchemy's business, financial information
  - Material agreements
    - > Key supplier agreements
    - > Key terms – Walmart
    - > Sample greenlight memo
    - > Systems and operating software
    - > Internal credit policies and procedures
    - > Returns reserves policies
    - > Historical charge-offs

**AS116**